UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

FILED

2004 SEP 24  P 2:50

DISTRICT COURT

BARBARA CAMPBELL,   )
)
Plaintiff,   )   Civil No. 3:03 CV 0520 (JCH)
)
v.   )
)
WINDHAM COMMUNITY MEMORIAL   )   September 24, 2004
HOSPITAL, INC. and   )
HATCH HOSPITAL CORP.   )
)
Defendants.   )

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**I. INTRODUCTION**

Plaintiff Barbara Campbell ("plaintiff") has brought a seven-count Complaint against her former employer Windham Community Memorial Hospital, Inc. ("Hospital") and its corporate parent Hatch Hospital Corporation (collectively "defendants") asserting a host of claims under federal and Connecticut anti-discrimination statutes and state common law. Specifically, plaintiff alleges that she was denied a full-time position as Staff Chaplain and Director of Pastoral Care ("Staff Chaplain"), was given a poor performance evaluation and had her probationary employment period extended, and was ultimately forced to resign as Staff Chaplain on account of her religion and gender and because of her opposition to religious and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e and the Civil Rights Act of 1991 ("Title VII") and Connecticut's Fair Employment

Practices Act, C.G.S. § 46a-58 *et seq.* ("CFEPA")(Complaint, at Counts 1 through 4). She further contends that she was terminated in violation of Connecticut public policy (i.e., because she submitted a written statement in response to disputed information contained in her personnel file (Complaint, at Count 5) and because she opposed religious discrimination in a place of public accommodation (Complaint, at Count 6). Finally, she alleges that she was terminated for exercising her rights under the federal and Connecticut Constitutions in violation of C.G.S. § 31-51q. (Complaint, at Count 7). Defendants now move for summary judgment with respect to Counts 1 through 7 of the Complaint.

Defendants are entitled to summary judgment with respect to plaintiff's claims of religious and gender discrimination and retaliation for several reasons. First, plaintiff cannot establish a *prima facie* case of religious or gender discrimination inasmuch as the circumstances surrounding the adverse employment actions do not give rise to an inference of discrimination. Second, plaintiff cannot establish that she engaged in any activity protected by Title VII or the CFEPA. Third, plaintiff cannot adduce any evidence that the legitimate and non-discriminatory reasons proffered by defendants for the adverse employment actions are a pretext for unlawful discrimination or retaliation.

Defendants are entitled to summary judgment with respect to plaintiff's pendent state law cause of action for wrongful discharge predicated upon C.G.S. § 31-128e, Connecticut's Personnel Files Act, inasmuch as that statute does not embody a public policy that would foreclose defendants from taking adverse action against plaintiff on account of the content of her written statements concerning her performance evaluation and, in any event, there is no dispute that defendants complied with the provisions of the statute. In addition, plaintiff's wrongful discharge claim premised upon C.G.S. § 46a-64 fails for the same reason as do her claims for

2

religious discrimination under Title VII and the CFEPA (i.e., she cannot establish that the Hospital engaged in any religious discrimination much less that she was terminated on account of her opposition to discrimination). Finally, defendants are entitled to summary judgment with regard to plaintiff's claim arising under C.G.S. § 31-51q because it is undisputed that plaintiff's rigid insistence that the Hospital comply with standards promulgated by the Joint Commission on the Accreditation of Healthcare Organizations ("JCAHO") and with the proposed privacy provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as she interpreted them, substantially and materially interfered with her job performance.

## II.   FACTS

### A.   General Background

Defendant Hospital is a private, non-profit, non-denominational, community Hospital in Willimantic, Connecticut. (Defendants' Local Rule 56(a)1 Statement of Undisputed Facts, at ¶ 1).[1] In or about March 2000, the Hospital decided to hire a Staff Chaplain in order to plan and coordinate pastoral care at the Hospital and to address the religious needs of the Hospital community including patients, family members and friends, Hospital staff and volunteers. (Undisputed Facts, at ¶ 18). The Staff Chaplain was required to serve as the Hospital's liaison to the local religious community and to coordinate the work of volunteer lay clergy; specifically, Delphis Beaulieu ("Mr. Beaulieu") and his wife Juanita Beaulieu ("Mrs. Beaulieu")(collectively "the Beaulieus"). (Id.).

Since approximately 1987, the Beaulieus have visited Roman Catholic patients at the Hospital. (Undisputed Facts, at ¶ 4). In addition to visiting patients, Mr. Beaulieu has served on

---

[1] Defendants' Local Rule 56(a)1 Statement of Undisputed Facts, filed herewith, is hereinafter referred to as "Undisputed Facts, at ¶ __."

3

the Hospital's Pastoral Care Advisory Committee ("PCAC") for more than a decade and was chairperson of the PCAC from approximately 1997 through June 2001. (Undisputed Facts, at ¶ 5). The PCAC is comprised of representatives of the local religious community and is intended to provide local clergy input into the manner in which the Hospital provides for the spiritual needs of its patients. (Id.). In approximately 1996, the PCAC solicited funds from various local parishes and congregations in order to furnish a chaplain's office at the Hospital. (Undisputed Facts, at ¶ 6). The office is utilized by the Beaulieus and other religious volunteers and local clergy and was designated by the Hospital as the office for the Staff Chaplain. (Id.).

The Staff Chaplain reported to Allison Breault ("Breault")(Vice President of Patient Care Services). (Undisputed Facts, at ¶ 15). In addition, Shawn Maynard ("Maynard") (Administrative Director of Communications and Volunteer Services), on account of his experience as a supervisor of the Hospital's volunteers and as the Hospital's liaison to the PCAC, had input into the Staff Chaplain's job performance and served as a resource to the Staff Chaplain. (Id.).

The Hospital considered several sources of outside funding for the Staff Chaplain position, including the Roman Catholic and Episcopal Dioceses, local church groups and grants. (Undisputed Facts, at ¶ 10). Ultimately, the Hospital concluded that the Staff Chaplain position would be a 30-hour per week position. (Undisputed Facts, at ¶ 16).

**B.    The Recruitment Process**

Breault, Maynard and Marty Levine ("Levine")(Vice President of Human Resources) conducted preliminary telephone interviews with the applicants for the Staff Chaplain position. (Undisputed Facts, at ¶ 11). Following these initial screening interviews, some applicants were invited to the Hospital for additional interviews with members of the Hospital's Staff Chaplain

4

Task Force ("Task Force"), which was comprised of a cross-section of Hospital employees, physicians, and local clergy. (Id.). Members of the Task Force included Maynard, Levine, Mary Barry, M.D. ("Dr. Barry"), Robin Begansky ("Begansky"), Dawn Noel ("Noel"), Vincent Stephens, M.D. ("Dr. Stephens"), Reverend Ana Maria Falcon-Garcia ("Reverend Falcon-Garcia"), Reverend Scott Stevens ("Reverend Stevens"), and Sharon Verraneault ("Verraneault"). (Id.). Mr. Beaulieu was also present during the interviews of some of the applicants. (Undisputed Facts, at ¶ 12). After several applicants had been interviewed for the Staff Chaplain position, the members of the Task Force met to discuss them. (Undisputed Facts, at ¶ 13). The Task Force was unanimous in the opinion that plaintiff was the best candidate for the Staff Chaplain position. (Id.). Mr. Beaulieu, in particular, believed plaintiff would be a good "fit" for the position and commented favorably upon her candidacy during the Task Force meeting. (Undisputed Facts, at ¶¶ 13-14). Plaintiff is a Unitarian Universalist minister. (Undisputed Facts, at ¶ 2).

By letter dated March 21, 2001, the Hospital offered plaintiff the position of Staff Chaplain. (Undisputed Facts, at ¶ 16). The letter expressly provides that the position is a "30-hour professional benefited position," that the first three months of plaintiff's employment is considered an "introductory" period during which her performance will be evaluated, and that she will report to Breault and work with Maynard as necessary. (Undisputed Facts, at ¶¶ 15-16). Plaintiff accepted the position on March 27, 2001, subject to the foregoing terms, and began work on May 7, 2001. (Undisputed Facts, at ¶ 16). Shortly after she began work at the Hospital, plaintiff embraced Mr. Beaulieu and thanked him for his support in recommending her for the Staff Chaplain job. (Undisputed Facts, at ¶ 14).

5

### C. Plaintiff's Employment History

During the course of her employment with the Hospital, plaintiff was advised that the Hospital did not maintain any formal policies or procedures with regard to pastoral care. (Undisputed Facts, at ¶ 20). The Hospital's practice was that local clergy, upon arriving at the Hospital, reported to the Hospital's information desk and were provided copies of patient lists, which included information concerning patient names, room numbers and religious affiliations. (Undisputed Facts, at ¶ 19). The clergy persons reviewed the patient lists in order to identify their respective parishioners and visited them. (Id.). Plaintiff prepared draft pastoral care policies, which would have modified the foregoing practice as well as the procedure whereby local clergy were notified of requests for clergy visitation made by patients and family members. (Undisputed Facts, at ¶ 21).

In or about June 2001, a Roman Catholic patient asked Hospital employee Noel to contact Mr. Beaulieu to come to the Hospital to visit with her prior to her surgery. (Undisputed Facts, at ¶ 23). When Mr. Beaulieu arrived at the Hospital to meet with the patient, plaintiff became upset and questioned him at length about who had contacted him to meet with the patient. (Id.). Noel later attempted to explain to plaintiff that the patient had specifically requested to meet with Mr. Beaulieu. (Id.). Plaintiff, however, insisted that she should have been contacted rather than Mr. Beaulieu. (Id.). Also in or about June 2001, Mr. Beaulieu advised plaintiff that he intended to convene a meeting of the PCAC. (Undisputed Facts, at ¶ 22). Plaintiff placed her fist upon a table and replied that she was the Staff Chaplain and would call all meetings of the PCAC. (Id.).

On June 19, 2001, plaintiff attended a meeting of the PCAC during which she discussed her proposed changes to the Hospital's pastoral care practices. (Undisputed Facts, at ¶ 29). In

accordance with plaintiff's proposed policies, she was to be contacted when patients or family members requested visitation from a particular clergy person and she, in turn, would be responsible for contacting the appropriate clergy person. (Id.). In addition, local clergy would no longer have access to patient lists but only to information concerning their respective parishioners. (Id.). During the meeting, some members of the PCAC expressed concern with plaintiff's proposed policies. (Id.). Plaintiff, however, did not acknowledge their concerns, became defensive, and, at one point, accused the local clergy of "picking on her." (Id.). Among the local clergy that expressed concern with plaintiff's proposed policies were Pastor John Heald ("Pastor Heald"), Reverend Falcon-Garcia, Father Poulin and Monsignor Willis West ("Monsignor West"). (Undisputed Facts, at ¶ 30). West, in particular, was concerned that plaintiff's proposed notification policies would result in a delay in the provision of emergency pastoral care to Roman Catholic patients. (Undisputed Facts, at ¶ 31). Following the PCAC meeting, Pastor Heald and Reverend Cheryl Larsen-Lawling ("Reverend Larsen-Lawling") criticized plaintiff to Maynard for the manner in which she had conducted herself during the meeting. (Id.).

During plaintiff's employment with the Hospital, she arranged for the removal of a section of countertop from the chaplain's office, which had previously been utilized by the Beaulieus while performing their volunteer work. (Undisputed Facts, at ¶ 24). Plaintiff did not consult with the Beaulieus before arranging for the removal of the countertop. (Id.). In addition, plaintiff arranged to have the lock changed on the door to the chaplain's office. (Undisputed Facts, at ¶ 25). Mr. Beaulieu discovered that the lock had been changed when he arrived at the Hospital one Sunday in order to visit with patients and could not enter the office. (Id.). Plaintiff prepared written notes regarding Mr. Beaulieu's reaction to having been denied access to the

7

office which provide: "Stroked [Mr. Beaulieu] – angry that door was locked Sunday (I would have been too!)." (Id.).

Dr. Barry observed that the Beaulieus were often upset as a result of their interactions with plaintiff. (Undisputed Facts, at ¶ 27). For example, Mrs. Beaulieu became upset when plaintiff instructed her to pray with all of the patients in the Hospital's maternity unit, an instruction that Mrs. Beaulieu felt was inappropriate. (Id.). Mr. Beaulieu was upset that plaintiff admonished him that he had acted inappropriately by visiting with a patient who had requested to meet with him and because plaintiff did not appear to value his service to the Hospital. (Id.). Indeed, plaintiff's relationship with the Beaulieus became so fractious that the Beaulieus ended up working from a table stationed in a Hospital corridor, rather than from the chaplain's office. (Undisputed Facts, at ¶ 28).

In addition to plaintiff's disagreements with certain local clergy concerning her proposed pastoral care policies and contentious relationship with the Beaulieus, several Hospital employees and staff physicians raised concerns about her performance. For instance, Sandy Minchew ("Minchew"), a critical care nurse, reported that plaintiff had interfered with the Hospital's nurses while they were providing emergency care to a patient. (Undisputed Facts, at ¶ 33). Hospital employee Juanita Vazquez ("Vazquez") commented that she did not believe plaintiff had been "culturally sensitive" to a local clergy person who spoke limited English, by meeting with him to discuss the Hospital's clergy visitation practices without the aid of an interpreter. (Undisputed Facts, at ¶ 32). Dr. Leach and Dr. Petro, two staff physicians, reported that plaintiff made what they perceived to be inappropriate notations in patient medical records. (Undisputed Facts, at ¶ 35). Several Hospital employees, including Begansky, Teddi Moore ("Moore"), Kathy Clairmont ("Clairmont"), Teresa Carey ("Carey"), Ellen Schreiber

("Schreiber") and Colleen Corcoran ("Corcoran"), remarked that plaintiff made them uncomfortable, stood too close to them and did not respect their sense of personal space, and that they were uncomfortable calling upon her to meet with their patients. (Undisputed Facts, at ¶ 34).

On or about August 1, 2001, Breault met with some of the individuals who had participated in the decision to hire plaintiff as Staff Chaplain, including Levine, Maynard (via telephone), Dr. Barry, Dr. Stephens, Begansky, Noel and Mr. Beaulieu, to discuss the concerns that had been identified with respect to plaintiff's performance during her probationary employment period; specifically, plaintiff's disharmonious relationships with some of the local clergy, the Beaulieus and Hospital staff, and her improper documentation in patient medical records. (Undisputed Facts, at ¶ 36). The consensus of those present at the meeting was that it was unlikely that plaintiff's performance would improve and that perhaps her probationary employment should be terminated. (Id.). Based, in part, upon the discussion during the meeting, Breault elected instead to extend plaintiff's probationary employment period in order to provide her an opportunity to improve her performance. (Id.).

Shortly after the August 1, 2001 meeting, Breault prepared plaintiff's performance evaluation with assistance from Maynard. (Undisputed Facts, at ¶ 37). In addition, Levine reviewed the evaluation before it was discussed with plaintiff. (Id.). In accordance with the evaluation, plaintiff's probationary employment period was extended for an additional three months to provide her an opportunity to repair her relationships with local clergy and the Beaulieus, to address improper documentation issues, and to modify her approach to Hospital staff so as to ensure respect for their personal space. (Id.).

9

On or about August 15, 2001, Breault and Maynard met with plaintiff to discuss her performance evaluation. (Id.). Approximately one week later, on or about August 22, 2001, and without any previous discussion with Breault or Maynard concerning her performance evaluation, plaintiff provided Breault with two documents entitled, respectively: "Evaluation Reply" and "Evaluation Suggestions." (Undisputed Facts, at ¶¶ 38-39). Breault perceived these documents to be argumentative and sarcastic and indicative of plaintiff's unwillingness to work cooperatively with Breault to improve her performance. (Undisputed Facts, at ¶ 38).

Also on or about August 22, 2001, Maynard attempted to schedule a meeting between plaintiff and the Beaulieus in order to mend their relationship and "clear the air" between them. (Undisputed Facts, at ¶¶ 40 & 42). Plaintiff, however, inexplicably refused to meet with the Beaulieus as Maynard had requested. (Undisputed Facts, at ¶ 40). When Maynard attempted to meet with plaintiff to discuss why she had refused to attend the proposed meeting, plaintiff would not speak with him, proceeded to an adjacent office in the Hospital and attempted to recruit two other Hospital employees to serve as witnesses to her conversation with Maynard. (Id.). Plaintiff later agreed to meet with the Beaulieus, provided Breault was present. (Id.).

In anticipation of the meeting between plaintiff and the Beaulieus, and in view of the conciliatory purpose of the meeting, Breault and Maynard directed plaintiff *not* to discuss an incident involving Mrs. Beaulieu that plaintiff had reported to them and that they correctly perceived would be particularly upsetting to Mrs. Beaulieu. (Undisputed Facts, at ¶ 42). Specifically, on one occasion, Mrs. Beaulieu attempted to comfort a patient who had been in a serious car accident by trying to focus her thoughts on being thankful for having survived the accident. (Id.). She did this, as she had done successfully on previous occasions, by relating her own personal experience of having lost both her sons in a car accident. (Id.). However, on this

occasion, Mrs. Beaulieu's remarks did not have their intended effect, and instead caused the patient to become more upset. (Id.).

On August 28, 2001, plaintiff, the Beaulieus, Maynard and Breault met to address the interpersonal problems that existed between plaintiff and the Beaulieus (Undisputed Facts, at ¶ 42). During the meeting, plaintiff, in contravention of the previous instructions from Breault and Maynard, brought up Mrs. Beaulieu's having upset a patient by discussing the death of her sons. (Id.). Plaintiff did this with a lack of compassion, in a manner that belittled Mrs. Beaulieu and trivialized the death of her sons, by referring to Mrs. Beaulieu's discussion with the patient as her "story." (Id.). Plaintiff intended to raise this issue in the meeting despite the instructions she had been given, as she had prepared written notes prior to the meeting with the Beaulieus, in which she listed the issues she wanted to discuss with them, including the notation: "Sharing of your story – sometimes it is appropriate, sometimes not . . . ." (Undisputed Facts, at ¶ 41). Mr. Beaulieu was incensed by plaintiff's comments and stated that "if [plaintiff] were a man, [he would] jack [her] up against the wall," or words to that effect. (Undisputed Facts, at ¶ 42). Also during the meeting, Breault learned that plaintiff had blacked-out the name of the Beaulieus' church from the front cover of several prayer pamphlets that Mr. Beaulieu had reproduced at his own expense for distribution to Roman Catholic patients to whom he offered the sacrament of Holy Communion and to others who requested them. (Undisputed Facts, at ¶ 26).

**D.     The Resignation**

Shortly after the August 28, 2001 meeting, Breault, Maynard and Levine met to discuss the issues that had arisen with plaintiff's performance subsequent to her August 2001 performance evaluation; specifically, her initial refusal to meet with the Beaulieus to address and repair their relationship, her disregard of express instructions from Breault and Maynard not to

11

discuss an issue during her meeting with the Beaulieus that would be particularly upsetting to Mrs. Beaulieu, her act of defacing prayer pamphlets reproduced by Mr. Beaulieu and the content of her response to her performance evaluation. (Undisputed Facts, at ¶¶ 43 & 46). For all of these reasons, Breault, Maynard and Levine decided that plaintiff should be terminated. (Id.). Dick Brvenik ("Brvenik")(President and Chief Executive Officer) was advised of the decision to terminate plaintiff's employment. (Undisputed Facts, at ¶ 44).

On September 4, 2001, Breault met with plaintiff and requested that she resign her position in lieu of termination. (Undisputed Facts, at ¶ 45). Plaintiff agreed to resign as Staff Chaplain. (Id.). Immediately after her meeting with Breault, plaintiff prepared written notes, which purport to memorialize her conversation with the Hospital employee who escorted her to her car following her resignation. (Undisputed Facts, at ¶ 47). Plaintiff's notes provide: "Annadell – I did not know anything about this. [Plaintiff –] 'I am surprised and grateful there is no security to escort me out' [Annadell –] 'What happened?' [Plaintiff –] 'A volunteer form [sic] hell.' . . . ." (Id.). Approximately three weeks after her resignation, plaintiff advised her personal physician that she had lost her job with the Hospital because of an "argument with [a] volunteer" and that she was fired for "doing [her] job too well." (Undisputed Facts, at ¶ 48).

### E.  **Plaintiff's Replacement**

Following plaintiff's resignation, the Hospital decided to make the Staff Chaplain position a 40-hour per week position in order to attract a broader pool of qualified candidates. (Undisputed Facts, at ¶ 49). The Hospital hired Reverend Steven Scott ("Reverend Scott") to replace plaintiff as Staff Chaplain. (Undisputed Facts, at ¶ 50). Reverend Scott is an ordained Disciples of Christ minister. (Id.).

12

In or about December 2002 or January 2003, the Hospital eliminated the Staff Chaplain position as a cost-cutting measure. (Undisputed Facts, at ¶ 51). In addition, the Hospital laid-off two nurse practitioners and reduced the hours of approximately five other non-union employees. (Id.).

### III.    LAW AND ARGUMENT

#### A.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of America*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir. 2000), *cert. denied*, 124 S. Ct. 53 (2003) (quoting *Anderson*, 477 U.S. at 256). The non-moving party, however, may not "rest upon . . . mere allegations or denials." *St. Pierre v.*

13

*Dyer*, 208 F.3d 394, 404 (2d Cir. 2000); *see also Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))("[I]n order to avoid summary judgment, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts'"). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vasser College*, 196 F.3d 435, 452 (2d Cir. 1999), *cert. denied*, 530 U.S. 1242 (2000); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)("If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted")(Internal quotation marks omitted; alteration in original).

**B.    Defendants are entitled to summary judgment with regard to plaintiff's claims for religious and gender discrimination.**

Plaintiff contends that defendants provided preferential treatment to certain persons and religious groups, particularly the Beaulieus and Roman Catholic clergy, that she opposed this so-called preferential treatment by insisting that these persons and groups comply with her proposed pastoral care policies and that, because of her religious affiliation (i.e., Unitarian Universalist) and insistence upon compliance with her proposed policies, she was denied a full-time position, given a poor performance evaluation and had her probationary employment period extended, and was terminated. (Complaint, at Counts 1 & 2). Plaintiff further contends that defendants "permitted and condoned" gender discrimination by Mr. Beaulieu and local clergy person Monsignor West and that she was retaliated against for complaining about the discrimination. (Complaint, at Counts 3 & 4). Specifically, plaintiff alleges that Mr. Beaulieu and Monsignor West do not believe that women should be ordained ministers and made it difficult for her to do her job. (Undisputed Facts, at ¶ 52).

14

As discussed below, plaintiff cannot establish a *prima facie* case of religious or gender discrimination under Title VII or Connecticut law; nor can she establish a *prima facie* case of retaliation on account of her alleged opposition to religious and gender discrimination. Furthermore, plaintiff cannot adduce any evidence that defendants' legitimate, non-discriminatory reasons for the adverse employment actions are a pretext for unlawful discrimination or retaliation. Accordingly, the Court should grant defendants' motion for summary judgment with regard to plaintiff's claims for religious and gender discrimination.[2]

### 1. Plaintiff cannot establish a *prima facie* case of religious or gender discrimination.

Plaintiff's religious and gender discrimination claims under Title VII and the CFEPA are governed by the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under this analysis, plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 767 (2d Cir. 2002); *Padilla v. Harris*, 285 F.Supp.2d 263, 269 (D.Conn. 2003).

Even if it is assumed that plaintiff could satisfy the first three elements of a *prima facie* case of religious and/or gender discrimination, she cannot satisfy the final element inasmuch as the circumstances surrounding her performance evaluation and corresponding extended

---

[2] "It is well-settled that the same legal standards apply to claims under CFEPA as to claims under Title VII." *Sedotto v. Borg-Warner Protective Services Corp.*, 94 F.Supp.2d 251, 268 (D. Conn. 2000); *see also Levy v. Commission on Human Rights and Opportunities*, 35 Conn. App. 474, 480 (1994), *aff'd*, 236 Conn. 96 (1996)("We look to federal employment discrimination law for guidance in enforcing our own antidiscrimination statute"). Accordingly, the arguments set forth herein with regard to plaintiff's Title VII claims apply equally to her claims under the CFEPA.

probationary employment period and her subsequent resignation do not give rise to an inference of discrimination.[3] As an initial matter, it is undisputed that, except for Breault, all of the individuals who participated in the August 2001 meeting to address concerns with plaintiff's performance were the precisely the same people who, only four months earlier, had recommended plaintiff for the Staff Chaplain job. (Undisputed Facts, at ¶¶ 11-14 & 36). Importantly, Mr. Beaulieu, the individual to whom plaintiff attributes a primary role in her performance issues and termination from the Hospital, and whom she claims discriminated against her, thought she would be a good "fit" for the Staff Chaplain position and recommended that she be hired. (Undisputed Facts, at ¶ 14). Indeed, plaintiff, shortly after beginning work at the Hospital, embraced Mr. Beaulieu and thanked him for his support. (Id.).

The Second Circuit Court of Appeals has found the "same actor inference" to be a "highly relevant factor in adjudicating a motion for summary judgment" with regard to claims of discrimination. *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000). In accordance with that inference, when the individual who made the adverse employment decision is the same individual who made a recent favorable employment decision regarding plaintiff, it is difficult to impute to him an invidious motivation that would be inconsistent with the favorable employment decision. *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997), *cert. denied*, 525 U.S. 936 (1998). In other words, the "same actor" theory implies that an individual who provides favorable treatment to a member of a protected class is unlikely to suddenly develop an aversion

---

[3] To the extent plaintiff contends that the Hospital denied her a full-time position because of her religion and/or gender, her claim must fail inasmuch as she cannot establish either that she experienced an adverse employment action or that such action occurred under circumstances giving rise to an inference of discrimination. There is no genuine issue of material fact that the Staff Chaplain position was advertised as a 30-hour per week position, that plaintiff was advised of the hours of the position before she was hired and that she agreed to them. (Undisputed Facts, at ¶ 16). Moreover, it is undisputed that, during plaintiff's employment, Breault lobbied the Hospital's "senior leadership team" to increase the hours for the Staff Chaplain position but that the request was denied. (Undisputed Facts, at ¶ 17). Plaintiff cannot adduce any evidence whatsoever that the Hospital officers who denied

to members of that class. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir.), *cert. denied*, 530 U.S. 1261 (2000)("Case law teaches that where the [adverse employment decision] occurs within a relatively short time after the [favorable employment decision] there is a strong inference that discrimination was not a motivating factor in the employment decision").

Here, it is simply illogical that the same individuals who recommended plaintiff for the Staff Chaplain position in March 2001 would suddenly develop an aversion to Unitarian Universalists and to women a mere four months later and would concoct false criticisms of plaintiff's performance. The same holds true for plaintiff's resignation. That is, Maynard and Levine, two of the three individuals who recommended plaintiff's termination in August 2001, also recommended that she be hired. (Undisputed Facts, at ¶¶ 11, 13 & 43). Furthermore, Breault, the individual who prepared plaintiff's performance evaluation, was responsible for the extension of plaintiff's probationary employment period and participated in the decision to request her resignation is, like plaintiff, a female. (Undisputed Facts, at ¶¶ 36-37 & 43). *See Toliver v. Community Action Com'n to Help the Economy, Inc.*, 613 F.Supp. 1070, 1074 (S.D.N.Y. 1985), *aff'd*, 800 F.2d 1128 (2d Cir.), *cert. denied*, 479 U.S. 863 (1986) (claims of discrimination are less plausible where decision-maker is in same protected class as plaintiff). Moreover, Breault is not a member of the religious group that plaintiff contends is accorded preferential treatment by the Hospital. (Undisputed Facts, at ¶ 3).

Plaintiff's *prima facie* case of religious discrimination is further undermined by the undisputed evidence that she was replaced by Reverend Scott, a Disciples of Christ minister, and not by a Roman Catholic. (Undisputed Facts, at ¶ 50). The fact that plaintiff's successor, like plaintiff, is not a member of the religious group which allegedly is given preferential treatment

---

Breault's request harbored any discriminatory animus or that they had even met plaintiff or were aware of her religion and/or gender.

by the Hospital negates any inference that the adverse employment actions plaintiff experienced were a product of religious discrimination. *See Carr v. Westlb Admin., Inc.*, 171 F.Supp.2d 302, 307 (S.D.N.Y. 2001)(recognizing difficulty that exists in establishing *prima facie* case of discrimination where plaintiff is replaced by someone within same protected class).

In addition to a complete dearth of circumstantial evidence, plaintiff does not allege (nor can she prove) that she was subjected to any discriminatory comments by Hospital staff, physicians or volunteers.[4] In fact, plaintiff concedes that she is unaware of any discriminatory remarks by Breault, Levine or Maynard (the Hospital employees involved in the decision to request her resignation); nor did she ever hear them say anything that would suggest that her religion or gender was a factor in her resignation. (Undisputed Facts, at ¶ 55). *See Schnabel*, 232 F.3d at 91 (granting employer's motion for summary judgment on age discrimination claim where plaintiff failed to offer any evidence that he was subjected to any age-related comments or criticisms); *Pesok v. Hebrew Union College—Jewish Institute of Religion*, 235 F.Supp.2d 281, 288 (S.D.N.Y. 2002)(granting employer's motion for summary judgment on plaintiff's Title VII claims for race and religious discrimination where plaintiff did not demonstrate the existence of any derogatory comments by decision-makers during his employment).

For all of the foregoing reasons, plaintiff cannot establish that the circumstances surrounding the adverse employment actions give rise to an inference of religious or gender discrimination.

---

[4] Plaintiff testified that the only gender-related comment made during her employment with the Hospital was a lone remark by Mr. Beaulieu that if plaintiff were a "man [he] would bounce [her] off the wall," or words to that effect. (Undisputed Facts, at ¶ 53). It is undisputed, however, that Mr. Beaulieu's remark was made in response to comments by plaintiff concerning the Beaulieus' deceased sons that were particularly upsetting to Mrs. Beaulieu. (Undisputed Facts, at ¶ 42). In any event, Mr. Beaulieu's remark does not evince any employment-related gender bias on his part.

2.  **Plaintiff cannot establish a *prima facie* case of retaliation based upon her alleged opposition to religious or gender discrimination.**

To the extent plaintiff's claims of religious and gender discrimination under Title VII and the CFEPA are premised upon her alleged opposition to discriminatory practices at the Hospital, her claims must be dismissed because it is undisputed that she did not engage in any activity that falls within the protection of the foregoing statutes.

In order to set forth a *prima facie* case of retaliation under Title VII and the CFEPA, plaintiff must show that: (1) she engaged in protected activity; (2) her employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *See Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001). The first of these elements is satisfied where a plaintiff can demonstrate that she had a "good faith, reasonable belief that the underlying challenged actions of the employer violated [Title VII]." *Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)(Internal quotation marks omitted). The Second Circuit has made clear that where a plaintiff has alleged facts that, even if taken as true, do not support a *prima facie* Title VII claim, she did not have such a good faith belief. For example, in *Wimmer v. Suffolk County Police Dept.*, 176 F.3d 125 (2d Cir.), *cert. denied*, 528 U.S. 964 (1999), the court held that a police officer in training did not establish a *prima facie* case of retaliation where he alleged that he was terminated in retaliation for complaining about the discriminatory practices of his co-workers against citizens. *Id.* at 134-36. According to the court, Wimmer's retaliation claim was "not cognizable under Title VII because his opposition was not directed at an unlawful *employment practice* of his employer." *Id.* at 135 (Emphasis in original). In reaching its decision, the *Wimmer* Court relied upon the following reasoning from an opinion of the Fourth Circuit Court of Appeals:

19