> We have emphasized . . . that Title VII is not a general bad acts statute. Rather, the conduct it prohibits is specifically set forth. . . . While Congress may decide to extend the statute's coverage to persons who may bring any discriminatory practice of an employer to light, such a step lies beyond the province of the courts. To find in Title VII protection for whistle-blowers on each and every instance of discrimination on the part of an employer is more than . . . the plain language of its provisions will support.

*Id.* at 135 (quoting *Crowley v. Prince George's County, MD.*, 890 F.2d 683, 687 (4th Cir. 1989))(Internal quotation marks omitted). *See also Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978)("[N]ot every act by an employee in opposition to . . . discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual.").

Plaintiff's retaliation claims under Title VII and the CFEPA are founded upon her alleged opposition to: (1) the Hospital's preferential treatment of certain local clergy people and volunteers; and (2) alleged gender discrimination by a local clergyperson and volunteer. (Complaint, at Counts 1 through 4). Even if it is assumed that plaintiff did in fact engage in the foregoing conduct, however, it does not amount to protected activity within the meaning of Title VII or the CFEPA. In other words, plaintiff does not allege that she opposed a discriminatory *employment practice*. Rather, plaintiff contends that she opposed the Hospital's preferential treatment of certain *non-employees* and that she opposed the discriminatory behavior of certain *non-employees*. Put simply, because plaintiff has not alleged that she opposed any actions made unlawful by Title VII or the CFEPA, she cannot establish a *prima facie* case of retaliation under either of those statutes.

### 3. Plaintiff cannot show that the non-discriminatory reasons justifying the adverse employment actions are a pretext for discrimination.

Even assuming that plaintiff could establish a *prima facie* case of religious or gender discrimination, her claims must fail because she cannot show that defendants' non-

20

discriminatory reasons for the adverse employment actions are pretexts for unlawful discrimination.

Pursuant to the *McDonnell Douglas* framework, where a plaintiff succeeds in establishing a *prima facie* case of discrimination, the employer bears the burden of articulating a legitimate, non-discriminatory reason for the adverse employment action. *Farias v. Instructional Systems, Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). *See also Bickerstaff*, 196 F.3d at 446 (employer need only offer an explanation for employment decision). If the employer proffers such a reason, it "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Mario v. P&C Food Markets, Inc.*, 313 F.3d at 767 (Internal quotation marks omitted). The burden thus shifts back to the plaintiff "'to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons but were a pretext for discrimination.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000)). "Summary judgment is appropriate if no reasonable jury could find the [employer's] actions were motivated by discrimination." *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003).

(a)     **Plaintiff's performance evaluation/extended probationary period.**

It is undisputed that plaintiff's performance evaluation and extended probationary period were the result of: (1) notations she made in patient medical records that were perceived by at least two physicians to be improper; (2) concerns expressed by Hospital staff that she did not respect their personal space; (3) her disharmonious relationship with the Beaulieus; and (4) perceptions held by some local clergy that she was a "barrier" to their participation in their parishioners' healthcare on account of her proposed pastoral care policies and the manner in which she communicated them. (Undisputed Facts, at ¶¶ 37-38). Plaintiff does not deny that she

21

made the notations that were a factor in the decision to extend her probationary period. Indeed, plaintiff, in her August 22, 2001 "Evaluation Reply," acknowledges that she had previously discussed an incident of improper documentation with Breault and states that she "has not committed this same 'sin' again." (Undisputed Facts, at ¶ 38). With regard to a second incident of improper documentation, plaintiff, in her "Evaluation Reply," states: "If you wish for me not to document like this again, I shall not." (Id.). Moreover, plaintiff does not contend that the concerns expressed by Hospital staff regarding her failure to respect their personal space were a product of gender discrimination on the part of the staff inasmuch as she testified that she does not believe any Hospital staff discriminated against her because of her gender. (Undisputed Facts, at ¶ 54).

Apparently, the crux of plaintiff's discrimination claims is that because her performance evaluation and corresponding extended probationary period were based, in part, upon her relationships with the Beaulieus and certain Roman Catholic clergy, and because any interpersonal conflicts that existed between her and these individuals were allegedly the result of religious and gender discrimination, defendants discriminated against her by making her relationships with these individuals a factor in her performance evaluation and the decision to extend her probationary period. Plaintiff, however, cannot adduce any direct evidence whatsoever to support her attenuated claims of religious and gender discrimination. Instead, she relies solely upon her unsupported personal belief that the Beaulieus and certain Roman Catholic clergy resisted her proposed pastoral care policies because they would eliminate the supposedly preferential treatment that Roman Catholics received from the Hospital; and that Monsignor West and Mr. Beaulieu do not believe women should be ordained ministers and, for that reason,

made it difficult for her to do her job. The fatal problem with plaintiff's fanciful theory is that there is not a shred of evidence to support it. It is nothing more than pure speculation.

As discussed above, Mr. Beaulieu was instrumental in the Hospital's decision to hire plaintiff for the Staff Chaplain position. Indeed, he recommended her for the job. (Undisputed Facts, at ¶¶ 12-14). Thus, any suggestion that the interpersonal conflicts that existed between plaintiff and Mr. Beaulieu were the result of Mr. Beaulieu's disdain for plaintiff on account of her religion and/or gender is implausible. Moreover, the undisputed facts establish that the interpersonal conflicts that existed between the Beaulieus and plaintiff were the result of non-discriminatory factors; specifically, plaintiff's lack of sensitivity to and respect for these long-time Hospital volunteers. For example, there is no genuine issue of material fact that plaintiff: (1) chastised Mr. Beaulieu when he attempted to convene a meeting of the PCAC, of which he was chairperson (Undisputed Facts, at ¶ 22); (2) interrogated Mr. Beaulieu about who had contacted him to come to the Hospital to visit with a patient (Undisputed Facts, at ¶ 23); (3) without consulting the Beaulieus, arranged for the removal of their workspace from the chaplain's office which had been furnished through funds solicited by the PCAC (Undisputed Facts, ¶ 24); (4) without consulting the Beaulieus, arranged to have the lock changed on the door to the chaplain's office (Undisputed Facts, at ¶ 25); and (5) defaced some prayer pamphlets that Mr. Beaulieu had reproduced at his own expense for distribution to Roman Catholic patients and others who requested them (Undisputed Facts, at ¶ 26). Clearly then, based on the foregoing undisputed facts, the hard feelings and interpersonal conflicts that existed between plaintiff and the Beaulieus are completely understandable and were not, as plaintiff contends, the result of any discriminatory conduct by the Beaulieus. *See Pesok*, 235 F.Supp.2d at 288 ("Personal animosity

23

and even unfair treatment are not actionable under Title VII unless discrimination is a motivating factor.").

In addition, it is undisputed that the local clergy that expressed concern with plaintiff's proposed policies and the manner in which she communicated them during the June 19, 2001 PCAC meeting were both male and female and represented religious faiths other than Roman Catholicism. For instance, Reverend Larson-Lawling, a non-Roman Catholic female, was critical of plaintiff for the manner in which she conducted herself during the PCAC meeting. (Undisputed facts, at ¶ 31). Likewise, Reverend Falcon-Garcia, another non-Roman Catholic female, expressed concern with plaintiff's proposed policy whereby local clergy would no longer have access to patient lists in order to facilitate the identification of their respective parishioners. (Undisputed Facts, at ¶ 30). Furthermore, plaintiff cannot adduce any evidence whatsoever to support her unsubstantiated personal opinion that Monsignor West's resistance to her proposed pastoral care policies was based upon her religion or gender. *See Ahmad v. Nassau Health Care Corp.*, 234 F.Supp.2d 185, 194 (E.D.N.Y. 2002)(plaintiff's unsupported personal beliefs cannot provide sole evidence of discrimination). In fact, Monsignor West clearly articulated the bases for his legitimate concerns with plaintiff's proposed policies during the June 19, 2001 PCAC meeting (e.g., that plaintiff's role as an intermediary for all requests for pastoral care communicated by patients to Hospital staff would delay the provision of pastoral care to Roman Catholic patients in emergency situations). (Undisputed Facts, at ¶ 31).

For all of the foregoing reasons, plaintiff cannot establish that the legitimate, non-discriminatory reasons justifying her performance evaluation and corresponding extended probationary employment period are a pretext for discrimination on the basis of her religion and/or gender.

24

(b)     **Plaintiff's resignation.**

Plaintiff cannot come close to making the requisite showing that defendants' reasons for requesting her resignation as Staff Chaplain are a pretext for discrimination. As with plaintiff's performance evaluation and extended probationary period, it is undisputed that plaintiff was asked to resign her position on account of: (1) her initial refusal to meet with the Beaulieus to repair their disharmonious relationship; (2) her disregard of her supervisor's instruction not to discuss an issue during her meeting with the Beaulieus that would be particularly upsetting to Mrs. Beaulieu; (3) her act of defacing some prayer pamphlets that Mr. Beaulieu had reproduced at his own expense for distribution to patients upon request; and (4) the content of her written response to her performance appraisal. (Undisputed Facts, at ¶ 46).

Importantly, there is no genuine issue of material fact that plaintiff engaged in each of the acts upon which her resignation was based. For instance, plaintiff's August 22, 2001 "Evaluation Reply" and "Evaluation Suggestions" speak for themselves and demonstrate her unwillingness to work cooperatively with Breault to improve her performance. (Undisputed Facts, at ¶ 38). Furthermore, plaintiff concedes that she initially refused to meet with the Beaulieus, disregarded Breault's instruction not to discuss an incident during a meeting with the Beaulieu's that was upsetting to Mrs. Beaulieu, and defaced some prayer pamphlets that Mr. Beaulieu had reproduced. (Undisputed Facts, at ¶¶ 26, 40 & 42). It is further undisputed that two of the three Hospital employees who participated in the decision to request plaintiff's resignation had recommended that she be hired approximately four months earlier and that the third decision-maker is, like plaintiff, a female. (Undisputed Facts, at ¶¶ 11, 13 & 43). Finally, plaintiff cannot point to any comments by the Hospital employees who participated in the

25

decision to request her resignation, which would suggest that her religion and/or gender was a factor in her resignation. (Undisputed Facts, at ¶ 55).

For all of the foregoing reasons, plaintiff cannot show that the legitimate, non-discriminatory reasons for her resignation are a pretext for unlawful discrimination on account of her religion and/or gender.

### C. Defendants are entitled to summary judgment with regard to plaintiff's wrongful discharge claim premised upon C.G.S. § 31-128e.

Plaintiff maintains that she was terminated in violation of the public policy embodied in C.G.S. § 31-128e, Connecticut's Personnel Files Act. Specifically, plaintiff alleges that she was terminated for submitting written statements to Breault in response to information contained in her personnel file with which she disagreed. (Complaint, at Count 5). Plaintiff's claim, however, is completely lacking in merit. As an initial matter, there is no genuine issue of material fact that plaintiff did not engage in any conduct protected by C.G.S. § 31-128e; nor is there any dispute that defendants complied with the express terms of that statute. Furthermore, C.G.S. § 31-128e does not embody an important public policy of the State of Connecticut that would foreclose an employer from taking adverse action against an employee on account of the content of her written submissions prepared in response to a performance evaluation.

Connecticut courts have carved out a narrow exception to the traditional rule of at-will employment. The Connecticut Supreme Court, in *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471 (1980), first recognized a "common-law cause of action for wrongful discharge in situations in which the reason for the discharge involved impropriety derived from some important violation of public policy." *Daley v. Aetna Life & Casualty Co.*, 249 Conn. 766, 798 (1999)(Internal quotation marks omitted). In evaluating wrongful discharge claims, Connecticut courts "look to see whether the plaintiff has . . . alleged that [her] discharge violated any explicit

26

statutory or constitutional provision . . . or whether [she] alleged that [her] dismissal contravened any judicially conceived notion of public policy. . . ." *Id.* (Internal quotation marks omitted). Courts, however, have repeatedly underscored their "adherence to the principle that the public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a narrow one." *Thibodeau v. Design Group One Architects, LLC*, 260 Conn. 691, 701 (2002)(quoting *Parsons v. United Technologies Corp.*, 243 Conn. 66, 79 (1997)). *See also Sheets*, 179 Conn. at 477 ("courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation"). Consequently, courts have "rejected claims of wrongful discharge that have not been predicated upon an employer's violation of an important and clearly articulated public policy." *Thibodeau*, 260 Conn. at 701.

As discussed above, plaintiff, approximately one week after receiving her performance evaluation and without any discussion with Breault, Maynard or any other Hospital employee concerning the substance of the evaluation, provided Breault with two documents entitled, respectively, "Evaluation Reply" and "Evaluation Suggestions." (Undisputed Facts, at ¶¶ 37-39). Breault perceived these documents to be extremely argumentative and sarcastic and indicative of plaintiff's unwillingness to work with Breault in a cooperative fashion to improve her performance. (Undisputed Facts, at ¶ 38). Plaintiff now contends that those documents constitute explanatory statements within the meaning of C.G.S. § 31-128e. (Complaint, at ¶ 89). According to plaintiff, C.G.S. § 31-128e embodies a public policy of the State of Connecticut that prohibits defendants from terminating her employment based, in part, upon the substance of her written statements made in response to information contained in her personnel file. Plaintiff's claim, however, is refuted by the undisputed facts regarding her so-called protected activity and by the express language of C.G.S. § 31-128e.

27

Importantly, C.G.S. § 31-128e provides only that an employee may inspect her personnel file and, if she disagrees with any information contained therein *and is unable to reach agreement with her employer as to the removal or correction of the information*, submit a written statement explaining her position. The statute further provides that such written statement must be maintained as part of the employee's personnel file and accompany any transmittal of the file to a third party. Here, it is undisputed that plaintiff neither inspected her personnel file nor met with anyone at the Hospital to discuss any aspect of her file, including her performance evaluation, prior to preparing the August 22, 2001 written statements. (Undisputed Facts, at ¶¶ 37-39). It is apparent, therefore, that plaintiff did not engage in any activity protected by C.G.S. § 31-128e and that her August 22, 2001 written submissions are not properly characterized as explanatory statements within the meaning of the statute. Moreover, even if it is assumed that plaintiff's August 22, 2001 written submission constitute explanatory statements, there is no genuine issue of material fact that defendants made those statements a part of plaintiff's personnel file in accordance with the statute. Nor does plaintiff claim that defendants improperly transmitted her personnel file to a third party sans her written statements. Accordingly, because plaintiff has premised her wrongful discharge claim upon the public policy allegedly embodied in C.G.S. § 31-128e, and because there is no genuine issue of material fact that defendants complied with the terms of that statute, her common law wrongful discharge claim must fail. *See Burnham v. Karl and Gelb*, 252 Conn. 153, 160-61 (2000)(affirming summary judgment for employer on plaintiff's wrongful discharge claim predicated upon the public policy embodied in C.G.S. § 31-51m where plaintiff failed to present evidence that created a material issue of fact with respect to whether employer's conduct violated that statute).

28

Plaintiff's wrongful discharge claim predicated upon C.G.S. § 31-128e is further undermined by the fact that the statute does not express any public policy against disciplining or terminating employees who respond in writing to information contained in their personnel files. The statute does not contain any language prohibiting an employer from taking adverse action against an employee on account of her written submissions made in response to information contained in her personnel file. Nor can plaintiff point to any legislative remarks and/or case law that would incorporate such a meaning into the statute. Indeed, if plaintiff's argument that employees are impervious to disciplinary action directed at the substance of their written submissions made to their employers were to be extended to its logical conclusion, it is foreseeable that employees could submit written statements containing all sorts of inappropriate and/or inflammatory comments or may otherwise utilize such written statements as a vehicle to harass, disparage or annoy their coworkers, supervisors and/or managers, all while under the guise of responding to information contained in their personnel files. Certainly, that is not the intent of the statute.

In *Daley*, the plaintiff relied upon several employment and child welfare statutes to support her argument that her termination contravened an important public policy that requires employers to provide flexible schedules for working parents and prohibits employers from discriminating against employees who pursue such arrangements. Among the statutes relied upon by plaintiff were the federal and Connecticut Family and Medical Leave laws. While the Connecticut Supreme Court recognized that, to varying degrees, each of the statutes relied upon by plaintiff to support her public policy claim regulates workplace conduct, it found that "[n]one of [the] statutes requires that an employer accommodate employee requests for flexible work schedules." *Daley*, 249 Conn. at 802. Accordingly, the plaintiff failed to present any evidence

29

that her discharge violated any "explicit statutory or constitutional provision, or judicially conceived notion of public policy." *Id.* at 804. The court stated:

> We recognize the important public policy embodied in the express provisions of the Connecticut Family and Medical Leave Law, the federal Family and Medical Leave Act of 1993 . . . and underscore every employer's duty to comply with those provisions. *None of these statutes, however, expressly obligates an employer to accommodate an employee's work-at-home requests, or to refrain from taking adverse action against an employee who persists in her efforts to secure such an arrangement.* In declining to recognize an important public policy to that effect, we are mindful that we should not ignore the statement of public policy that is represented by a relevant statute. . . . *Nor should we impute a statement of public policy beyond that which is represented. To do so would subject the employer who maintains compliance with express statutory obligations to unwarranted litigation for failure to comply with a heretofore unrecognized public policy mandate.*

*Id.* (Citations omitted; emphasis added).

As in *Daley*, plaintiff cannot point to any provision of C.G.S. § 31-128e which obligates defendants to refrain from taking adverse action against her based upon the substance of her August 22, 2001 written submissions. Thus, plaintiff cannot, as she must, establish that her resignation contravened an explicit statutory or constitutional provision, or judicially conceived notion of public policy.

For all of the foregoing reasons, plaintiff's wrongful discharge claim premised upon Connecticut's Personnel Files Act should be dismissed.

### D. Defendants are entitled to summary judgment with regard to plaintiff's wrongful discharge claim premised upon C.G.S. § 46a-64.

Plaintiff contends that she was terminated in violation of the public policy embodied in C.G.S. § 46a-64. Specifically, plaintiff alleges that she was terminated on account of her opposition to religious discrimination in a place of public accommodation. (Complaint, at Count 6). Even if it is assumed, however, that C.G.S. § 46a-64 represents an important public policy of the State of Connecticut upon which a common law wrongful discharge claim may be

predicated, plaintiff's claim must fail because she cannot establish either that defendants violated C.G.S. § 46a-64 by denying any persons "full and equal accommodations" on account of religion or that she was asked to resign her position on account of her so-called opposition to religious discrimination.

### 1. Defendants did not violate C.G.S. § 46a-64.

Plaintiff maintains that defendants failed to provide "full and equal accommodations" in a "place of public accommodation," within the meaning of C.G.S. § 46a-64, because they treated certain religious persons differently than other similarly situated persons. That is, they allowed preferred religious groups to: (1) distribute religious literature and Bibles; (2) proselytize to patients; and (3) review confidential patient information. (Complaint, at ¶ 95). Plaintiff further maintains that defendants provided an office at the Hospital for use by preferred religious persons and allowed them input into the "hiring and/or retention of the Staff Chaplain." (Id.). In other words, plaintiff claims that Roman Catholics in general and the Beaulieus in particular were given preferential treatment by the Hospital. The undisputed facts, however, do not bear out plaintiff's claims of religious discrimination.

First, there is no genuine issue of material fact that the Hospital's practice with regard to patient visitation by local clergy and/or volunteers during plaintiff's tenure was of universal application to all religious groups and persons inasmuch as local clergy persons of all religious denominations were permitted to review patient lists in order to identify their respective parishioners. (Undisputed Facts, at ¶ 19). Second, there is no evidence whatsoever that the Hospital knowingly allowed Roman Catholic clergy, the Beaulieus or any other religious group and/or persons to proselytize to patients. Third, it is undisputed that the chaplain's office was furnished through funds solicited from various local parishes and congregations and was

31

available to all religious volunteers and local clergy persons. (Undisputed Facts, at ¶ 6). Fourth, while it is accurate that Mr. Beaulieu distributed prayer pamphlets to Roman Catholic patients and that he arranged to have copies of Gideon's Bibles placed in the nightstands in patient rooms, there is no evidence that the Hospital prohibited other religious persons or groups from engaging in similar conduct. (Undisputed Facts, at ¶¶ 7 & 26). Nor is there any evidence that anyone complained of these practices. (Undisputed Facts, at ¶ 7). Fifth, while Mr. Beaulieu, on account of his unique role as chair of the PCAC and as a regular Hospital volunteer, participated in the interview process for the Staff Chaplain and in fact recommended that plaintiff be hired, it is undisputed that he had no role whatsoever in the decision to request her resignation. (Undisputed Facts, at ¶ 43).

In sum, there is no genuine issue of material fact regarding the Hospital's provision of "full and equal accommodations" to all religious persons and groups. Plaintiff cannot establish a violation of C.G.S. § 46a-64 based upon the simple fact that for the past seventeen years the Beaulieus are the only Hospital volunteers who have continuously and regularly visited patients at the Hospital and that they engaged in certain conduct during that time period. On the contrary, plaintiff must prove that non-Roman Catholic volunteers and clergy were "den[ied] . . . full and equal accommodations" at the Hospital. This she cannot do. Indeed, there is no evidence of any complaints of unfair treatment made by these so-called disfavored religious persons or groups. Accordingly, because plaintiff cannot establish that the Hospital denied any persons or groups full and equal accommodations on account of religious creed, her common law claim for wrongful discharge should be dismissed.

2.  **Plaintiff was asked to resign her position for legitimate, non-discriminatory reasons.**

Even if plaintiff could establish that defendants denied any person "full and equal accommodations" on account of religious creed, she cannot prove that she was asked to resign her position for opposing any such discriminatory conduct. As discussed at length above, there is no genuine issue of material fact that plaintiff was asked to resign from her probationary position as Staff Chaplain on account of legitimate, non-discriminatory reasons. Specifically, plaintiff was terminated because: (1) of the content of her written response to her performance evaluation; (2) she initially refused to meet with the Beaulieus to address the interpersonal conflicts that existed between them; (3) she disregarded her supervisor's express instruction not to discuss an issue during her meeting with the Beaulieus that was upsetting to Mrs. Beaulieu; and (4) she defaced some prayer pamphlets that Mr. Beaulieu had reproduced at his own expense. (Undisputed Facts, at ¶ 46). Moreover, there is no dispute that plaintiff engaged in each of the acts upon which her resignation was based. (Undisputed Facts, at ¶¶ 26, 38, 40 & 42).

Accordingly, because plaintiff cannot establish that she was asked to resign her position on account of her alleged opposition to conduct made unlawful by C.G.S. § 46a-64, her wrongful discharge claim predicated upon that statue should be dismissed.

E.  **Defendants are entitled to summary judgment with regard to plaintiff's claim arising under C.G.S. § 31-51q.**

Plaintiff asserts a cause of action under C.G.S. § 31-51q alleging that she was terminated because she "exercised rights protected by the First Amendment to the United States Constitution and/or Section 3 of Article One of [sic] Constitution of the State of Connecticut." (Complaint, at ¶ 103). Plaintiff, however, cannot establish an essential element of her statutory

33

claim because it is undisputed that her alleged exercise of her constitutional rights "substantially and materially" interfered with her performance as Staff Chaplain.

C.G.S. § 31-51q makes it unlawful for an employer to discipline an employee on account of her exercise of rights guaranteed by the first amendment to the United States Constitution and/or analogous provisions of the Connecticut Constitution "provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer . . . ." *See Lowe v. Amerigas, Inc.*, 52 F.Supp.2d 349, 359 (D.Conn. 1999), *aff'd*, 208 F.3d 203 (2d Cir. 2000).

Plaintiff contends that the allegations set forth in multiple paragraphs of her Complaint provide examples of her constitutionally-protected "speech and conduct"; particularly, the allegations contained in paragraphs 23, 25-29, 31-40, 44, 50, 53, and 58. (Complaint, at ¶ 102). Notwithstanding that many of the foregoing allegations of the Complaint describe private matters concerning the terms and conditions of plaintiff's employment and not matters of public concern, plaintiff's claim arising under C.G.S. § 31-51q fails for the separate and independent reason that her so-called protected speech and conduct interfered with her job performance.[5]

The essence of plaintiff's claim under C.G.S. § 31-51q is that, during her brief tenure at the Hospital, she prepared draft versions of pastoral care polices, which addressed such areas as clergy visitation and notification, that she insisted upon compliance with these proposed policies inasmuch as, in her opinion, they were mandated by the provisions of JCAHO and the proposed confidentiality provisions of HIPAA, and that she was terminated on account of her efforts to

---

[5] For example, plaintiff maintains that the discussions involving her office arrangements at the Hospital are "speech and conduct" protected by the federal and state constitutions. (Complaint, at ¶¶ 22, 35 & 54). In accordance with Connecticut law, however, an employee's statements concerning the terms and conditions of her employment, as opposed to matters of public concern, are not protected under the federal or state constitutions and, thus, cannot form the basis of an action under C.G.S. § 31-51q. *See MacKay v. Rayonier, Inc.*, 75 F.Supp.2d 22, 30 (D.Conn. 1999); *Urashka v. Griffin Hospital*, 841 F.Supp. 468, 474 (D.Conn. 1994).

34

secure compliance with her proposed policies. There is no genuine issue of material fact, however, that the privacy provisions of HIPAA were not in effect during plaintiff's tenure at the Hospital. (Undisputed Facts, at ¶ 9). Furthermore, plaintiff cannot point to any provision of the JCAHO regulations that would compel any of her proposed pastoral care policies. For example, JCAHO regulations do not address the propriety of placing copies of Gideon's Bibles in the nightstands in patient rooms. (Undisputed Facts, at ¶ 8). Nor do JCAHO regulations address documentation of pastoral care. (Id.).

Notwithstanding the issue of whether the Hospital was legally compelled to adopt pastoral care policies generally and/or in the form proposed by plaintiff, it is undisputed that the Hospital had no objection to plaintiff's proposed policies but, rather, disagreed with the heavy-handed manner in which she communicated them to the Hospital's constituency; particularly, local clergy persons and the Beaulieus. For instance, it is undisputed that Breault and Maynard reviewed plaintiff's proposed pastoral care policies before she presented them during a June 2001 meeting of the PCAC and that they had no objection to the general subject matter contained therein. (Undisputed Facts, at ¶ 21). It is further undisputed, however, that plaintiff adopted an authoritarian attitude with the Beaulieus and that she was wholly uncompromising in her efforts to secure compliance with her proposed policies. For example, plaintiff rebuked Mr. Beaulieu when he advised her that he intended to convene a meeting of the PCAC and advised him that she would call any and all meetings of the PCAC. (Undisputed Facts, at ¶ 22). In addition, plaintiff interrogated Mr. Beaulieu concerning the identity of the Hospital employee who had requested that he come to the Hospital to visit with a patient prior to her surgery. (Undisputed Facts, at ¶ 23). Furthermore, plaintiff insisted that Mr. Beaulieu remove all Gideon's Bibles from patient rooms and blacked out the name of Mr. Beaulieu's church from some prayer

pamphlets which he reproduced at his own expense for distribution to Roman Catholic patients – notwithstanding that neither JCAHO nor HIPAA mandates such measures. (Undisputed Facts, at ¶¶ 7-9 & 26). Indeed, based, in part, upon plaintiff's insistence that the Beaulieus strictly comply with her proposed pastoral care policies, her relationship with them deteriorated to the point that the Beaulieus conducted their volunteer work from a table stationed in a Hospital corridor rather than from the chaplain's office. (Undisputed Facts, at ¶ 28). Plaintiff's hard-line position caused further conflicts between her and some local clergy persons. For instance, as discussed above, during a June 19, 2001 PCAC meeting, plaintiff refused to acknowledge the legitimate concerns raised by some local clergy with regard to her proposed policies and, instead, accused them of "picking" on her. (Undisputed Facts, at ¶ 29).

Among plaintiff's essential duties as Staff Chaplain was to: "serve[] as the Hospital's representative to the religious community and to other appropriate entities;" "serve as a liaison with local religious groups;" and "[s]upport, advance and exemplify the Mission, Vision, Values and Expectations of [the] Hospital in all interpersonal interactions within and across departments, and in the community as appropriate." (Undisputed Facts, at ¶ 18). Plaintiff, however, on account of her insistence upon rigid compliance with her proposed policies, alienated the very religious groups and persons whose cooperation was essential for the successful performance of her job. Indeed, during her employment, plaintiff was expressly advised that her approach to implementing her proposed polices was hindering the effective performance of her job. For instance, plaintiff's performance evaluation provides: "Overall, you are aware of what needs to be accomplished with respect to our Pastoral Care Program and are able to identify the policies, procedures and practices that need to be put in place in order to appropriately protect patient confidentiality. However, it is perceived at this time that these

36

considerations are being put in place without input from local clergy and at the unnecessary expense of access and goodwill." (Undisputed Facts, at ¶ 37).

Accordingly, even if it is assumed that plaintiff could establish that she was disciplined on account of her exercise of constitutional rights, her claim under C.G.S. § 31-51q must fail because it is undisputed that plaintiff's so-called protected activity, in the form of her efforts to secure compliance with her proposed pastoral care policies, "substantially" and "materially" interfered with her job performance and her working relationship with the Hospital.

## IV.   CONCLUSION

For all of the foregoing reasons, defendants are entitled to summary judgment with respect to Counts 1 through 7 of the Complaint.

DEFENDANTS
WINDHAM COMMUNITY MEMORIAL
HOSPITAL and
HATCH HOSPITAL CORPORATION

By: *William J. Albinger*
Stephen B. Harris, ct13125
William J. Albinger, ct18861
Wiggin & Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
Their Attorneys

## CERTIFICATE OF SERVICE

This is to certify that on this 24th day of September, 2004, a copy of the foregoing has been mailed, postage prepaid, to the following:

>Mary E. Kelly, Esq.
>Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.
>557 Prospect Avenue
>Hartford, CT 06105-2922

                                                  _William J. Albinger_
                                                  William J. Albinger

\4033\89\474762.3