UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BARBARA CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:03 CV 0520 (JCH) |
| | ) | |
| v. | ) | |
| | ) | |
| WINDHAM COMMUNITY MEMORIAL | ) | September 24, 2004 |
| HOSPITAL, INC. and | ) | |
| HATCH HOSPITAL CORP. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT OF UNDISPUTED FACTS

### General Background

1.    Windham Community Memorial Hospital, Inc. ("Hospital") and Hatch Hospital

Corporation (collectively "defendants") operate a private, non-profit, non-denominational,

community hospital in Willimantic, Connecticut. (Exhibit 1, Complaint and Answer, at ¶ 12;

Exhibit 2, Deposition of Dick Brvenik dated November 21, 2003, at p. 41).[1]

2.    Barbara Campbell's ("plaintiff") religious affiliation is Unitarian Universalist.

(Exhibit 3, Deposition of Barbara Campbell dated October 10, 2003, at p. 51).[2]

3.    Allison Breault's ("Breault")(Vice President for Patient Care Services) religious

affiliation is Protestant. (Exhibit 4, Deposition of Allison Breault dated October 15, 2003, at p.

58).[3]

---

[1] Hereinafter cited as "Brvenik Depo., at p. __."
[2] Hereinafter cited as "Campbell Depo. # 1, at p. __."
[3] Hereinafter cited as "Breault Depo. # 1, at p. __."

4.      Delphis Beaulieu ("Mr. Beaulieu") and his wife Juanita Beaulieu ("Mrs. Beaulieu")(collectively "the Beaulieus") are volunteers who have visited Roman Catholic patients at the Hospital since approximately 1987. (Exhibit 5, Deposition of Delphis Beaulieu dated October 9, 2003, at pp. 6-7).[4]

5.      Mr. Beaulieu has served on the Hospital's Pastoral Care Advisory Committee ("PCAC") since approximately 1993, and was chair of the PCAC from approximately 1997 until shortly after plaintiff began her employment at the Hospital. The role of the PCAC is to provide local clergy input into the manner in which the Hospital provides for the spiritual needs of its patients. (Exhibit 2, Brvenik Depo., at pp. 28-30; Exhibit 5, Beaulieu Depo., at pp. 10-11, 14-15; Exhibit 6, Deposition of Shawn Maynard dated March 8, 2004, at pp. 54-55).[5]

6.      In approximately 1996, the PCAC solicited funds from various local parishes and congregations in order to furnish a chaplain's office at the Hospital. Prior to and during plaintiff's employment, the office was utilized by religious volunteers and local clergy. Maynard advised plaintiff of the history of the chaplain's office. (Exhibit 5, Beaulieu Depo., at pp. 12, 33-35, 47-48, 120; Exhibit 6, Maynard Depo., at pp. 82-83, 238).

7.      Approximately one year before plaintiff began work at the Hospital, Mr. Beaulieu placed copies of Gideon Bibles, which had been donated to the Hospital, in the nightstands in patient rooms. Some copies were also stored at the nurses' stations. The Hospital is unaware of any patient complaints regarding the presence of Gideon Bibles in the nightstands in patient rooms. (Exhibit 4, Breault Depo. # 1, at p. 98; Exhibit 5, Beaulieu Depo., at pp. 28-31).

8.      The Joint Commission on the Accreditation of Healthcare Organizations ("JCAHO") does not maintain a position with regard to the presence of bibles in patient rooms

---

[4] Hereinafter cited as "Beaulieu Depo., at p. ___."
[5] Hereinafter cited as "Maynard Depo., at p. ___."

and/or documentation of pastoral care. (Exhibit 3, Campbell Depo. # 1, at p. 64; Exhibit 4,

Breault Depo. # 1, at pp. 99-100, 208).

9.     The privacy provisions of the Health Insurance Portability and Accountability Act

of 1996 ("HIPAA") were not in effect prior to or during the period that plaintiff was employed

by the Hospital. (Exhibit 1, Complaint and Answer, at ¶17).

### The Hospital's Recruitment of a Staff Chaplain

10.     Before plaintiff was hired, and following her termination, the Hospital considered

whether the Roman Catholic or Episcopal Dioceses would provide funding for a Staff Chaplain

and Director of Pastoral Care ("Staff Chaplain"). In addition, Dick Brvenik

("Brvenik")(President and Chief Executive Officer) spoke with some local clergy persons about

the possibility of church groups providing funding for a Staff Chaplain. The Hospital also made

efforts to obtain grants to subsidize a Staff Chaplain position. (Exhibit 2, Brvenik Depo., at pp.

183, 189-191; Exhibit 6, Maynard Depo., at pp. 11-12).

11.     The Hospital's recruitment process for a Staff Chaplain was conducted in the

following manner. Breault, Shawn Maynard ("Maynard")(Administrative Director of

Communications and Volunteer Services) and Marty Levine ("Levine")(Vice President of

Human Resources) conducted preliminary telephone interviews with the applicants. Following

the preliminary screening interviews, some of the applicants were invited to the Hospital for

additional interviews with members of the Hospital's Staff Chaplain Task Force ("Task Force"),

which was comprised of a cross-section of Hospital employees, physicians and clergy from the

surrounding community. Among the members of the Task Force were: Maynard, Levine, Mary

Barry, M.D. ("Dr. Barry"); Robin Begansky ("Begansky"); Dawn Noel ("Noel"); Vincent

Stephens, M.D. ("Dr. Stephens"); Reverend Ana Maria Falcon-Garcia ("Reverend Falcon-

Garcia"); Reverend Scott Stevens ("Reverend Stevens"); and Sharon Verraneault

("Verraneault"). (Exhibit 6, Maynard Depo., at pp. 8-9; Exhibit 7, Deposition of Marty Levine

dated December 17, 2003, at pp. 58-61;[6] Exhibit 8, Deposition of Mary Barry, M.D. dated

December 19, 2003, at pp. 5-9, 20-21;[7] Exhibit 9, Defendants' Responses to Plaintiff's First Set

of Interrogatories dated September 15, 2003, at Interrogatory # 12;[8] Exhibit 10, Defendants' First

Supplemental Responses to Plaintiff's First Set of Interrogatories dated October 10, 2003, at

Interrogatory # 12;[9] Exhibit 11, Staff Chaplain Task Force Minutes dated March 10, 2000).

     12.    In or about spring 2001, Mr. Beaulieu participated in the recruitment process for a

Staff Chaplain but was not a member of the Task Force. Mr. Beaulieu was present during

interviews with some of the applicants, including plaintiff, and provided his opinion of the

applicants during meetings of the Task Force. Mr. Beaulieu did not ask any applicants to

disclose their religion. (Exhibit 5, Beaulieu Depo., at pp. 17-18, 20; Exhibit 6, Maynard Depo.,

at p. 7).

     13.    After several applicants had been interviewed for the Staff Chaplain position, the

Task Force convened to discuss them. The members of the Task Force were unanimous in the

opinion that plaintiff was the best candidate for the job. Mr. Beaulieu and Dr. Stephens, in

particular, made favorable comments about plaintiff during this meeting. (Exhibit 8, Barry

Depo., at p. 22, 24-25; Exhibit 9, Def. Response to Interrog. # 12; Exhibit 10, Def. First Supp.

Response to Interrog. # 12; Exhibit 12, Deposition of Robin Begansky dated November 25,

---

[6] Hereinafter cited as "Levine Depo., at p. __."
[7] Hereinafter cited as "Barry Depo., at p. __."
[8] Hereinafter cited as "Def. Response to Interrog. # __."
[9] Hereinafter cited as "Def. First Supp. Response to Interrog. # __."

2003, at pp. 16-17;[10] Exhibit 13, Deposition of Dawn Noel dated November 25, 2003, at pp. 23-24).[11]

14.    Mr. Beaulieu thought plaintiff would be a good "fit" for the Staff Chaplain position based upon her interview and agreed with the Hospital's decision to hire her. After she was hired, plaintiff embraced Mr. Beaulieu and thanked him for his support. (Exhibit 3, Campbell Depo. #1, at p. 51; Exhibit 5, Beaulieu Depo., at pp. 22 & 36).

## The Staff Chaplain Position

15.    Before plaintiff was hired, the Hospital determined that the Staff Chaplain would report to Breault and would have a "dotted-line" reporting relationship to Maynard, meaning that Maynard would have input into the Staff Chaplain's job performance, would serve as a resource for him or her and would supervise him or her intermittently. Plaintiff was advised of her reporting relationship with respect to Breault and Maynard before she was hired. (Exhibit 6, Maynard Depo., at pp. 21-22; Exhibit 14, March 21, 2001 offer letter from Wendy Nogler to plaintiff).

16.    On March 21, 2001, the Hospital hired plaintiff as Staff Chaplain. A March 21, 2001 letter from the Hospital to plaintiff provides that the Staff Chaplain position is a "30-hour professional benefited position" and that the first three months of plaintiff's employment is an "introductory" period during which plaintiff's "performance will be evaluated." Plaintiff signed the March 21, 2001 letter accepting the Staff Chaplain job subject to the terms stated therein. Plaintiff began work at the Hospital on May 7, 2001. (Exhibit 1, Complaint and Answer, at ¶ 13; Exhibit 14, March 21, 2001 offer letter from Wendy Nogler to plaintiff).

---

[10] Hereinafter cited as "Begansky Depo., at p. __."
[11] Hereinafter cited as "Noel Depo., at p. __."

17.    During plaintiff's employment at the Hospital, Breault advised her that she had submitted a request to the Hospital's senior leadership team to convert the Staff Chaplain position to 40-hours per week and that the request had been denied. (Exhibit 4, Breault Depo., at p. 171-176).

18.    As Staff Chaplain, plaintiff was responsible for planning and coordinating pastoral care at the Hospital. She also was required to serve as a liaison to the local religious community and to coordinate the work of the volunteer lay clergy; specifically, the Beaulieus. The Staff Chaplain job description provides, in relevant part, that the Staff Chaplain "serves as the Hospital's representative to the religious community and to other appropriate entities," "serve[s] as a liaison with local religious groups," and "[s]upport[s], advance[s] and exemplif[ies] the Mission, Vision, Values and Expectations of [the] Hospital in all interpersonal interactions within and across departments, and in the community as appropriate." (Exhibit 1, Complaint and Answer, at ¶ 14; Exhibit 15, Staff Chaplain Job Duties/Responsibilities).

## The Hospital's Pastoral Care Practices

19.    Before plaintiff was hired, local clergy, upon arriving at the Hospital, reported to the Hospital's information desk and were provided copies of patient lists, which included the following information: patient names, patient room numbers, and patient religious affiliations. Local clergy reviewed the patient lists to determine whether any of their parishioners were patients in the Hospital. (Exhibit 5, Beaulieu Depo., at pp. 25-26; Exhibit 6, Maynard Depo., at pp. 63-65; Exhibit 16, Defendants' Second Supplemental Responses to Plaintiff's First Set of Interrogatories dated November 18, 2003, at Interrogatory # 19).[12]

---

[12] Hereinafter cited as "Def. Second Supp. Response to Interrog. # __."

20.    During her employment at the Hospital, plaintiff was advised that there were no Hospital policies or procedures concerning pastoral care. (Exhibit 17, Deposition of Barbara Campbell dated March 9, 2004, at p. 158).[13]

21.    During her employment at the Hospital, plaintiff prepared draft policies concerning clergy visitation and notification. Maynard and Breault reviewed the draft policies and did not object to the general subject matter contained therein. (Exhibit 6, Maynard Depo., at pp. 156-158).

### Plaintiff's Relationship with the Beaulieus

22.    In or about May or June 2001, Mr. Beaulieu, in his role as chair of the PCAC, advised plaintiff that he intended to convene a meeting of the PCAC. Plaintiff placed her fist on a table and stated that she was the Staff Chaplain and would call any meetings. Mr. Beaulieu related this conversation to Maynard. (Exhibit 5, Beaulieu Depo., at pp. 36, 38, 49, 77; Exhibit 6, Maynard Depo., at pp. 149-150; Exhibit 16, Def. Second Supp. Response to Interrog. # 4).

23.    In or about June 2001, a Roman Catholic patient requested that Noel contact Mr. Beaulieu to come to the Hospital to visit with her prior to her surgery. When Mr. Beaulieu arrived at the Hospital, plaintiff was upset that she had not been notified of the patient's request and questioned Mr. Beaulieu at length about who had contacted him to come to the Hospital. Noel later met with plaintiff to explain why she had contacted Mr. Beaulieu but plaintiff insisted that she should have been contacted instead of Mr. Beaulieu. Noel advised Breault of her conversation with plaintiff either on the day it occurred or the following day. In addition, Mr. Beaulieu advised Maynard of the incident. (Exhibit 5, Beaulieu Depo., at pp. 36, 41-43; Exhibit 6, Maynard Depo., at pp. 125-126, 131-132; Exhibit 13, Noel Depo., at pp. 41-45).

---

[13] Hereinafter cited as "Campbell Depo. # 2, at p. __."

24.    Plaintiff arranged for the removal of a portion of a countertop in the pastoral care office that had previously been utilized by the Beaulieus. As a result, the Beaulieus were left with approximately three feet of work space. Plaintiff did not consult with the Beaulieus before making this change. (Exhibit 5, Beaulieu Depo., at pp. 46-47, 49).

25.    Plaintiff arranged to have the lock changed on the door to the pastoral care office. Plaintiff did not advise Mr. Beaulieu of her plan to the change the lock. Mr. Beaulieu discovered that the lock had been changed when he arrived at the Hospital one Sunday to visit with Roman Catholic patients and could not enter the pastoral care office. Mr. Beaulieu reported the incident to Maynard. Plaintiff prepared contemporaneous written notes regarding the incident which provide: "Stroked Del – angry that door was locked on Sunday (I would have been too!)." (Exhibit 5, Beaulieu Depo., at p. 69; Exhibit 18, Barbara Campbell's notes).

26.    Prior to and during plaintiff's employment at the Hospital, Mr. Beaulieu distributed prayer pamphlets to Roman Catholic patients to whom he offered the sacrament of Holy Communion, and to other patients who requested them. The pamphlets identified the church that had donated them. Mr. Beaulieu reproduced some of the pamphlets at his own expense using his home computer. On one occasion, plaintiff blacked-out the name of Mr. Beaulieu's church from the front cover of several pamphlets, which Mr. Beaulieu had left in the pastoral care office. (Exhibit 3, Campbell Depo. # 1, at p. 124; Exhibit 5, Beaulieu Depo., at pp. 28-29, 110, 116-118; Exhibit 17, Campbell Depo. # 2, at pp. 159-160, 163-165).

27.    Dr. Barry observed that the interpersonal relationship between plaintiff and the Beaulieus was "strained" and that the Beaulieus were often "visibly upset" as a result of their interactions with plaintiff. For example, Mrs. Beaulieu was upset that plaintiff (a) showed a lack of compassion towards her when discussing the death of her sons; and (b) instructed her to pray

with all of the patients in the Hospital's maternity unit. Mr. Beaulieu was upset that plaintiff: (a) admonished him that he had acted inappropriately by visiting with a patient who had requested to meet with him; (b) treated his wife disrespectfully when discussing the death of their sons: and (3) did not value his service to the Hospital. Dr. Barry communicated her observations during an August 2001 meeting. (Exhibit 8, Barry Depo., at pp. 32-34, 38-42).

28.    Plaintiff's relationship with the Beaulieus became so strained that the Beaulieus, rather than share the pastoral care office with plaintiff, worked from a table set up in a Hospital corridor. (Exhibit 5, Beaulieu Depo., at pp. 48, 76-77).

### Plaintiff's Relationship with Local Clergy

29.    On June 19, 2001, plaintiff attended a meeting of the PCAC. During the meeting, plaintiff discussed her proposed changes to the Hospital's pastoral care practices. Plaintiff stated that, pursuant to her proposed pastoral care policies, she was to be the first person contacted when patients or family members request visitation from a particular clergy person and that she would contact the appropriate clergy person. She further stated that clergy would no longer have access to patient lists but only to information regarding their respective parishioners. Some members of the PCAC objected to plaintiff's proposed policies. Plaintiff, however, refused to acknowledge their concerns, became defensive, and, at one point, accused them of "picking" on her. Maynard had to intercede in order to restore order to the meeting. (Exhibit 3, Campbell Depo. # 1, at pp. 71, 75-76; Exhibit 5, Beaulieu Depo., at p. 52-60; Exhibit 6, Maynard Depo., at pp. 162, 164, 171; Exhibit 10, Def. First Supp. Response to Interrog. # 4; Exhibit 13, Noel Depo., at pp. 73-75; Exhibit 19, Notes from June 19, 2001 PCAC meeting).

30.    Among the local clergy that objected to plaintiff's proposed change in Hospital practice whereby clergy would no longer have access to patient lists in order to allow them to

identify their respective parishioners were Reverend Falcon-Garcia, Father Poulin ("Father Poulin"), Pastor John Heald ("Pastor Heald"), and Monsignor Willis West ("Monsignor West"). (Exhibit 5, Beaulieu Depo., at pp. 95-98).

31.    During plaintiff's employment at the Hospital, the following local clergy made negative statements about her performance as Staff Chaplain:  Reverend Falcon-Garcia, Pastor Heald, Monsignor West and Reverend Cheryl Larson-Lawling ("Reverend Larson-Lawling"). Specifically, Reverend Falcon-Garcia, Pastor Heald and Reverend Larson-Lawling were critical of plaintiff's behavior during a June 19, 2001 PCAC meeting.  Monsignor West was concerned that plaintiff's proposed policies would result in a delay in the provision of pastoral care to Roman Catholic patients. (Exhibit 6, Maynard Depo., at pp. 101-102, 147-148, 175, 258-261; Exhibit 10, Def. First Supp. Response to Interrog. # 13).

32.    Juanita Vazquez ("Vazquez"), a Hospital employee, advised Noel that local clergy person Reverend William Mendez ("Reverend Mendez") had requested that she serve as an interpreter to a conversation between him and plaintiff concerning the Hospital's visitation policies.  Vazquez advised Noel that she believed plaintiff had not been "culturally sensitive" to Reverend Mendez by failing to request the assistance of an interpreter prior to her first meeting with him.  Plaintiff prepared contemporaneous written notes regarding the foregoing incident which provide:  "Met with William Mendez (Deacon at Alpha and Omega Pentecoastal [sic] Church) upset that I `barred' him from visiting all people in hospital."  (Exhibit 13, Noel Depo., at pp. 58-62; Exhibit 18, Barbara Campbell's notes; Exhibit 20, Defendants' Responses to

Plaintiff's Second Set of Interrogatories dated April 12, 2004, at Interrogatory # 2).[14]

### Plaintiff's Relationship with Hospital Staff and Physicians

33.     During plaintiff's employment at the Hospital, Sandy Minchew, R.N. ("Minchew") reported that plaintiff had interfered with the nurses in the Hospital's critical care unit while they were providing emergency care to a patient. (Exhibit 13, Noel Depo., at pp. 65-66; Exhibit 20, Def. Response to Second Set of Interrog. # 2).

34.     During plaintiff's employment at the Hospital, several staff members remarked that plaintiff made them uncomfortable and that she stood too close to them and did not respect their personal space. A few nurses further commented that they were not comfortable calling upon her to consult with their patients. Among the staff members who commented about plaintiff were Begansky, Minchew, Teddi Moore ("Moore"), Kathleen Clairmont ("Clairmont"), Teresa Carey ("Carey"), Ellen Schreiber ("Schreiber") and Colleen Corcoran ("Corcoran"). Breault and Maynard spoke with plaintiff about the comments made by some of the Hospital staff. (Exhibit 4, Breault Depo. # 1, at pp. 133-138; Exhibit 6, Maynard Depo., at pp. 86-89; Exhibit 12, Begansky Depo., at pp. 33-41; Exhibit 21, Defendants' Supplemental Responses to Plaintiff's Second Set of Interrogatories dated June 14, 2004, at Interrogatory # 2;[15] Exhibit 22, Deposition of Allison Breault dated April 28, 2004, at pp. 312-316, 319-324;[16] Exhibit 23, Deposition of Teddi Moore dated August 16, 2004, at pp. 7-8, 10-11;[17] Exhibit 24, Deposition of Teresa (Carey) LaFleur dated August 17, 2004, at pp. 8-12, 15;[18] Exhibit 25, Deposition of Kathleen Clairmont dated August 16, 2004, at pp. 11, 13-17).[19]

---

[14] Hereinafter cited as "Def. Response to Second Set of Interrog. # __."
[15] Hereinafter cited as "Def. Supp. Response to Second Set of Interrog. # __."
[16] Hereinafter cited as "Breault Depo. # 2, at p. __."
[17] Hereinafter cited as "Moore Depo., at p. __."
[18] Hereinafter cited as "Carey Depo., at p. __."
[19] Hereinafter cited as "Clairmont Depo., at p. __."

35.    During plaintiff's employment at the Hospital, Dr. Leach and Dr. Petro, two staff physicians, commented that plaintiff had made what they believed were inappropriate notations in patient charts. (Exhibit 4, Breault Depo. #1, at pp. 112-114; Exhibit 6, Maynard Depo., at pp. 90-93, 198-199).

### Plaintiff's End of Probation Performance Evaluation

36.    On or about August 1, 2001, Begansky, Dr. Barry, Mr. Beaulieu, Breault, Dr. Stephens, Noel, Levine and Maynard (via phone) met to discuss concerns that had been identified during plaintiff's probationary employment period (e.g., plaintiff's relationships with local clergy, the Beaulieus and Hospital staff and plaintiff's improper documentation in patient charts). The consensus of the group was that plaintiff's performance would not likely improve and that perhaps she should be terminated. Based, in part, upon the discussion during the meeting, Breault decided to extend plaintiff's probationary employment period in order to afford her an opportunity to improve her performance. (Exhibit 4, Breault Depo. # 1, at pp. 176-178, 185-187; Exhibit 6, Maynard Depo., at pp.186-189; Exhibit 26, Notes/Statement regarding August 1, 2001 meeting).

37.    Following the August 2001 meeting, Breault prepared plaintiff's end of probation performance evaluation with assistance from Maynard. Levine reviewed the evaluation before it was discussed with plaintiff. On or about August 15, 2001, Breault and Maynard met with plaintiff to discuss her evaluation. In accordance with the evaluation, plaintiff's probationary employment period was extended for an additional three months to provide her an opportunity to address and improve her relationships with local clergy and the Beaulieus, address documentation issues, and modify her approach with Hospital staff so as to acknowledge their

need for personal space. (Exhibit 4, Breault Depo. # 1, at pp. 190-191, 264; Exhibit 6, Maynard

Depo., at pp. 35, 207; Exhibit 27, Plaintiff's Performance Evaluation).

38.    On August 22, 2001, plaintiff met with Breault and provided her with two

documents entitled, respectively: "Evaluation Reply" and "Evaluation Suggestions." Breault

perceived these documents to be argumentative and sarcastic and indicative of plaintiff's

unwillingness to work cooperatively with Breault in order to improve her job performance.

Breault discussed plaintiff's "Evaluation Reply" and "Evaluation Suggestions" with Levine.

(Exhibit 4, Breault Depo. # 1, at pp. 204-206; Exhibit 16, Def. Second Supp. Response to

Interrog. # 4; Exhibit 28, Plaintiff's Evaluation Reply and Evaluation Suggestions dated August

22, 2001).

39.    Plaintiff did not discuss her performance evaluation with Breault or Maynard

before she prepared her "Evaluation Reply" and "Evaluation Suggestions." (Exhibit 3, Campbell

Depo. # 1, at p. 128).

## Plaintiff's August 2001 Meeting with the Beaulieus

40.    On or about August 22, 2001, Maynard attempted to arrange a meeting between

plaintiff and the Beaulieus in order to repair their relationship. Plaintiff initially refused to meet

with the Beaulieus as Maynard requested. When Maynard attempted to speak with plaintiff to

discuss why she had refused to attend the meeting, plaintiff would not speak with him, proceeded

to another office in the Hospital and attempted to recruit two other Hospital employees to serve

as witnesses to her conversation with Maynard. Plaintiff later advised Breault that she would not

meet with Maynard and the Beaulieus unless Cathy Brunson Young ("Young"), a temporary

Hospital employee, was present as a witness. Plaintiff later agreed to attend the meeting with the

Beaulieus, provided Breault was present. (Exhibit 3, Campbell Depo. # 1, at p. 129; Exhibit 4,

13

Breault Depo # 1, at pp. 77, 219-227; Exhibit 6, Maynard Depo., at pp. 221-224; Exhibit 29, August 22, 2001 voicemail message from plaintiff to Shawn Maynard).

41.    Plaintiff prepared written notes in preparation for her meeting with Maynard, Breault and the Beaulieus which provide: "Sharing of your story – sometimes it is appropriate, sometimes not . . . ." (Exhibit 30, Barbara Campbell's notes; Exhibit 31, Deposition of Barbara Campbell dated April 20, 2004, at p. 261).[20]

42.    During an August 28, 2001 meeting involving plaintiff, Maynard, Breault and the Beaulieus intended to "clear the air" between plaintiff and the Beaulieus, plaintiff referred to an incident whereby Mrs. Beaulieu upset a patient by discussing the death of Mrs. Beaulieu's two sons. Plaintiff referred to this discussion as Mrs. Beaulieu's "story." Plaintiff had been told by Maynard and Breault prior to the meeting not to discuss this incident because it would be upsetting to Mrs. Beaulieu. In reply to plaintiff's comment, Mr. Beaulieu stated that "if you were a man I'd jack you up against the wall" or words to that effect. (Exhibit 3, Campbell Depo. # 1, at pp. 112, 118-119; Exhibit 4, Breault Depo. # 1, at pp. 242-248; Exhibit 5, Beaulieu Depo., at pp. 70-73).

### Plaintiff's Resignation

43.    On or about August 28, 2001, Breault, Maynard and Levine met to discuss plaintiff's employment and determined that she should be terminated. (Exhibit 4, Breault Depo. # 1, at pp. 251-252; Exhibit 10, Def. Supp. Response to Interrog. # 7).

44.    Brvenik was advised of the decision to terminate plaintiff's employment. (Exhibit 2, Brvenik Depo., at pp. 136, 172-173; Exhibit 9, Def. Response to Interrog. # 7).

45.    On September 4, 2001, Breault met with plaintiff and requested that she resign

---

[20] Hereinafter cited as "Campbell Depo. # 3, at p. __."

her position in lieu of termination. Because plaintiff agreed to resign her position, Breault was not required to provide her with a termination letter she had prepared in advance of the meeting. (Exhibit 32, Allison Breault's September 4, 2001 notes; Exhibit 33, September 4, 2001 termination letter).

46.    Plaintiff was asked to resign as Staff Chaplain on account of her disregard of Breault's and Maynard's instruction not to discuss during an August 28, 2001 meeting the fact that Mrs. Beaulieu had upset a patient; her initial refusal to meet with the Beaulieus on August 28, 2001; her act of defacing some prayer pamphlets that Mr. Beaulieu had reproduced at his own expense; and the content of her response to her performance evaluation. (Exhibit 4, Breault Depo. # 1, at pp. 251-254; Exhibit 6, Maynard Depo., at pp. 221, 228, 239-240; Exhibit 7, Levine Depo., at pp. 143-144; Exhibit 22, Breault Depo. # 2, at p. 331; Exhibit 32, Allison Breault's September 4, 2001 notes; Exhibit 33, September 4, 2001 termination letter).

47.    Following her meeting with Breault on September 4, 2001, plaintiff prepared written notes concerning the circumstances of her resignation and her conversation with the Hospital employee who assisted her in removing her personal items from the Hospital. Plaintiff's notes provide: "Annadell – I did not know anything about this. `I am surprised and grateful there is no security to escort me out' `What happened?' `A volunteer form [sic] hell.'" (Exhibit 31, Campbell Depo. # 3, at pp. 252-254; Exhibit 34, Barbara Campbell's notes).

48.    Plaintiff met with a physician on September 24, 2001. The physician's progress notes provide: "lost job . . . argument with volunteer and fired for `doing job too well.'" (Exhibit 35, Strawbridge Family Medicine progress notes).

**Plaintiff's Replacement**

49.    Following plaintiff's resignation, the Hospital decided that the Staff Chaplain position should be a 40-hour per week position in order to attract a broader pool of qualified candidates. (Exhibit 2, Brvenik Depo., at pp. 186, 188-189; Exhibit 4, Breault Depo. # 1, at pp. 32-33).

50.    Plaintiff was replaced by Reverend Steven Scott ("Reverend Scott").  Reverend Scott is an ordained Disciples of Christ minister.  (Exhibit 9, Def. Response to Interrog. # 9; Exhibit 36, Resume of Steven Scott/January 22, 2002 Norwich Bulletin article).

51.    In or about December 2002 or January 2003, the Hospital's administration decided to cease funding for the Staff Chaplain position as a cost-cutting measure.  The Hospital also laid off two nurse practitioners and reduced the hours of approximately five other non-union employees. (Exhibit 2, Brvenik Depo., at pp. 212-214; Exhibit 4, Breault Depo. #1, at pp. 35-37).

**Plaintiff's Claims of Religious and Gender Discrimination**

52.    Plaintiff believes that she was discriminated against on the basis of gender because Mr. Beaulieu and Monsignor West do not believe that females should be ordained and made it difficult for her to do her job, meaning they objected to being denied access to patient lists.  (Exhibit 3, Campbell Depo. # 1, at pp. 39-40, 48-50; Exhibit 17, Campbell Depo. # 2, at pp. 218-219, 221).

53.    The only comment made about plaintiff's gender by Hospital staff, volunteers or local clergy was a lone comment by Mr. Beaulieu that "if [plaintiff] was a man [he] would bounce [her] off the wall" or words to that effect.  (Exhibit 3, Campbell Depo. # 1, at pp. 40-41).

54.    Plaintiff does not believe there are any Hospital staff who believe she should not be Staff Chaplain because of her gender.  (Exhibit 3, Campbell Depo. # 1, at pp. 41-42).

55.    Plaintiff is unaware of any negative comments by Levine, Breault, Maynard or Brvenik concerning her religion or gender.  Nor did she ever hear them say anything that would suggest that her religion or gender was a factor in her resignation.  (Exhibit 17, Campbell Depo. # 2, at pp. 204-206).


DEFENDANTS
WINDHAM COMMUNITY MEMORIAL
HOSPITAL and
HATCH HOSPITAL CORPORATION


By:    _William J. Albinger_____
Stephen B. Harris, ct13125
William J. Albinger, ct18861
Wiggin & Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
Their Attorneys

## CERTIFICATE OF SERVICE

This is to certify that on this 24th day of September, 2004, a copy of the foregoing has been mailed, postage prepaid, to the following:

>
> Mary E. Kelly, Esq.
> Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.
> 557 Prospect Avenue
> Hartford, CT  06105-2922

William J. Albinger

\4033\89\470087.4