## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

| | | |
|---|---|---|
| BARBARA CAMPBELL | : | CIVIL ACTION NO. |
| Plaintiff | : | 3:03 CV 0520 (JCH) |
| | : | |
| v. | : | |
| | : | |
| WINDHAM COMMUNITY HOSPITAL, | : | |
| INC. | : | |
| | : | |
| HATCH HOSPITAL CORP. | : | |
| Defendants. | : | November 8,  2004 |

_____  :

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

This case arises out of the termination of Unitarian Universalist Minister Barbara

Campbell (hereinafter "the plaintiff") from her position as Chaplain by defendants Windham

Memorial Community Hospital Inc., and Hatch Hospital Corp., ("hereinafter "the Hospital ").

The plaintiff contends that her evaluation was extended and she was  terminated because of her

speech concerning patient rights, in violation of C.G.S. §31-51q.   The  plaintiff also contends

that her termination violated the public policy  expressed in C.G.S §31-128, in that she  was

terminated because of her submission of a written statement disagreeing with her evaluation.

Finally, the plaintiff contends that she was discriminated against because of her  gender, religion,

and/or complaints of discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. §2000e, and the Connecticut Fair Employment Practices Act, C.G.S. §46a-60 et. seq.

The defendant  moves for summary judgment on all counts.  As is demonstrated below, this

motion must be denied as to Counts 1-5 and 7, because the defendant has  ignored critical factual

allegations, misstated others, relied on disputed facts and misapplied the legal authority.[1]

## II.    FACTS

The defendant is a non-denominational Hospital. As such, it may not promote any religion. (Ex. 5 at 41)[2]    During the 1980's and early 1990's spiritual care at the Hospital was co-ordinated by Chaplain Andrew Gerns.[3] (Ex 1 at 8-11). The Hospital had detailed policies governing the provision of spiritual care.[4] (Ex. 2)    In 1992, Chaplain Gerns left the Hospital and was not replaced. (Ex.1 at 11; Ex. 4) Instead, the Hospital created a Pastoral Care Advisory Committee (PCAC), made up of local clergy and Hospital representatives, to co-ordinate the provision of spiritual care and provide input as to how the Hospital should meet the spiritual needs of patients.[5] (Ex. 8 at 29-30) The PCAC was also supposed to help frame and modify the Hospital's spiritual care policies. (Ex. 8 at 160).

Local clergy could join the PCAC only at the invitation of existing members. (Ex. 8 at 138-140; Ex.1 at 13-14) In 2001, the PCAC did not represent the breadth of faith communities in the area. All five clergy members of the PCAC were Christian, and two, including the

---

[1] The plaintiff does not oppose the motion for summary judgement with respect to Count 6 of the Complaint, wrongful discharge premised on C.G.S. §46a-64.

[2] Exhibits cited herein refer to exhibits attached to Plaintiff's Rule 56(a)2 Statement.

[3] Chaplain Gerns co-ordinated the provision of spiritual care with the help of volunteer clergy. (Ex. 2 at 0608-0611)   Among these were volunteers Delphis and Juanita Beaulieu, Roman Catholic Eucharist Ministers. (Ex. 1 at 6; Ex. 3 at 57)

[4] Under the policies, local clergy were not permitted to proselytize to patients, and were only permitted to visit patients who were members of their own congregation, or who otherwise requested a visit. (Ex. 2 at 0599-0600; 0582)  The policies also prohibited the distribution of religious literature in common areas of the Hospital. (Ex. 2 at 0581-0581)

[5] Shawn Maynard, the Administrative Director of Communications and Volunteer Services, was assigned responsibility for supervising the volunteer clergy. (Ex. 5 at 41 )

Chairman,  were Roman Catholic.[6]   The PCAC did not modify or update the pastoral care

policies[7], and did not offer training to clergy or volunteers.  (Ex. 1 at 25-27; Ex. 5 at 295-296)

Due to the lack of  training, new volunteers were not permitted to visit patients.[8]  (Ex. 7  at 22-

29)  By 2001, only the Beaulieus were allowed to visit patients.[9]  (Id.)

        Thus, by 2001 the Hospital's official policies had fallen into disuse, and spiritual care was

being  co-ordinated by six individuals, all of whom were Christian and three of whom were

Roman Catholic.  Perhaps because of this, the Hospital's practices began to change.  The

Hospital stopped enforcing the pastoral care policies concerning the distribution of religious

literature.  Instead, the Hospital placed Bibles in all patient rooms,[10] and allowed the Beaulieus

to place Roman Catholic religious literature in common areas of the Hospital.  (Ex. 14 ¶ 25)

Ignoring the policies which provided that patients had the right to have their presence in the

Hospital treated as  confidential, the Hospital began notifying  St. James Church of  all Roman

Catholic admissions, and allowing Roman Catholic clergy, including  Monsignor West, Father

Poulin and Father Luke, to visit  patients who were not members of their church.  (Ex. 7 at 74-77;

---

        [6]    The PCAC consisted of  Delphis Beaulieu, Roman Catholic, Monsignor Willis West, Roman Catholic,  Pastor John Heald, Light of the Hill Christian Fellowship,   Reverend Ana Maria Falcon-Garcia, Pentecostal, and Cheryl Larsen-Lawling, Lutheran.  (Ex.13)  Delphis Beaulieu was the Chairperson of the PCAC.  (Ex. 1 at 14)  Local clergy also included Congregationalists, Jewish, Methodists, Episcopalians, Unitarians, Baptists, Seventh Day Adventists,  Greek Orthodox, Ukranian, Quakers, Evangelical, Spiritual, Nazarene, Presbyterians,  Buddhists, Mormon, Muslim,  and Church of Christ .  (See Ex. 10-12 )

        [7]    However, the Hospital did not rescind the policies, and Maynard  continued to use them as a reference.    (Ex. 7 at 18; Ex. 6 at 1,2,and3)

        [8]    Other clergy volunteers were only permitted to make telephone calls.  (Ex. 7  at 22-29)

        [9]    The Hospital gave the Beaulieus an office.    While the defendant claims that the office was provided for all clergy, only the Beaulieus had keys.  (Ex. 15 at ¶11; Ex. 7 at 83, 238-239).

        [10]   This was done at the request of the all Christian PCAC.  (Ex. 7 at 72)

165-168; Ex. 6 at 35)

    In early 2000, the Hospital decided that a Chaplain should be hired to coordinate pastoral care. Seven candidates were asked to come for in-person interviews. [11] (Ex. 21-24) Only three were considered strong candidates- Christopher Beukman, Susan Stewart, and the plaintiff.[12] (Ex. 7 at 13-14) Beukman, who lived in Boston, refused to consider moving to the area, indicating that he intended to commute and to be present at the Hospital only a few days per week. (Id.) This was unacceptable to the Hospital. (Id.) Stewart was dependant on public transportation, making it unlikely that she could fulfill the on call duties. (Ex. 16 at 14) This left the plaintiff- a Unitarian Universalist minister.[13] (Ex. 15).

    On or about March 21, 2001, the plaintiff was hired as Staff Chaplain and Director of

---

[11] A committee of Hospital officials, local clergy, employees and medical staff were involved in the hiring process. (Ex. 4) The exact membership of this committee is unclear. Some witnesses testified that Allison Breault, the Vice President of Patient Care Services, was on the committee, but she has denied it. (Ex. 16 at 17-18; Ex. 5 at 52-54) Some witnesses have claimed that Delphis Beaulieu was on the committee, but he has denied it. (Ex. 16 at 14-15; Ex. 17 at 20-22; Ex. 1 at 19-20) The selection process is similarly unclear. Hospital records indicate that initial interviews were conducted by the Vice President of Human Resources, Marty Levine, Maynard and a human resources employee. (Ex. 18) However, Levine claims that Breault was also involved. (Ex. 19 at 58-61) She denies involvement. (Ex. 5 at 50-54).

    The seven candidates who were invited for in person interviews were apparently not interviewed by all of the committee members. Stevens and Breault testified that they did not interview anyone (Ex. 20 at 10; Ex. 5 at 52-54) Begansky recalls interviewing three people. (Ex. 16 at 11-14). Barry recalls only two. (Ex. 17 at 22-24) Beaulieu recalls six. (Ex. 1 at 19-22). Dawn Noel interviewed four. (Ex. 24 at 17). No Roman Catholic applicant was sufficiently qualified to merit an in person interview. (Ex. 6 at 9)

[12] The interviews of Lucia and Tanquey were merely a matter of courtesy because they had connections to the Hospital. (Ex. 7 at 14-17) Pearl was initially considered but lacked the proper credentials. (Ex. 7 at 14-17) Siverls was weak, and lacked experience. (Ex. 7 at 17)

[13] Some members of the committee wanted to continue search. (Ex. 3 at 23-24) Others, including Beaulieu, apparently believed that she should be given the position. At the time he was not aware of her religion. (Ex. 1 at 20)

Pastoral Care.[14]  (Ex. 25)   She began work on May 7, 2001.  (Id.)  When the plaintiff began

employment she was provided with a detailed written job description.  (Ex. 26)   This job

description provided, *inter alia,* that she was responsible for coordinating and supervising all of

the spiritual support and pastoral care  provided through the Hospital, including the work of all

volunteers and clergy.   (Id.)  It explained that she was to function both, "interfaith and

ecumenically", and that she was to ensure that the Hospital complied with relevant regulations.[15]

(Id.)  It further stated that she was to be supervised by Alison Breault.  (Id.)

    The plaintiff was  assigned an office that had previously been used by the Beaulieus. (Ex.

15 ¶11; Ex. 7 at 82)   She wanted to develop a good relationship with the Beaulieus, who she

knew were longtime volunteers, so she told the Beaulieus that she had no objection to sharing the

office with all clergy as long as  privacy was respected when she was providing confidential

counseling. [16]  (Ex. 15 ¶11)   The plaintiff  spent her first months of employment educating

---

[14]It is not clear who made the decision to hire the plaintiff.   CEO Dick Brvnik claimed
that the decision was made by Alison Breault with input from Levine, Maynard and the
committee. (Ex.8 at  48-49)   Breault has denied involvement. (Ex. 5 at 55)  Some committee
members have similarly denied involvement in any hiring decision. (Ex. 20 at 10; Ex. 17 at 25)

[15]  One of the regulations for which the plaintiff  was responsible, was the standards of the
Joint Commission on  Accreditation of Health Care Organizations (JCAHO).    (Exhibit 15 ¶9;
Ex. 8 at 61-62; Ex. 28)   Hospitals must be accredited by JCAHO or the state  in order to be
approved for medicare. (Ex. 7 at 55-57) The Hospital had chosen to be accredited by JCAHO.
(Ex. 7 at 55-57)   One JCAHO standard  requires that the Hospital demonstrate respect for patient
needs concerning  confidentiality, privacy, and spiritual care. ( Ex 15  ¶9; Ex 28)    Under
JCAHO, the Hospital is to respect a patient's spiritual traditions, including the patient's right to
worship as he or she chooses.  (Ex. 8 at 65; Ex. 5 at 48- 49).
    The Health Insurance  Portability and Accountability Act of 1996 (HIPAA), PL 104-191,
is a comprehensive statute governing the disclosure of confidential health information.  (Ex. 15
¶10) Among other provisions, HIPAA  limits  a hospital's ability  to share patient information
with non-employee clergy.    (Ex. 15 ¶10; Ex. 5  at 28)   When the plaintiff  was hired HIPAA
had not yet gone into effect.  (Ex. 15 ¶10)   However, the Hospital was required to create
policies  and train employees with respect to HIPAA. ( Ex. 15 ¶10; Ex. 8 at 66)

[16]   There were some early mis-communications involving the sharing of this office.  At
the invitation of Breault, the plaintiff ordered new furniture to ensure that there were work spaces

herself about Hospital practices,[17] and educating the local clergy, patients and Hospital staff as to the services she could provide as Chaplain.[18]   (Ex. 15 ¶15)   The plaintiff soon identified a number of concerns with respect to the provision of spiritual care to patients.

First, the plaintiff learned that the Roman Catholic priests regularly went to see Catholics who were not members of their particular church, and who had not requested such visits.  (Ex. 15 ¶28)    William Mendez, Deacon of the Alpha and Omega Pentecostal Church, also went room to room at the hospital reaching to persons of other faiths. [19]   (Ex. 15 ¶ 28; Ex. 1 at 86-87)   The plaintiff believed that this visitation and proselytizing invaded the privacy of patients, and failed to show respect for their spiritual values, thereby violating JCAHO. (Ex. 15 ¶28)   On May 29, the plaintiff learned that Mendez had approached a Jewish patient, began to pray over him and spoke to him about Jesus.[20]   (Ex. 1 at 86; Ex. 15 ¶30) The plaintiff told Mendez that he was not permitted to proselytize and should only visit members of his own

---

for the local clergy and herself.   ( Ex. 15 ¶12)   The Hospital provided file cabinets, a telephone, a new computer and a second desk for clergy to use while working in the office. (Id.)   In order to make room for this new furniture, the plaintiff had part of a counter removed. (Id.)  Unfortunately nobody had informed the plaintiff that the counter had been donated by the various area churches. (Ex. 15 ¶13)  The plaintiff did not learn this until after the counter had been removed, when Mr. Beaulieu began shouting angrily at her. (Id.)   The plaintiff had also asked that the Hospital have the office locks changed because the office contained confidential patient information and she did not know who might have been given keys over the years.  (Ex. 15 ¶14)  Mr. Beaulieu was inadvertently locked out when the Hospital changed the locks.   (Id.) The plaintiff apologized and personally gave him a key.   (Id.)

[17]  She had asked if the Hospital had any written policies concerning pastoral care, and was inaccurately told that that they did not.  (Ex. 15   ¶16)

[18]  She also created and distributed informational pamphlets, and joined Hospital committees.   (Ex. 15 ¶17; Ex. 29)  She began to meet the local clergy .  (Ex. 15 ¶ 17)   She tried to visit all newly admitted patients, and began counseling patients, families, and staff.  (Id.)

[19]  According to Beaulieu, Mendez had just started his own church, "and was trying to fill the pews".  (Ex. 1 at  at 87).

[20]When the plaintiff arrived she calmed the patient, who was offended.  (Ex. 15 ¶30-32) She apologized to him, and documented his complaint, and her apology on his chart.  (Id.)

church or persons who had requested care.  (Ex. 15  ¶30-32) The next day Mendez  told her that

the Bible said to visit the sick, pray over them and lay hands on them.  (Id.)  She again explained

that it was not appropriate for him to visit or  pray over patients who were not his parishioners

and had not requested that he provide spiritual care. (Id.)   Mendez  complained to Shawn

Maynard. (Ex. 7 at  136 )

        Second, the plaintiff  learned that the Hospital placed Bibles in all patient rooms.   (Ex.

14 ¶25; Ex. 15 ¶34)   The plaintiff  believed that this was not appropriate at a non-

denominational Hospital.  (Id.)   She also believed that placing such literature in  patient rooms

showed a lack of respect for the spiritual values of non-Christian patients, and was therefore

inconsistent with JCAHO.   (Id.)   The plaintiff asked Beaulieu to remove the Bibles, explaining

that while Bibles could be available upon request,  it was not appropriate to place them in every

room of a non-denominational Hospital.  (Id.)   He was furious, insisting that the Bibles remain.

(Ex. 15¶34-35; Ex. 1 at 79-81, 104; Ex. 7 at 112; 257-258; Ex. 5 at 104)  He complained to

Maynard. (Id.)

        The plaintiff also learned that the Hospital allowed Beaulieu to distribute copies of a

Roman Catholic  prayer  booklet[21].   (Ex. 15 ¶36; Ex. 14 ¶25)  The plaintiff  believed that the

distribution of pro-Catholic prayer booklets showed a lack of respect for the beliefs of non-

Catholics, was inconsistent with JCAHO standards, and was inappropriate in  a non-

denominational Hospital.  (Ex. 15 ¶36-37)  She  explained to Beaulieu that   the placement of

Roman Catholic literature in patient rooms and in common areas of a non-denominational

Hospital might be viewed  as showing a lack of respect for other  faiths.  (Id.)  He appeared

angry about this, and continued to distribute the  prayer booklets.   (Id.)    Beaulieu also gave

---

[21]  She found these in waiting areas and even in empty patient rooms. Id.

out these prayer booklets, which contained the name of his church, when he visited Roman Catholic patients from other parishes.[22] (Ex. 15 ¶38 ) The plaintiff explained that when he was acting on behalf of the Hospital, he should not provide literature which advocated or promoted a particular church to persons who were not members of that church.[23] (Id.) Beaulieu continued to distribute the booklets promoting his church to members of other churches.[24] (Id. )

Third, the plaintiff believed that the PCAC was not sufficiently inclusive, in that it included only Christian faiths. (Ex. 15 ¶25) The plaintiff decided that it would be a good idea to expand the membership[25], and began talking to some of the non-Christian clergy.[26] (Ex. 15 ¶25) In May 2001, Beaulieu told the plaintiff that he intended to call a PCAC meeting. (Ex. 1 at 36; 52, Ex. 15 ¶26)   Since she was intending to expand the membership, the plaintiff politely told Beaulieu that she would call the meeting when she was ready to hold a meeting.[27] (Ex. 15 ¶26) Beaulieu complained about this. (Ex. 7 at 149)

---

[22] As a clergy volunteer Beaulieu was permitted to visit Roman Catholic patients who were not members of his church or parish. (Ex. 9 )  In doing so, he was supposed to minister as an inter-faith and/or ecumenical chaplain. (Ex 9)

[23] She explained that a Roman Catholic who attended a different church might feel that this was proselytizing or that he was showing a lack of respect for their church. (Ex. 15 ¶ 38 ) She noted that there was no problem with him handing out Roman Catholic material to Roman Catholics if the name of the specific church were deleted, and that he could provide the booklets promoting his church to members of his church or to anyone who asked for one.  (Id.)

[24] The plaintiff spoke to Maynard and Breault about her concerns with respect to the Bibles, and the distribution of the prayer booklets, including her concern that this conduct was inconsistent with JCAHO. (Ex. 15 ¶ 39; Ex. 7 at 114-117; 122-123)  No action was taken.  (Id.)

[25] She also believed that it would be helpful to include Hospital employees. (Ex. 15 ¶25 )

[26] She eventually invited Rabbi Schwartz to join the PCAC. (Ex. 15 ¶ 25)

[27] At this time, the plaintiff was unaware that Beaulieu was Chair of the committee. (Ex.26)  The defendant falsely claims that the plaintiff's demeanor was inappropriate, that she shouted and that she pounded on the table with her fist.  This untrue. (Ex. 15 ¶26)

Fourth, the plaintiff became concerned that Beaulieu did not respect the privacy rights of patients or persons receiving pastoral counseling. (Ex. 15 ¶18-19) He interrupted counseling sessions and apparently spoke outside of the Hospital about the identity of a person the plaintiff was counseling.[28] (Id.)    The plaintiff believed that this conduct violated the confidentiality and privacy rights of patients.[29]  (Ex. 15 ¶20)

Fifth, the plaintiff learned that there had been problems with the Hospital's notification of clergy in response to patient requests- particularly with the smaller denominations.[30] (Ex. 15 ¶24; Ex. 31)    The plaintiff believed that ensuring prompt and appropriate spiritual care for all patients was of critical importance, and asked to be notified of all patient requests for spiritual care so that she could ensure prompt notification.[31]  (Ex. 15 ¶ 24; Ex. 16 at 50-52)   She carried a beeper so that she could carry out this responsibility.  (Ex. 15 ¶24)   In May or June 2001, the plaintiff learned that the Hospital had called Beaulieu about a patient request for spiritual care, without notifying her. (Ex. 15 ¶40; Ex. 1 at 36-37)   The plaintiff reminded Beaulieu that she

---

[28]The plaintiff's counseling sessions often took place in the office. (Ex. 15 ¶ 18-19) Beaulieu walked in and interrupted without knocking. (Id.)    The plaintiff spoke to him and explained that he should not walk in during counseling as the identity of the person she was counseling was confidential. (Id.)   The plaintiff explained that if he knocked she could fetch whatever he needed.  (Id.) He refused to listen. (Id.) In order to ensure that this did not happen, the plaintiff posted a sign during her sessions. (Id.)   Beaulieu again walked in without knocking. (Id.)  After this second interruption, the woman did not return for further counseling. (Id.)   The plaintiff was later told that Beaulieu had been telling people outside of the Hospital about the woman the plaintiff was counseling, and her husband's hospitalization.  (Id.)

[29]   She spoke to Maynard and Breault about her concerns, but the Hospital never mentioned the issues to Beaulieu. (Ex. 15 ¶20; Ex. 1 at 85-86)

[30]   The practice of the staff was to try to reach the patient's own clergy person, and if that person was not available to go to the telephone book and try to find someone.  (Ex. 16 at 27-28) With respect to the smaller denominations, there were sometimes difficulties in finding someone to provide spiritual care. (Ex. 3 at 37-38)   Ken Rice, a spokesperson for the Hospital, described the Hospital's practice as "hit or miss at times".  (Ex. 6 at 40; Ex. 31 )

[31]   Unbeknownst to the plaintiff, her suggestions was very similar to the policies adopted by the Hospital under Reverend Gerns.  (Ex. 2)

needed to be notified about patient requests, and asked who had contacted him. [32] (Id.)
Beaulieu disagreed, refused to listen to her explanation, and walked out while she was trying to
talk to him[33]. (Id.)    He then complained to Maynard and Dawn Noel.[34]  (Ex. 1 at 43-55)

Finally, the plaintiff believed that the Hospital's practices did not sufficiently respect the
privacy rights of patients.   For example, the plaintiff learned that the local clergy were
permitted to review the complete Hospital directory or census, which contained confidential
information about all patients including each patients' diagnosis and physician.  (Ex. 15¶21-23;
Ex.30)  Because clergy were given the entire directory, and not just the information concerning
their own parishioners, each clergy person was able to review patient information for non-
parishioners without that patient's permission or knowledge.  (Ex. 15 ¶21-23) The Hospital also
had a practice of notifying the local churches when patients were admitted, without first getting
permission from the patient.  (Ex. 15 ¶27)   The plaintiff believed that these practices violated
the privacy rights of patients, were inconsistent with JCAHO standards requiring respect for
each patient's right to privacy and confidentiality, and would violate HIPAA. (Ex. 15¶23, 27 )

The plaintiff became convinced that policies governing spiritual care needed to be
adopted in order to protect patient privacy and confidentiality, ensure that patient requests for
spiritual care were honored, and ensure that all faiths were respected and none promoted.   She
began to draft such policies.  (Ex. 15 ¶29, 42 ; Ex. 32, 33, 34)  The draft policies were reviewed

---

[32]  The defendant suggests that the plaintiff's demeanor and tone were inappropriate, and
that she attempted to "interrogate" him.   These claims are false. (Ex. 15 ¶40)

[33]Although Beaulieu had complied with a similar policy under Chaplain Gerns, he was
infuriated at the plaintiff wanting to be notified of patient requests.  (Ex. 1 at 36-37; Ex. 2)

[34]  Dawn Noel went to talk to the plaintiff in response to Beaulieu's complaints.   (Ex. 3 at
42-45)  The plaintiff again explained why she needed to be notified of any patient requests for
spiritual care that went through the Hospital. (Ex. 15 ¶41; Ex. 3 at 42-45)  Noel also objected to
having to tell the plaintiff about requests for spiritual care.  (Id.)

and approved by Quality Assurance, Breault, and Maynard.[35]  (Ex. 15 ¶ 43; Ex. 5 at 120- 130)

On June 19, 2001, the plaintiff held a meeting of  PCAC.[36]  (Ex. 13)   During this meeting she discussed her plans for the provision of spiritual care at the Hospital.  (Ex. 15 ¶44-45)  She also talked about the need to change the Hospital's  practices with respect to the provision of spiritual care.   (Id. )      The plaintiff discussed the draft policies and tried to explain why the changes were necessary.[37]  (Ex. 15 ¶43-45; Ex. 13)

Beaulieu, Heald, and West,  were upset about the proposed changes in policy.[38] (Ex. 15 ¶45 ; Ex. 7  at 253-255)   In particular, they were upset about the idea that they could only visit their own church members, and could see the census only with respect to  their own church

---

[35]  These draft policies stated that the plaintiff was to be notified of any patient request for pastoral care, and would be responsible for notifying the appropriate clergy. (Ex. 15 ¶42; Ex. 6 at 44; Ex. 32, 33, 34)   They indicated that religious literature could not be placed in common areas, and that literature espousing a particular church could only be given to persons belonging to that church or to persons who requested the literature.  (Id.)   They also stated that clergy could only view the census or directory data for patients who had identified themselves as belonging to that particular clergy persons church, and who had given permission.  (Id.)  They stated that clergy could only visit patients who had identified themselves as belonging to that particular clergy persons church, or who had otherwise requested visitation. (Ex. 15 ¶42; Ex. 6 at 41;Ex. 32, 33, 34)   The policies prohibited proselytization and room to room visiting.  (Id.)  Finally, they stated that the Hospital would only  notify a church of a  members hospitalization with permission from the patient.   (Ex. 15  ¶42; Ex. 6 at 43; Ex. 32, 33, 34)

[36]  The  clergy  present were  Beaulieu, Pastor John Heald, Monsignor Willis West, and Reverend Cheryl Larsen Lawling.  ( Ex. 13)

[37]  During the meeting the plaintiff  noticed that Beaulieu consistently interrupted her, spoke over her and paid little attention to her opinions.  (Ex. 15  ¶50) He treated female  minister Larsen Lawling in the same manner.  (Id. )  He did not do any of these things when Heald, West or Maynard spoke.  (Id. ) Similarly, the plaintiff  noticed that West  interrupted her and refused to listen to her explanations.   (Ex. 15  ¶51)  When Larson-Lawling spoke,  West would roll his eyes or make faces, even when the opinions she was expressing were similar to his.  (Id.)  West did not behave like this when  any  male spoke.   (Id.)

[38]  Larsen Lawling also expressed dismay upset about the substance of the changes and the fact that the policies were being changed without PCAC input.  (Ex. 7  at 20-261)

members- and then only if the member consented.[39]  (Ex. 15¶45; Ex. 1 at 97-100; Ex. 7 at 148-

149)  They wanted to be able to see the entire census.  (Ex. 1 at at 97-101)  They even wanted

to be able to see patients who had deliberately chosen to not identify themselves as belonging to

a certain church.   (Ex. 1 at  97-101)  As Beaulieu explained,

> a lot of the people for their own reasons would say, "I'm a Catholic
> unaffiliated."   Now that meant, if they were unaffiliated., then no priest
> could go and see them.   Now, sometimes a lot of these people go to
> church once or twice a year, but they didn't want to say that they went to
> church at St. Joe's because they only showed up once or twice a year,
> and they don't want the priest to come in there and give them a hard time.
>
> So you had all different kinds of reasons.   But [Father Poulin, Pastor
> Heald, Monsignor West and Reverend Falcon-Garcia) wanted to see who
>  was in there so they could see them."

(Ex. 1 at  97-98)

The plaintiff tried to explain why the policies were necessary.   (Ex. 15 ¶45)  However,

the clergy refused to listen and criticized her about the changes. [40]   Beaulieu  admitted that when

the plaintiff tried to explain her plans and changes to the policies  the clergy began cutting her

off, "talking at once because they didn't like what they were hearing".   (Ex. 1  at 54- 57)     He

explained that, "they were not interested in where she wanted to go.... they were interested in

what [she] was going to do for [them]".   (Ex. 1 at 54-57)    After the meeting, the plaintiff

explained the need for policy changes  in writing.[41]  (Ex. 15 ¶46; Ex. 37)  She also held several

meetings with local clergy  and  met individually with any clergy member with  questions.  (Ex.

---

[39]West was also initially concerned that a priest might not be notified promptly when
baptisms or last rites were needed.  (Ex. 15 ¶45; Ex. 7 at 148; 256)  The plaintiff  reassured him
that she wore a beeper at all times and would make sure  that a priest was promptly called. (Id.)

[40]The defendant suggests that the plaintiff's demeanor was inappropriate, that she did not
take the clergy concerns seriously, accused them of "picking on her" and that Maynard had to
essentially rescue her form the clergy.   These claims are false.  (Ex. 15 ¶ 45)

[41]  The content of this clergy letter was approved by Breault.  (Ex. 5 at 129-130)

15 ¶ 46-47)   She was very well received, and even Heald seemed to accept the changes. (Id.)
However, West and Beaulieu continued to complain.  (Ex. 15 ¶47-48)

The plaintiff continued to reach out to patients, staff, and local clergy.   She met with
hundreds of patients, family members and staff, and provided counseling as requested.   (Ex. 15
¶55; Ex. 43)   She acted as a liaison to local clergy and to the local community,  worked on
Hospital committees, and helped to simplify  and update the Hospital's  church codes so that the
directory  would be more accurate, and would include all area religions. (Id.)    Most of the staff
and local religious leaders responded positively[42].  (Id. )

During this period, the plaintiff  met on a weekly or bi-weekly basis with Breault and
Maynard  to discuss her efforts and concerns[43].   (Ex. 15  ¶56)   At no time did either indicate that
there were any concerns about  her  performance.   (Ex. 15 at ¶56) At no time did either  criticize
her for the changes in policies that she had proposed and they had approved.   (Id.)

By late June or July , the plaintiff had become concerned that she was not going to be
able to  get  West or Beaulieu to accept her.  (Ex. 15 ¶ 50-54 )  The plaintiff complained to
Breault and Maynard that she believed that neither  would accept her  as a minister because of

---

[42]  She was even asked to preach at several churches.  Id.

[43]  There were a few problems with the Beaulieus during this period.  In June or July,
during a discussion with Mr. Beaulieu he told her that "if she were a man" he  would bounce her
against the wall.  (Ex. 15 ¶50)  The plaintiff also continued to find  prayer pamphlets in
common areas.  (Ex. 15  ¶57) The plaintiff was also aware that Beaulieu continued to give out
prayer pamphlets promoting St. Mary's when he visited or gave communion to Catholics from
other parishes.  (Id.)  On one occasion in July, she blacked out the name St. Mary's on a handful
of the pamphlets so that he could give the pamphlets to Catholics without promoting his church.
(Id.)
　　　In July or early August, a nurse came to ask the plaintiff to speak with a patient who was
crying and very upset.  (Ex. 15  ¶58)  When the plaintiff spoke with the patient she learned that
Mrs. Beaulieu  had apparently upset the patient by talking about the fatal accident of her sons.
(Id.)   The plaintiff believed that Mrs. Beaulieu meant well, but had shown poor judgement. (Id. )
 The plaintiff spoke to Breault and Maynard  about her concerns.  (Id.) They told her not  to
discuss the issue with Mrs. Beaulieu, explaining that they  would handle the issue  "later".  (Id. )
Nobody  ever did so.  (Ex. 1 at 70-74)

her gender. (Ex. 15 ¶50-54; Ex. 6 at 50)  Breault and Maynard admitted that West probably believed that women should not be ordained, and might have a difficult time accepting the plaintiff.    (Ex. 15 ¶ 53; Ex. 7 at 28-29; Ex. 5 at 217-219)   They similarly admitted that Beaulieu might have a difficult time accepting a female ordained minister.  (Ex. 15 ¶54)

During this period, Beaulieu was complaining about the plaintiff throughout the Hospital- to Maynard, to various physicians, and to various members of the nursing staff. [44]  (Ex. 17 at 31- 32; Ex. 20 at 13-14; Ex. 5 at 104; Ex. 3 at 45-55; Ex. 38 at 9; Ex. 39 at 9-11; Ex. 40 at 9; Ex. 40)

As a result of his complaints, Dr. Barry asked the Hospital if they were going to have an opportunity to review the plaintiff's performance.[45]  (Ex. 42)

On  August 1, 2002, Levine, Maynard, and Breault did hold a  meeting to discuss the plaintiff's performance.   (Ex. 46; Ex. 47)  Drs. Barry and Stephens, Nurse Robin Begansky,

---

[44]  West also repeatedly complained about the plaintiff's desire to change the  policies to Maynard, Noel and Beaulieu  (Ex. 7 at 146-149; 255-256; Ex. 3 at 54-55; Ex. 1 at  97-101) Father Poulin apparently complained about the changes in policies with respect to the Hospital no longer notifying the church of a parishioners hospitalization without permission, and of being limited to visiting only parishioners.  (Ex. 1 at 92; 97-101; Ex. 5 at 166-167, 179-187, Ex.  41)

[45]The Hospital has detailed policies and practices governing discipline.   (Ex. 44)   These require that discipline be applied in a "uniform, fair and systematic method".  ( Ex. 44 at 0306) Managers are trained that before administering discipline they must engage in a fair and objective investigation to, "thoroughly examine all evidence associated with the allegation".  (Ex. 44 at  168)  Every employee is entitled to an investigation before discipline is  applied.  (Ex, 19 at 23- 24; Ex. 8 at 20-21)   There must be substantial evidence to support an accusation  of misconduct or poor performance  before a  employee is  disciplined.  (Ex. 44 at 168)   Extension of probationary status is considered a "serious level" of discipline.   (Ex. 19 at 36-37)

The Hospital also has detailed policies and practices concerning the evaluation of employees. (Ex. 45) These policies require that the supervisor conduct a, "thorough, impartial, and timely performance review".  (Ex. 45 at 0091)   Performance is to be assessed, "against each of the written standards, independently of other standards, and should be based on measurable or observable job-related results or behaviors".   (Ex. 45 at 0092; Ex. 19 at 31-32)   The evaluating supervisor must look for objective evidence of these job related results or behaviors.  (Id.)   A supervisor is  not to negatively evaluate an employee based on an observable but not measurable criteria, if they have not observed the performance and have not done an investigation to determine if the observations of others were accurate.  (Ex. 19 at  33)   This is because a supervisor is to use all available evidence.  (Ex. 19 at 27-29;  158;  206-206)

Dawn Noel and Delphis Beaulieu were invited to attend.  (Ex. 46)   These individuals discussed

purported problems with: (1) the plaintiff's  documentation of  patient complaints; (2) the

plaintiff's relationship with local clergy and Delphis Beaulieu; and (3) the plaintiff's approach to

patients and/or staff.  (Ex. 46)

With respect to the issue of documentation, the concerns involved the plaintiff's  having

documented Mendez' inappropriate proselytizing and her having noted on another patient chart

that a patient did not like her nurse. (Ex. 46)   The plaintiff was criticized for documenting in the

chart  even though the Hospital did not have a policy or practice with respect to how a Chaplain

was supposed to chart complaints.  (Ex. 20 at 30; Ex. 5 at  178-179; Ex. 6 at 63; Ex. 46).[46]

The alleged problems with local clergy,  involved general criticism of the plaintiff  by

Beaulieu and criticism about the changes in policies by other clergy.    (Ex. 17 at 59-61)  While it

is not clear what Beaulieu reported at the meeting, his complaints about her at that time involved

the initial difficulties with sharing the office, her changes in policies, claims that her attitude and

demeanor were inappropriate, and claims that she improperly provided spiritual care to Roman

Catholic patients.[47]  (Ex. 20 at 13-14; Ex. 5 at 104; Ex. 3 at 43-57; Ex. 17 at 31-32; Ex. 20 at 16-

17)   The other clergy complaints were: (1) a complaint by  Mendez about being denied the

opportunity to proselytize; (2)  complaints by Larsen Lawling, and Heald  at the time of the

_____

[46]   The Hospital guidelines generally provide that staff **are** to document patient problems
on the chart. ( Ex. 49) During the hiring process the Hospital had also been told that a chaplain
may document issues  in the patient record.  (Ex. 50)

[47]    His claims that her demeanor and behavior were inappropriate, including the claim
that she pounded on a table, and complained that people were "picking on her", were false.  (See
Ex. 15; Ex. 1 at 42-43; 52)   His complaints that she acted inappropriately with respect to the
provision of spiritual care, including claims that she gave an unconsecrated host to a patient,  told
Mrs. Beaulieu to pray over all patients, and failed to call a priest in an emergency, were false.
(Ex. 20 at 16-17; Ex. 1 at 51, 58, 64-65; Ex. 15 at 74-75)  His claim that he and  Mrs. Beaulieu
were forced to work in a hallway, was false.  (Ex. 1 at 76, Ex. 15 at 87) As was explained above,
a jury could also find that his criticism of the changes in policies, the removal of the counter, and
the changing of the locks in the office was unjustified.  (See: Ex. 15).

PCAC meeting about the policy changes, (3) a complaint from Father Poulin about the policy changes; and (4) complaints by West both at and after the PCAC meeting about the policy changes.[48]  (Ex. 5 at 179, 181, 194-198; Ex. 3 at  50-55;  Ex.7 at 146-149; 255-262 ).

The alleged problems with patients and staff  involved criticism  by a handful of nurses, primarily on the Hospital's  4Shea unit.[49]   (Ex. 46) It is impossible to reconstruct the complaints/concerns reported in the meeting with any degree of  specificity.  However, at most, some or all of the following concerns may have been reported[50]:

(1) one  patient was uncomfortable with Campbell's "new age" religious style[51];

(2) an unidentified 4 Shea nurse was uncomfortable with the plaintiff because the plaintiff "prayed to the moon and the stars";

(3) an unidentified 4 Shea nurse was uncomfortable with the plaintiff because she found the plaintiff's way of ministering, "unusual"

(4) Dawn Noel was uncomfortable with the plaintiff's changes in clergy notification policies and how she expressed them;

(5) on one occasion the plaintiff offered support to ICU staff members at a time when ICU Nurses Sandy Minchew and/or Susan Nosal felt it was distracting;

(6) on a second occasion Maynard observed the Plaintiff  "hovering" near staff at the ICU;

(7)  on one occasion the plaintiff  listened to a doctor's conversation in a way that  4Shea Nurse Begansky found inappropriate;

---

[48]   Falcon Garcia repeated complaints made by members of the PCAC.   (Ex. 7 at at 147)

[49]The plaintiff  interacted with approximately one hundred members of the medical staff, and one to two hundred Hospital staff.  (Ex. 5 at t 147)   During the time that she was employed by the Hospital she also met with more than 600 patients, met with family or staff about a patient over 400 times, and provided pastoral care to over 100 staff members.   (Ex. 43; ex. 15 ¶55)

[50]   The defendant relies on the testimony of Dawn Noel for the proposition that Juanita Vazquez may have believed that the plaintiff was "culturally insensitive" with respect to Mendez. (Defendant's Memorandum at 8) This, of course, is hearsay.   This hearsay cannot even be offered for the limited purpose of showing the effect of this  report on the defendant because Breault testified that the allegation  was not a factor in the defendant's decisions. (Ex. 5 at 260)

[51]The defendant now admits that it  is unaware of any patient complaints.   (Ex. 6 at 14)

(8) Begansky felt Campbell stood too close to her by which she meant within two feet;

(9) on one occasion 4Shea Nurse Moore was uncomfortable because Campbell touched her shoulder in an attempt to connect;

(10) on one occasion 4Shea Nurse Carey was uncomfortable because Campbell stood close to her and told her she mattered after Carey had been treated in an unprofessional manner by a physician;

(11) on one occasion 4Shea Nurse Clairmont was uncomfortable because Campbell stood close to her and said, "I'm here for you";

(12) 4 Shea Nurse Johnson thought Campbell seemed unapproachable;

(13) Discharge Nurse Butler thought Campbell seemed unfriendly; and

(14) on one occasion Dawn Noel thought that the Plaintiff looked ludicrous when she waived her arms at Noel in an attempt to be friendly.

(See Ex. 7 at 92; 100; Ex. 6 at 64- 65; Ex. 51 at 8; Ex. 52 at 2; Ex. 3 at 38-39, 45; 49-50, 65-67;

70-71; Ex. 16 at 31-33, 45; Ex. 20 at 11-12, 18-23; Ex. 17 at 26-30, 52-55, 80; Ex. 46; Ex. 5 at

140; 185, 310-325: Ex. 38 at 7-19; Ex. 53 at 7-14; Ex. 39 at 7-13; Ex. 40 at 7-11; Ex. 54 at 5-11)

Breault did not speak with Heald, Mendez, Larsen-Lawling, or West to see if the reports

of problems with the plaintiff were accurate. (Ex. 5 at 194-198)   Similarly, Breault did not try

to talk to any patients, to Butler, Minchew, Nosal, Clairmont, Carey, Johnson or to the doctors

whose conversation the plaintiff allegedly, overheard to determine whether or not the reports of

concerns were accurate.[52] (Ex. 5 at 145-149; 262-264)   Despite this, the persons present at the

meeting decided that the plaintiff had engaged in poor performance with respect to clergy,

families, patients and staff, and discussed terminating her.   (Ex. 46)  Ultimately Breault decided

to extend the plaintiff's probation instead of terminating her. (Ex. 20 at 30-31)

After making the decision to extend the plaintiff's probation, Breault and/or Maynard

---

[52]  Breault contends that she did speak to Moore, Clairmont, Carey, and/or Johnson, who allegedly came to her with complaints.  However, Clairmont, Carey and Johnson deny this.  (Ex. 39 at 11-13; Ex. 53 at 12-14; Ex. 38 at 15-19)

created an evaluation which supported this decision. (Ex. 5 at 185-187)   This evaluation
criticized the plaintiff for: (1) problems with local clergy with respect to her requests that she be
notified of patient requests for spiritual care[53]; (2) problems with local clergy; (3) problems
regarding a failures to respect personal space and take appropriate time to establish relationships
with staff and patients; and (4) improper documentation in patient records.    (Ex. 55)

On or about August 15, 2001, Breault and Maynard gave the plaintiff the evaluation and
discussed it with her. (Ex. 15 ¶60)  The plaintiff was told that her probation was being extended
because of performance problems. (Id.)  The plaintiff did not agree with the evaluation and tried
to explain this to Breault. (Id.)  Breault and Maynard went over the evaluation, and the plaintiff
expressed some of her concerns. (Id.; Ex. 5 at 202-203)  Breault did not change the evaluation.
(Ex. 15 ¶60)  Instead, the plaintiff was encouraged to provide feedback and suggestions.[54] (Id.)

On or about August 22nd 2001, the plaintiff responded to the evaluation in writing in
order to correct the inaccurate information, and in hopes that the Hospital would reconsider and
change the evaluation.[55] (Ex. 15 ¶61; Ex. 55)    In this response, she explained that the
problems were only with a few members of the clergy, and were the result of certain religious

_____

[53] Although the plaintiff was criticized and had her probation extended in part because of
this policy, it is undisputed that Breault and Maynard approved the draft policy. Brvnik and
Levine also testified that the request to be notified of all spiritual requests was appropriate. (Ex.
19 at 200-203; Ex. 8 at 86)

[54] Employees are permitted to respond to evaluations. ( Ex. 19 at 29-30; Ex. 45)

[55] The plaintiff pointed out the positive response she had received from most patients,
families staff and community clergy. (Ex. 55) She also explained that she had explained the new
policies to patients and clergy, and asked the identity of the persons who allegedly did not
understand the policy so that she could address the problem. (Ex. 55) She asked for specific
direction on how to modify her behavior to meet the Hospital's expectations and information as
to who she had offended so that she could repair the relationships. (Ex. 55)  With respect to the
alleged improper documentation, she explained her belief that documentation of proselytizing
was necessary and that she thought her conduct was consistent with industry practices.    (Ex.
55) However, she agreed to comply with the Hospital's instructions not to document such
behavior in patient records in the future.    (Ex. 55)

persons having difficulty with having a female Chaplain.[56]  (Ex. 15 ¶61; Ex. 55)  Although the

Hospital has a detailed harassment policy which requires that discrimination complaints about

volunteers or clergy be investigated, the Hospital never investigated this complaint .  (Exhibit 56,

Ex. 8  at 14-16; Ex. 6 at 51-52)

On the same day that the plaintiff handed in her evaluation response, Maynard asked her

to  attend a meeting with him and the  Beaulieus on the 29th.   (Ex.15 ¶63)  The plaintiff said that

she would be unable to meet on that date,  suggesting other dates.[57]  (Ex. 15 ¶63-64; Ex. 5 at 219;

Ex. 7 at 221-222)  Maynard came to her office,  shouted at her, and accused her of

insubordination.[58]   (Ex. 15 ¶64)  The plaintiff explained that she was not unwilling to meet, but

was simply unwilling  to meet on the 29th.   (Ex. 15 ¶64; Ex. 7 at 221-223)  While  Maynard

continued to shout at her, the plaintiff walked into a hallway, and then into  a nearby office where

there were other people.[59]   (Id. )  The plaintiff went to Human Resources to complain about

Maynard's behavior.  (Ex. 15 ¶65 )    Breault was notified.  (Ex. 15 ¶65; Ex. 5 at 224-225)   The

plaintiff told Breault what had happened.   (Id. )   Breault offered to go to the meeting, and the

plaintiff  agreed to attend.  (Id. )

---

[56]   The Hospital also had an obligation to investigate the areas of  the evaluation which
the plaintiff had claimed were inaccurate.   (Ex. 19 at  210-211) No such investigation took
place. (Ex. 5 at  205- 211; Ex. 6 at 62, 63)

[57]The plaintiff did not want to meet without an objective third party present. (Ex. 15 ¶63)
She felt that neither she, Maynard, nor the Beaulieus were sufficiently objective about the issues
that were likely to be discussed.  (Id.)    The plaintiff wanted to wait until Quality Assurance
Manager Cathy Young was available to attend the meeting.  (Id. )

[58]Although Maynard "ordered" the plaintiff to a meeting and had accused her of
insubordination when she wanted to meet on a different date, he was a peer and  not her
supervisor.  (Ex. 15 ¶25; Ex. 9; Ex. 25; Ex. 19 at 75-77)

[59]   When Maynard asked what she was doing, the  plaintiff  explained that she  wanted
witnesses to his behavior. (Ex.15 ¶ 64; Ex. 7 at 222-223)   Maynard told her that it was
inappropriate for her to try to get others involved, and left.   (Id. )

On or about August 29th, the plaintiff met with Maynard, the Beaulieus and Breault.[60] (Ex. 15 ¶69)  Beaulieu expressed anger about the plaintiff having removed the counter and changed the lock. (Ex. 15 ¶69; Ex. 5 at 230-232)  The plaintiff raised her concerns about Beaulieu's failure to respect confidentiality and privacy with respect to her counseling.[61]  (Id. ) Breault indicated that the Hospital would find someplace else for the Beaulieus to work.  (Id. )

Beaulieu also complained about the plaintiff wanting to be notified about patient requests for spiritual care, wanting the Bibles removed, and having redacted the name of his church from a handful of prayer pamphlets in the office.  (Ex. 15 ¶70;  Ex. 5 t at 232-236)  The plaintiff tried to explain her reasons.  (Id. ;  Ex. 7 at 219-220)  With respect to the pamphlets, she explained that she had redacted the church name on a few of the booklets so that he could give them out to Roman Catholics without improperly promoting a specific church.  (Id.)

Breault asked if there were any other issues.  (Ex. 15 ¶72; Ex. 5 at 246-247)  By her asking the question, the plaintiff thought Breault had changed her mind about not bringing up the issue about Mrs. Beaulieu. (Ex. 15 ¶72) The plaintiff turned to Breault and quietly said something about the issue.  (Id.)  Breault turned to the Beaulieus and began to explain the concern.  (Id.) The plaintiff told Mrs. Beaulieu that it was not always appropriate, in offering pastoral care, to share your personal story.[62]  (Id.)  Mr. Beaulieu was incensed, and said that if

---

[60]    The plaintiff had created notes for the meeting, which included the concern about Mrs. Beaulieu making a patient hysterical.  (Ex. 15 ¶76; Ex. 57)  However, shortly before this meeting, Breault and/or Maynard told the plaintiff that she should not bring up the criticism in the meeting.  (Ex. 15¶68; Ex. 5 at 243)

[61] Beaulieu indicated that he did not agree, explaining that the woman he had spoken about frequently and openly talked about her personal business. (Ex. 15 ¶ 71)

[62]    Beaulieu was upset, in part, because neither he, nor his wife, had heard the allegation about his wife before.  (Ex. 1 at 71-73) The defendant has claimed that the plaintiff was insensitive about the death of the Beaulieus sons.  This is false.   During this meeting the plaintiff did not in any way belittle or trivialize the death of the Beaulieus sons. (Ex. 15 ¶72)

the plaintiff had been a man, he would "bounce her off a wall".[63]  (Id.)

After this meeting Breault, Maynard and Levine met and decided to terminate the plaintiff.[64]  (Ex. 5 at 250-251)  On or about September 3, 2001, the plaintiff met with Breault. (Ex. 15 ¶73)  Breault told her to resign.  (Id.; Ex. 5 at 254-255)  When the plaintiff asked what would happen if she refused to resign, she was told that she would be fired.[65]  (Id.)

The Hospital reconvened the committee to hire the plaintiff's replacement.  (Ex. 61)  The committee members talked about the importance of hiring a chaplain who was a "good fit".  (Id.) Begansky reported that the nurses on 4Shea wanted the Hospital to hire a Chaplain from a

---

[63]    No action was taken in response to this comment.  (Ex. 1 at 250-251)

[64]Levine testified that the reasons for the termination were: (1) the conduct identified in her evaluation;  (2) the initial refusal to meet on the specific date requested by Maynard; (3) raising the issue about Mrs. Beaulieu at the meeting; and (4) the plaintiff's response to the evaluation. (Ex. 19 at 108-109)   With respect to the evaluation, he admitted that one of the reasons for the termination was the plaintiff's having told the Hospital in what ways she thought her evaluation was inaccurate and how she thought it should be revised. (Ex. 19 at 150-152; 163)
     Breault testified that the Plaintiff was terminated because of her response to the evaluation and her relationship with the Beaulieus.  (Ex. 5 at 251-253)  Breault stated,"her job was to figure out as the professional and as the pastoral care individual how to negotiate that relationship so that it was a constructive relationship.   And in opposition to that at that meeting she brought up [an issue] that was highly charged that she was instructed not to bring up and would not be conducive to a good working relationship.   In addition the issue of defacing the pamphlet was raised that was also not conducive to a good working relationship".(Ex. 5 at 252-253)
     Maynard testified that the termination was based on her conduct in crossing out the church name on the pamphlet, her refusal to meet on the date initially suggested, her inability to deal effectively with the Beaulieus, and her misconduct as identified in the August 1, meeting. (Ex. 7 at 219-221; 227-229)  Maynard later conceded that the content of her evaluation response- with respect to her unwillingness to address the issues with the local clergy - was a factor.  (Ex. 7 at 240-241)   However, Maynard was unable to identify what was inappropriate about these portions of the response.  (Ex. 7 at 241-243)

[65]    When the plaintiff explained that she had been unable to resolve the relationship with Beaulieu because he would not accept a female clergy person, Breault disagreed.  (Ex. 15 ¶73; Ex. 5 at 256)  After the plaintiff was terminated, several local clergy wrote the Hospital a letter explaining that the plaintiff had been working on her assigned goals, that the PCAC did not represent the breadth of faith communities, and that the clergy suspected that, "plain old sexism" was involved in the friction between Campbell and, "at least one of the interested parties".  ( Ex. 60)  The defendant never investigated this complaint either.  (Ex. 8 at 141)

"standard" religion, rather than a "spiritualist", and Reverend Falcon-Garcia reported that the local clergy agreed.[66]   (Id.)

## III.    THE LEGAL STANDARD

Summary judgment may be granted only if the moving party is able to show that, "there is no genuine issue as to any material fact," and that it is, "entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c).  A "material fact" is one whose resolution will affect the ultimate determination of the case.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).  A "genuine" issue as to such a material fact "only arises if the evidence would allow a reasonable jury to return a verdict for the non-moving party."  Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2nd Cir. 1988); Anderson, 477 U.S. at 248.

The moving party bears the initial burden of proving that no factual issues exist.  Gallo v. Prudential Residential Services, 22 F.3d 1219, 1223 (2nd Cir. 1994).  The non-moving party must then make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).  In assessing the record, the Court must resolve all ambiguities and draw all inferences in the light most favorable to the non-moving party.  Gallo, 22 F.3d at 1223. Because credibility is not an issue on summary judgement, the non-movant's evidence must be accepted as true.  Gupta v. City of Norwalk, 221 F.Supp.2d 282, 296 (2nd Cir. 2002).

Moreover, summary judgement must be sparingly used in discrimination cases, where intent and state of mind are at issue.   Graham v. Long Island.  R.R., 230 F.3d 34, 38 (2nd Cir. 2000).   The trial court's task, "is carefully limited to discerning whether there are any issues of

---

[66]In  addition to the internet, the Hospital advertised for the plaintiff's replacement on: the National Catholic Reporter; the Catholic Observer; and  Catholic Health World.  (Ex. 62)   They also contacted seminaries.  (Ex. 61) Despite these efforts,  no qualified Roman Catholics applied. (Ex. 6 at  61) The Hospital hired  Disciples of Christ Minister, Steven Scott.  (Ex.  63)

material fact to be tried, not to deciding them." LaFond v. General Physics Services Corp., 50

F.3d 165, 171 ( 2nd Cir. 1995), citing Gallo, 22 F.3d at 1224.  "When reasonable persons, applying

the proper legal standards, could differ in their responses to the questions raised on the basis of the

evidence presented, the question is best left to the jury". Hogan v. State of Connecticut, 220

F.Supp.2d 111 (Conn. 2002);  Sologub v. City of New York, 202 F.3d 175,178 (2nd Cir. 2000).

**IV.    ARGUMENT**

    A.    A Reasonable Jury Could Conclude That The Defendant Violated C.G.S. 31-51q

    It is undisputed that during her employment with the defendant, Barbara Campbell spoke

out about her belief that  the Hospital was failing to protect the privacy and confidentiality of its

patients, was improperly promoting  Christian faiths,  and was failing to show sufficient respect

for the  faith traditions of non-Christian patients.[67]    The plaintiff contends that she was

disciplined and terminated  in motivating part because of this speech, and that by doing so the

defendant has violated C.G.S. §31-51q.

    C.G.S. §31-51q prohibits employers from disciplining or discharging any employee for

such  employee's exercise of rights guaranteed by the First Amendment, unless the speech,

"substantially or materially interferes with the employees bona fide job performance or the

working relationship" between the employer and the employee.  C.G.S § 31-51q; Lowe v.

Amerigas, Inc. , 52. F. Supp. 2d. 349,  359 (D. Conn. 1999).  In moving for summary judgement,

---

    [67]The plaintiff spoke out about: (1) Delphis Beaulieu's failure to respect patient privacy
and confidentiality; (2) the Hospital's placement of Bibles in patient rooms; (3) the Beaulieus
distribution of Catholic prayer books in public places, including patient rooms;  (4) the Beaulieus
distribution of prayer booklets promoting a particular Roman Catholic church attended by the
Beaulieus to Catholics who were not members of that church; (5) the clergy's ability to  view
census data without patient permission; (6) the clergy's ability to visit non-parishioners without
patient permission; (7)  proselytization;  (8) the Hospital preferential treatment of Christian
religions, and particularly of the Roman Catholic religion; (9) the Hospital's notification of area
churches when parishioners were hospitalized without the patient's consent;  (10) the hit or miss
nature of the Hospital's notification of  clergy with respect to smaller faiths; and (11) the non-
inclusive, all Christian, nature of the PCAC.

the defendant suggests that: (1) some of the plaintiff's speech involved the terms and conditions of her own employment, and was not entitled to protection; and (2) the plaintiff's heavy-handedness, authoritarian attitude, and hardline position with respect to her draft policies interfered with her bona fide job performance.[68]  (See Defendant's Memorandum at 33-37)  As is explained below, a reasonable jury could disagree.

First, it is apparent that the plaintiff's speech was entitled to protection.  Speech is protected under C.G.S § 31-51q when it involves issues of public concern.  DiMartino v. Richens, 263 Conn. 639, 667 (2003).  An employee's speech addresses matters of public concern when it, "can fairly be considered as relating to any matter of political, social, or other concern to the community", and the employee's motive in speaking out is as a citizen and not as an employee to address personal grievances. Id.; Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 783-785 (1999).  Most of the plaintiff's speech involved her belief that the Hospital was not adequately protecting patients.  The remaining speech involved her belief that the Hospital was improperly promoting certain religions.  A reasonable trier of fact could certainly find that these are issues of concern to the community.  See: DiMarco v. Rome Hospital, 1991 WL336000 (NDNY 1991).

The defendant does not contend that in raising these issues, the plaintiff had a personal motive. [69]   Thus, the defendant apparently concedes that the plaintiff's motive in raising these

_____

[68]  The defendant also suggests that summary judgement must be granted because neither HIPAA, nor JCAHO was actually violated.  (Defendant's Memorandum at 34-35) This is false.  A jury could find that JCAHO was violated in that the practices of the Hospital failed to show respect for the privacy, confidentiality, and spiritual choices of patients.   More importantly, the plaintiff is not required to show an actual violation of HIPAA or JCAHO.  She need only show that there are disputed issues of fact as to whether she was terminated because of speech involving issues of public interest.  Clearly, the public could have an interest in a hospital's practice of disclosing patient information without permission, even if such conduct did not yet violate HIPAA.  Similarly, the public could be concerned about a practice of allowing clergy to proselytize to bedridden patients, whether or not such conduct violated JCAHO.

[69]  In claiming that some or all of the plaintiff's speech is not protected, the defendant suggests only that the, "discussions involving her office arrangements" are matters of private

issues was to protect patient rights, and to ensure that all faith traditions were treated equally by the Hospital. The defendant also apparently admits that the protected speech was a motivating factor in the discipline and discharge of the plaintiff.[70]   (Defendant's Memorandum at 33-37). However, the defendant argues that summary judgement must be granted, claiming that the her exercise of her First Amendment rights, "substantially or materially interfered with her bona fide job performance". (Defendant's memorandum at 34-37).  A reasonable jury could find otherwise.

There is no evidence of any disruption in the provision of spiritual care to patients, staff, or family members.   There is no evidence that the plaintiff failed to supervise the provision of pastoral care, failed to act to ensure compliance with regulations, failed to act as an interfaith minister, or failed to ensure that patients received appropriate spiritual care.   In fact, there is no evidence of any failure to perform her duties.   On the contrary, the evidence shows that Barbara Campbell was working excessively hard to offer spiritual care, reach out to all of the local clergy, and establish an effective pastoral care program.

In claiming that the plaintiff's speech constituted a bona fide performance problem, the defendant argues that the speech interfered with her ability to function effectively as a liaison to the clergy and the community.   This, however, is disputed.  The plaintiff has testified that she was

_____

concern.  (See Defendant's Memorandum at 5)  However, the plaintiff's speech about her office includes speech involving Mr. Beaulieus failure to respect the privacy of persons receiving counseling, his failure to respect patient confidentiality, and/or her opposition to the Hospital's provision of an office for the sole use of Roman Catholic clergy.   Thus, a reasonable trier of fact could find that the plaintiff's motive in speaking out on these issues was not to further some purely private interest, but rather constituted an exercise of her First Amendment rights.

[70]  With respect to the decision to extend the plaintiff's probation, the defendant admits that her speech concerning policy changes and adherence to JCAHO were a motivating factor. (Ex. 55)  With respect to the termination decision, Levine and Maynard both testified that all of the issues that led to the poor evaluation played a role in the decision.  Thus, plaintiff's protected speech concerning JCAHO and the draft policy changes was also factor in her discharge. Moreover, it is undisputed that the plaintiff's failure to establish a good relationship with Beaulieu- which a jury could find was caused by her speech- was a factor in the termination.

well received by virtually all of the clergy.  This testimony is supported by the fact that she was

asked to speak at several churches, and that after her termination several members of the clergy

sent a letter praising her efforts and objecting to the termination.  Moreover, it is undisputed that

the defendant approved the policy changes objected to by  Beaulieu, West, Heald, Mendez and

Larsen-Lawling.  A reasonable jury clearly could find that the communication of approved

policies is not a bona fide performance issue.

Perhaps realizing this, the defendant suggests that it was not the content of the speech that

constituted the  bona fide performance problem, but rather her manner of communicating the

changes in policy which interfered with her performance.  However, this argument involves issues

of disputed fact.[71]   A jury could find that the plaintiff clearly, politely, and professionally

expressed these policies and the reasons  for the changes; that the clergy members of PCAC,

Poulin and  Mendez  were upset- not by her manner, demeanor or method of communication - but

rather because they objected to the content of her speech; and that the plaintiff was disciplined and

terminated to placate the clergy who objected to her speech.   Since a jury could find that the

plaintiff terminated the plaintiff, not because of bona fide performance problems, but because of

objections to the content of her protected speech, the defendant's motion for summary judgement

as to this claim must be denied.

B.    A Reasonable Jury Could Conclude That The Defendant Violated
       Public Policy By Terminating the Plaintiff  Because of Her Written
       Response To Her Evaluation

The plaintiff also claims that the  defendant violated the public policy embodied in the

C.G.S. § 31-128e, by terminating her in retaliation for filing a written response to her negative

_____

[71]    In fact,  Maynard could not recall complaints from Heald, West, or Larsen Lawling
about the plaintiff's demeanor- just about the content of her speech.  (Ex. 7 at 145-149, 262-265)

performance evaluation.  CGS § 31-128(e) provides that,

> [i]f upon inspection of his personnel file or medical records an employee disagrees
> with any information contained in such file or records, removal or correction of
> such  records may be agreed upon by such employee and his employer.  If such
> employee and employer cannot agree upon such removal or correction then such
> employee may submit a written statement explaining his position.....

C.G.S. 31-128e.

It is undisputed that the defendant created a written employee evaluation of the plaintiff,
that she submitted a written response, and that the  defendant terminated her  in  part because of
this  response.    Despite these facts, the defendant moves for summary judgement, claiming that
the plaintiff 's wrongful discharge claim is fatally flawed because: (1) she did not inspect her
personnel file before submitting her response; (2) she did not speak with anyone from the Hospital
to discuss the removal or correction of the information before submitting her response; and (3)
nothing in §31-128(e)  expresses a public policy against retaliating against an employee for the
submission of a  response. [72]  (Defendant's Memorandum at 26-30).  These claims are meritless.

First, the defendant misconstrues the meaning of the term,  "personnel file".  The term
"personnel file" within the meaning of this statute, is not limited to the actual files kept in the
defendant's human resources office.    While it is true that this would be a "personnel file",  the
term has a broader meaning.   C.G.S. 31-128a states that the term personnel file,

> means papers, documents, and reports, including electronic mail and facsimiles,
> pertaining to a particular employee that are used or have been used by an
> employer to determine such employee's eligibility for employment, promotion,
> additional compensation, transfer, termination, discipline or other adverse
> personnel action, including employee  evaluations....

---

[72]  The defendant also notes that it complied  with C.G.S.§ 31-128, by retaining the
plaintiff's submission as part of the file.   (See Defendant's Memorandum at 26-30)  While true,
this  is not relevant to the question of whether the discharge violates public policy.

C.G.S. 31-128a(5).    Since it is undisputed that the plaintiff inspected her evaluation prior to submitting her response, she "reviewed" her "personnel file" as required by the statute.

Second, a reasonable jury could find that the plaintiff did try to get the Hospital to agree to the correction of the evaluation before drafting her response.    At the time that she was given the evaluation, she discussed it with Allison Breault- and pointed out some areas of disagreement. Breault told her that she was entitled to provide a response in writing.  Thus, her written submission is a statement protected by C.G.S. 31-128e.[73]

The defendant next suggests that in order to bring a claim for  violation of public policy, the plaintiff must show,  not only a violation of the public policy expressed in C.G.S. §31-128e, but also a violation of the statute itself.   (Defendant's Memorandum  at 28-30) This is not the law.

 The tort of public policy wrongful discharge was first recognized  in Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 480 (1980).    In Sheets, the plaintiff, a quality control director,  had complained to his employer about vegetables being substandard and meat underweight.  Id. at 473.   He was promptly fired.   The Court  found that, "although the stated reason for his discharge was his unsatisfactory  performance, he was actually dismissed in retaliation for his efforts to ensure that the defendant's products would comply with the applicable law relating to labeling and licensing. " Id.[74]   The Court found that an employee could bring a claim for

---

[73]  It would be bizarre indeed if an employer could tell the plaintiff to place her concerns in writing- as the defendant did in this case- terminate her for doing so, and then claim that the termination was permissible because the plaintiff did not first express her disagreement verbally.

[74]The Court also noted that the plaintiff could have been subjected to criminal sanctions for violation of the labeling and licencing laws.   Id. at 478.

wrongful discharge if, "the discharge contravened a clear mandate of public policy". Id. at 474.

In doing so, the Court explained,

> we need not decide whether violation of a state statute is invariably a prerequisite
> to the conclusion that a challenged discharge violates public policy.
> Certainly when there is a relevant state statute we should not ignore the
> public policy that it represents.   For today it is enough to decide that an
> employee should not be put to an election whether to risk criminal sanction
> or to jeopardize his continued employment.

Id. at 480.

Since Sheets, the Court has explained that the critical question is whether the plaintiff can

show that the  discharge, "implicates an explicit statutory or constitutional provision or judicially

conceived notion of public policy".  Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 802-803

(1999), citing Parsons v. United Technologies Corp., 243 Conn. 66, 76-77 (1997).   The plaintiff

is not required to show a statutory  violation-  only a violation of the public policy explicitly

expressed by the statute.  See:  Fenner v. Hartford Courant Co., 77 Conn. App. 185, 194-196

(2003)(upholding jury instructions because they did not require the plaintiff to prove an actual

violation of the statute, but rather that his termination violated the public policy embodied in the

statute).   See Also: Thibodeau v. Design Group, 260 Conn. 691, 701 (2002); Schmidt v. Yardney

Electric Corp., 4 Conn. App. 69, 74 (1985) [75]

---

[75] In claiming that the plaintiff must show a violation of the statute, the defendant relies
on Burnham v. Karl & Gelb, 252 Conn. 153, 160-161( 2000) and Daley v. Aetna Life & Casualty
Co., 249 Conn. 766, 802-804 (1999).  However, the cases do not stand for such a proposition.  In
Burnham, 252 Conn at 160, the plaintiff claimed that her termination violated the public policy
set out in C.G.S. § 51-51, because she had been fired for reporting unsafe dental practices to the
dental association. Id.   The Court noted that § 31-51m only prohibited retaliation against
employees who reported violations to a public  body.   Id.  Explaining that the dental association
was not such a public body, the Court found that the termination could not have violated the
public policy identified in the statute.  In Daley, 249 Conn.  at 797, the plaintiff alleged that she
was terminated in violation of the, "important pubic policy that requires employers to provide

C.G.S. ¶31-128 involves an important and clearly articulated public policy.   See:

Giannecchini v. Hospital of St. Raphael, 47 Conn. Sup. 148, 157-158 (2000).   It expressly

provides that an employee has the right to file a response to her evaluation if she believes it

contains incorrect information.    The  legislative history indicates that this statute was designed,

in part, to protect employees by providing them with such an opportunity. [76]   The right to file a

response is, therefore,  an "explicit provision" of the statute and a clear statement public policy.

The defendant suggests that despite this clear public policy, an employer should be

permitted terminate an  employee for exercising her  rights under C.G.S. §31-128e when the

substance of the response is inflammatory.  However, the statute at issue does not contain any

limitations on the employee's right to file a response, and the Court should not impose such

limitations in the absence of legislative action.  As was explained in Giannecchini,

> [t]he statutes just quoted are part of a comprehensive legislative scheme....
> dealing with the integrity and disclosure of employee personnel files.   It is clear
> from the statutory text that the legislature intended to cover the field pertaining
> to the subject matter, and did so with some care....

Giannecchini, 47 Conn. Supp. at 157-158.

---

flexible work schedules for working parents".    The court noted that,  "none of these statutes
[relied upon by the plaintiff] requires that an employer accommodate employee requests for
flexible work schedules".   Id.  at 802.  Since there was no proof of a  public policy requiring
such schedules, the Court found that the termination did not violate any public policy.   Thus,
Burnham and Daly require only that the plaintiff show that there is an explicit policy, identified
by the statute, and that this policy would be contravened by the plaintiff's termination.

[76] See: Testimony of Francis Mullins,  Committee on Labor and Public Employees,
Public Act 79-264, 32-33; attached hereto as Exhibit A, (noting that passing bill which includes
right to view records and right a counter statement relations for the file "will render an important
service to the workers of the State of Connecticut"); Testimony of William Olds, Committee on
Labor and Public Employees, Public Act 80-158, attached hereto as Exhibit B,  ("If an employee
cannot have an opportunity to rebut ... injustices and misinformation can easily occur").

Moreover, a reasonable jury could find that the plaintiff was not terminated because of any harassing or disruptive content in her response.   Decision maker Marty Levine admitted that the termination was based, in part, on the fact that the plaintiff's response to her evaluation told the Hospital  the ways in which she thought her evaluation was inaccurate and how it should be revised.  (Ex. 19 at 163)  This is precisely what the statute was designed to allow.   To permit an employer to terminate an employee under such circumstances,  would force employees to choose between the right to file a response, and their jobs.   The Connecticut Supreme Court, in <u>Sheets</u>, 179 Conn.  at 480, expressly rejected this kind of Hobson's choice.   Since a reasonable jury could find that defendant terminated the plaintiff in retaliation for her exercise of rights protected under C.G.S. §31-128e, the defendant's motion for summary judgement as to the wrongful discharge claim must be denied.

     C.      <u>A Reasonable Jury Could Conclude that the Defendant Violated Title VII and CFEPA by Discriminating and Subsequently Terminating the Plaintiff Because of her Gender and/or Religion</u>

     1.      <u>Introduction</u>

With respect to the claims of gender and religious discrimination, the defendant first suggests that summary judgement must be granted because the facts surrounding the plaintiff's discipline and subsequent  termination, even viewed in the light most favorable to the plaintiff, do not give rise to an inference of discrimination.  (See Defendant's Memorandum at 15-18)  In the alternative, the defendant claims that summary judgement must be granted because no reasonable jury could believe that the defendant's stated reasons for disciplining and/or terminating the plaintiff are pretextual.  (See Defendant's Memorandum at 20-26)  Once again these contentions are based on the defendant's  insistence on viewing the facts in the light most favorable to itself.

31

As is explained in detail below, when the summary judgement standards are correctly applied it is abundantly clear that the defendant's motion must be denied.

2.     The Elements of An Employment Discrimination Claim

The three step analytical framework for the indirect proof of discriminatory intent is essentially the same for both of the plaintiff's discrimination claims.[77]  First, the plaintiff must prove by the preponderance of the evidence the *prima facie* case: (1) that she was in the protected class, (2) that she was qualified for the position, (3) that she suffered an adverse employment action, and (4) that the facts support an inference of discrimination. Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2nd Cir. 2001), citing O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313, 116 S. CT. 1307 (1996).  The plaintiff's burden at this stage is *de minimis*, especially where summary judgement is at issue.  Soares v. University of New Haven, 154 F.Supp.2d 365, 373 (D. Conn. 2001);  Shkolnik v. Combustion Eng. Inc., 856 F.Supp. 82, 86 (D. Conn. 1994), citing Meiri v. Dacon, 759 F.2d 989, 996 (2d Cir. 1985), cert. denied, 474 U.S. 829 (1985).

If the plaintiff makes out a *prima facie* case, a presumption arises that the employer unlawfully discriminated, and the burden shifts to the defendant to proffer a nondiscriminatory reason for the adverse employment action.  If the employer introduces such evidence, the burden returns to the plaintiff to prove "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).  The ultimate question is whether a reasonable person could find

---

[77]  The defendant correctly points out that the gender, religion, and retaliation claims under the Connecticut Fair Employment Practices Act (CFEPA) are analyzed in the same way as claims brought under Title VII.   See: Levy v. CHRO, 236 Conn. 96, 103 (1996).

that the adverse action was motivated at least in part by prohibited discrimination.[78]  Stratton v. Department for the Aging for the City of New York, 132 F.3d 869, 878 (2nd Cir. 1997).

It is not necessary that the plaintiff show that the official identified as the decision maker had a discriminatory motive.  See: See: Rose v. New York City Bd. of Educ., 257 F.3d 156, 162 (2nd Cir. 2001).  Liability will also  be found where a person having such animus influenced the decision.  Id.  See Also: Griffin v. Washington Convention Ctr., 142 F.3d 1308, 1312 (D.C. Cir.1998); Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 286 (3d Cir.2001); Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226 (5th Cir.2000); Maarouf v. Walker Mfg. Co., Div. of Tenneco Automotive, Inc., 210 F.3d 750, 754 (7th Cir.2000);  Mato v. Baldauf, 267 F.3d 444, 450 (5th Cir.2001). An employer may even be liable where the animus that infected the decision belonged to  a customer or client.[79]  Pascal v. Storage Technology Corp., 152 F.Supp. 2d. 191, 201 (D.Conn. 2001) (noting that complaints based on customer discrimination cannot justify termination).   See Also: Fernandez v. Wynn Oil Co., 653 F.2d. 1273, 1276-1277 (1981); Platner v. Cash & Thomas Contractors, Inc., 908 F.2d. 902, fn 5 (11th Cir. 1990); Rucker v. Higher Educational Aids Board, 669 F.2d. 1179 (7th Cir. 1982); ; Diaz v. Pan American World Airlines Inc., 442 F.2d. 385 (5th Cir. 1971);  Coker v. Dixie Motors, Inc., 2002WL 32123992 (E.D. La.

---

[78]  The plaintiff is not required to prove that the prohibited motivation was the sole or even the principal factor in the decision, or that the employer's proffered reasons played no role in the employment decision, but only that those were not the only reasons and that the plaintiff's protected status contributed to the employer's decision.  Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 78-79 (2nd Cir. 2001); Renz v. Grey Advertising, Inc., 135 F.3d 217, 220-222 (2nd Cir. 1997); Stratton, 132 F.3d at 878; Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995).

[79]  Indeed, an employer may not refuse to hire or terminate an employee due to discriminatory customer preferences unless gender or religion is a bona fide occupational qualification, "reasonably necessary to the normal operation of the particular business or enterprise". 42 U.S.C. 2000-e2(e).

33

2002); <u>Ray v. University of Arkansas</u>, 868 F. Supp. 1104, (ED Ark. 1994); <u>Bollenbach v. Bd. of Educ.</u>, 659 F. Supp. 1450, 1472 (SDNY 1987).

Since direct evidence of discrimination is seldom available with respect to an employer's mental processes, plaintiffs in discrimination suits must rely on the cumulative weight of circumstantial evidence. <u>Carlton v. Mystic Transport, Inc.</u>, 202 F.3d 129, 135 (2nd Cir. 2000), <u>cert. denied</u>, 530 U.S. 1261 (2000); <u>Banks v. Travelers</u>, 180 F.3d 358, 367 (2nd Cir. 1999); <u>Danzer v. Norden Systems, Inc.</u>, 151 F.3d 50, 56-57 (2nd Cir. 1998); <u>Norton v. Sam's Club</u>, 145 F.3d 114, 119 (2d Cir. 1998), <u>cert. denied</u>, 525 U.S. 1001 (1998).[80]  To meet this burden, the plaintiff may rely "on the evidence constituting the *prima facie* case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason for the adverse action." <u>Carlton</u>, 202 F.3d at 135.  The Supreme Court in <u>Reeves</u> made it plain that proof that the fact that the explanation for its decision is unworthy of belief constitutes "circumstantial evidence that is probative of intentional discrimination...." 530 U.S. at 147.   Evidence that the stated reason is false,  combined with the prima facie case, will usually be sufficient to allow the issue to go the jury.  <u>Reeves</u>, 530 U.S. at 148.   In such cases summary judgement may be granted only if,

> the record conclusively revealed some other non-discriminatory reason for the employer's decision [or] the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontradicted evidence that no discrimination had occurred.

---

[80]In fact, the thrust of the Supreme Court's reasoning in developing the three-part analysis set out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981), was to create a mechanism to allow victims of discrimination to establish their cases through inferential and circumstantial proof.  <u>See</u> <u>Trans World Airlines Inc.  v. Thurston</u>, 469 U.S. 111, 121, (1985) ("[t]he shifting burdens of proof set forth in <u>McDonnell/Douglas</u> are designed to assure that the Plaintiff [has] his day in court despite the unavailability of direct evidence.")

Reeves, 530 U.S. at 148.

3.    A Reasonable Jury Could Conclude that the Plaintiff has Made Out a Prima
Facie Claim of  Discrimination

The plaintiff contends that the defendant discriminated against her with respect to her

gender and/or religion by: (1) giving her a poor evaluation which falsely evaluated her

performance and by extending her probation as a result of this false evaluation; and (2) by

informing her that if she did not resign she would be terminated.    With respect to the gender

discrimination claim, the plaintiff contends that Beaulieu and West were motivated by

discriminatory animus, and that their discriminatory complaints about the plaintiff played a

substantial role in these decisions.   With respect to the claim of religious discrimination, the

plaintiff contends that she opposed the practices at the Hospital which promoted Roman Catholic

and other Christian faiths, that Beaulieu objected to this, and that his complaints played a

substantial role in the Hospital's decisions.[81]

The defendant suggests that the plaintiff cannot make out a prima facie case of

discrimination because: (1) the same person or persons who made the decision  to extend her

probation and/or to  terminate her made the decision to hire her; (2) the decision maker is female;

and is not Roman Catholic; and (3) no discriminatory comments were made by any of the

decision-makers.   In making these arguments the defendant confuses the prima facie case with the

ultimate burden of proof,  ignores the law, and ignores the facts.

As was explained above, in order to make out a prima facie claim of  discrimination, the

---

[81]As a Unitarian Universalist, her religious beliefs include the belief that all faiths and
religions are worthy of respect and of equal treatment.

plaintiff need only produce evidence from which a jury could determine: (1) that she was in the

protected class, (2)  that she was qualified for the position, (3) that she suffered an adverse

employment action,  and (4) that the facts support an inference of discrimination.  It is undisputed

that the plaintiff is female, and is a member of the Unitarian Universalist church.   Thus, she is  in

the protected class.   Since the defendant hired the plaintiff- finding that she was the best

candidate- it is beyond argument that she was minimally qualified for the position.[82]  See: Gupta

v. City of Norwalk, 221 F.Sup.2d 282, 296 (2nd Cir. 2002).   The extension of her probation and

her resignation in lieu of termination are adverse employment actions.[83]   After the plaintiff 's

discharge, the defendant hired a Christian male.    Under these circumstances it is black letter law

that the plaintiff has met her *de minimus* burden for proving a prima facie case of discrimination.

Tarshis v. Riese Org., 211 F.3d. 30, 36 (2nd. Cir. 2001)(fourth element of the prima facie case may

be satisfied by a showing that the plaintiff's position remained open after she was discharged or

she was replaced by someone outside the protected class).  See Also :  Valenti v. Carten Controls,

[82]A person is qualified for the position for the purpose of creating a prima facie case, if he possesses the basic skills necessary.  Owens v. New York City Housing Authority, 934 F.2d 405, 409 (2d Cir. 1991), cert. denied, 502 U.S. 964 (1991).  She need not show perfect or even average performance, but only that basic eligibility.  Gupta, 221 F.Sup.2d at 296, quoting Gregory v. Daly, 243 F.3d 687, 696 (2nd Cir. 2001).

[83]   A poor evaluation, standing alone is generally not considered an adverse employment action in this circuit.  However, a reasonable jury could find that the decision to extend the plaintiff's probation was discipline amounting to an adverse employment for the purposes of this claim. See: Slattery v. Swiss Reinsurance America Corp.,  248 F.3d. 87, 95 (2nd cir. 2001).  See Also: Hights v. International Harvester Co., 675 F. Supp. 418, 421 (ND Ill. 1987); *aff'd* 873 F.2d. 1443 7th Cir. 1989).  The plaintiffs "resignation" is also an adverse employment action.  As the Second Circuit Court of Appeals has explained, "an actual discharge in the context of Title VII exists when an employee would reasonably understand that his tenure at the company has been terminated".  Chertkova v. Conn. Gen. Life Ins. Co. 92 F.3d. 81, 88 (2nd. Cir. 1996).  It is undisputed that the plaintiff  resigned in lieu of termination.   Under such circumstances she has suffered an actual discharge.

36

Inc., 1997 WL766854 at * 21-22 (D. Conn. 1997)(noting that whether position was eliminated or duties were reassigned to implement discriminatory objectives was issue for the jury).

The Hospital suggests that the application of the same actor inference mandates a finding that the plaintiff cannot make out a prima facie case. [84]    This is a permissive and not a mandatory inference, and is not to be used as a  substitute for a fact-intensive inquiry.  Copeland v. Rosen, 38 F.Supp.2d 298, 305 (S.D.N.Y.1999).  Under the facts in this case, it is clear that such an inference should not be made.

First, the jury could find that the same person or persons who made the decision to hire did not make  the decision to extend the plaintiff's probation and/or terminate the plaintiff.   The defendant suggests that the members of the hiring committee essentially made the hiring decision, and later made the decision to extend the plaintiff's probation.[85]  This is disputed.   As was explained above, it is unclear who made the decision to hire.  Thus, a reasonable jury could find that there was no "same actor".

Moreover,  the hiring decision in this case is not inconsistent with a later discriminatory discharge.  With respect to the gender discrimination claim, a jury could find that it was the

---

[84]In cases where the same decision maker fires a person shortly after making  a decision to hire that same person the court will sometimes infer that discrimination could not have been a motivating factor.   See: Carlton, 202 F.3d. at 137.   The "underlying rationale for the inference is simple: it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class." Id. ; Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir.1997), cert. denied 525 U.S. 936 (1998).

[85]  This is not the case.   Verraneault, Reverend Stevens and Ana Maria Falcon Garcia were allegedly part of the task force that discussed hiring the plaintiff but were admittedly not involved in the decision to extend the probation of the plaintiff.  Breault, who was involved in the decision to extend the probation and to terminate the plaintiff testified that she was not involved at all in the decision to hire the plaintiff.

discriminatory animus of Delphis Beaulieu and Monsignor West, and their numerous unjustified complaints, that caused the defendant to extend the plaintiff's probation and to terminate her. Monsignor West had no role at all in the decision to hire.  While Beaulieu did take part in the interviews and discussions about those candidates that the Hospital decided to interview, a reasonable jury could find that of those candidates that only three of those candidates, were qualified- two women and one man.  The male candidate refused to relocate which was unacceptable to the Hospital.  This, of course, left only female applicants.  Beaulieu's recommendation of the plaintiff under such circumstances is not inconsistent with a discriminatory animus.  A jury could find it plausible that Beaulieu held stereotypical or sexist beliefs about women ministers and recommended the plaintiff simply because of the unavailability of a qualified male applicant.[86]

With respect to the religious discrimination claim, it is undisputed that there were no qualified Roman Catholic applicants.  Hiring a Unitarian Universalist rather than a Roman Catholic cannot show an absence of discriminatory animus if there are no Roman Catholics to hire.  Moreover, Beaulieu- the person whose animus is at issue in this case- testified that he was unaware of her religion at the time that he allegedly recommended that she be hired.  Perhaps most importantly, at the time that the hiring decision was made Beaulieu did not know that the plaintiff would oppose the preferential treatment of certain religions.    Under such circumstances the same -actor inference should not apply. See: <u>Feingold v. New York</u>, 366 F.3d 138 (2nd. Cir. 2004)(refusing to find inference where, "after complaining about discrimination [plaintiff]

---

[86]A reasonable trier of fact could also find that it was not until after the plaintiff was hired that Beaulieu learned of the objections of Monsignor West and/or came to realize his own animosity regarding supervision by a woman with respect to spiritual matters.

became not merely a white Jew but a white Jew who... would not tolerate a discriminatory office culture).   Consequently, the same actor inference cannot be applied to bar either claim.

The defendant next claims that the plaintiff cannot make out a prima facie cases because Breault is female, and is not Roman Catholic.[87]     However, as was explained above, the gender and religion of the official decision maker is not determinative since the  element of causation can be satisfied by showing that a person with discriminatory animus toward the plaintiff influenced the "actual" decision maker, even if the latter did not consciously discriminate.   Sadki v. Suny College at Brockport, 310 F.Supp.2d 506 (WDNY 2004)  The critical inquiry in such a case would be the  gender of the individual or individuals with influence.  Since both Monsignor West and Delphis Beaulieu are male, a reasonable trier of fact could find that it is plausible that each would have animus against a female minister.   Since Beaulieu is Roman Catholic it is plausible that he would object to the plaintiff's religious beliefs when they conflicted with his desire to continue the practices that were advantageous to Roman Catholics.[88]

Finally, the defendant suggests that the plaintiff cannot make out a prima facie case because she has not produced evidence  of  discriminatory comments by Breault, Levine or

_____

[87]  The defendant also suggests  that summary judgement must be granted because Stevens is not Roman Catholic.   However, the plaintiff does not contend that only Roman Catholics were given preferential treatment.   She contends that the Hospital promoted other Christian religions as well- by providing Bibles and by permitting the PCAC to function as an exclusively Christian organization.   A reasonable jury could find that the defendant aggressively sought a Roman Catholic applicant- by advertising in Catholic periodicals and speaking to seminaries.   When no qualified Roman Catholic candidates applied, the defendant hired a Christian - and not a Unitarian Universalist.   This is  sufficient to make out a prima facie case.

[88]  In addition, it must be remembered that the  Supreme Court has expressly "rejected any conclusive presumption" that an employer  will not discriminate against members of their own class. Oncale v Sundowner Offshore Svs. Inc., 523 U.S.75,  78, (1998).  See Also: Booze v. Shawmut Bank of Connecticut, 62 F.Sup.2d 593, 598 (D. Conn. 1999).

Maynard.  However, "smoking guns are rarely left in plain view".  Garcia v. S.U.N.Y. Health

Sciences Center of Brooklyn, 280 F.3d 98, 112 (2nd Cir.2001)  Consequently, the plaintiff need

not produce  evidence that the decision makers made  discriminatory comments in her presence  in

order to make out a case of discrimination.[89]  See:  Carlton, 202 F.3d at  135; Banks , 180 F.3d at

367; Danzer, 151 F.3d at 56-57; Norton, 145 F.3d at  119.

It is clear that the plaintiff has met the *de minimis* requirements for making out a prima

facie case.[90]  Consequently,  the defendant's motion for summary judgement must denied.

4.    A Reasonable Jury Could Conclude that the Stated Reasons for Extending
the Plaintiff's Probation Are Pretextual

The defendant next suggests that no reasonable trier of fact could believe that the stated

reasons for extending the plaintiff's probation were a pretext for discrimination.  (Defendant's

Memorandum at 20-24)   The defendant has claimed that the plaintiff's probation was extended

and she was given a poor evaluation because of her  poor performance as shown by:  (1)

inappropriate documentation in patient charts; (2) her failure to respect the personal space and to

take time to establish relationships with patients and staff; (3) her creation and communication of

pastoral care policies; and (4) her failure to establish good relationships with the  local clergy.

---

[89] The question of whether or not there is sufficient circumstantial or direct evidence is
more properly addressed as part of the pretext analysis.   As the plaintiff  explains in detail
below, there is sufficient evidence, and summary judgement must be denied.

[90]In claiming otherwise the defendant relies on Toliver v. Community Action
Commisson to Help the Economy Inc., 613 F. Supp. 1070, 1074 (SDNY 1985) *aff'd* 800 F.2d.
1128 (2nd. Cir.) *cert. denied.*, 479 U.S. 863 (1986), Schnabel v. Abramson, 232 F.3d. 83, 91 (2nd.
Cir. 2000) and Pesok v. Hebrew Union College, 235 F.Supp. 2d. 281, 288 (SDNY 2002).
However these cases are simply not on point.  However, in both  Toliver, 613 F. Supp. at 1074,
and Schnabel, 232 F.3d. At 87, the Court found that the plaintiff had met the minimal burden of
showing a prima facie case, but failed to prove pretext.  In Pesok, 235 F. Supp. at 288-289, the
Court found that the plaintiff had not made out a prima facie case based on his testimony that he
himself did not believe that the defendant's action were motivated by his race or religion!

40

However, a reasonable jury could find that the claims of poor performance with respect to improper documentation, patient complaints, staff complaints, and the issues surrounding the creation and communication of the draft policies are untrue.   With respect to the claim that the plaintiff had poor relationships with local clergy, a reasonable jury could find that the poor relationships were only with West and Beaulieu and  were the result of discriminatory animus and not poor performance.

It is black letter law that an organization's failure to follow it's own policies or routine procedures can be considered as  evidence of pretext.  See: Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2nd  Cir.1997);  Zahorik v. Cornell University, 729 F.2d 85, 93 (2nd Cir.1984). In the present case, the defendant had detailed procedures concerning evaluations and discipline which required that the plaintiff's evaluation  be based on observable or measurable goals, on substantial evidence and on the best available evidence.   Breault not only did not rely on the best available evidence before extending the plaintiff's probation, she did not  require evidence at all. She relied on second, third or even fourth hand reports without investigating to see if the criticism was accurate.   She herself admitted that she made the decision based not on observable or measurable performance, but rather on the perceptions of a handful of people- many of whom she never spoke with.   She also made the decision to extend the plaintiff's probation **before** she evaluated the plaintiff against the job- related criteria. The defendant's complete failure to apply its own policies evidences the pretextual nature of the decision.

A second factor which tends to evidence the pretextual nature of the defendant's explanation, is the subjective nature of the criticism.     An employer's subjective evaluation of performance may  hide prohibited discrimination. Gibson. v. Amer. Broadcasting Co. Inc., 892

F.2d 1128, 1132-1133 (2nd Cir. 1989), (citations omitted).  Therefore, any subjective criteria must

be carefully scrutinized for abuse.  See: Zimmitti v. Aetna Life Ins. Co., 64 F.Sup.2d 69, at n. 16

(D. Conn. 1999), citing Nicholas v. Nynex, Inc., 974 F.Supp. 261, 267 (SDNY 1997).  Here, the

claims of poor performance essentially involve the defendant's belief that the plaintiff had failed

to develop harmonious relationships and stood too close to people.  These complaints are clearly

very subjective.   A reasonable trier of fact could find that this is evidence of pretext.

Third, and perhaps most importantly, the claims of poor performance cannot withstand

scrutiny.   With respect to the claims of improper documentation, the defendant has been unable to

identify  a single document, policy,  standard or other piece of evidence that would support the

claim that it was inappropriate for the plaintiff  to document patient complaints in the patient

chart.  In fact, all of the documentary evidence suggests that the plaintiff's conduct was in

accordance with Hospital policy and industry standards.[91]    Given this, it is simply not credible

that, absent the discriminatory complaints, the defendant would have disciplined the plaintiff for

making such notations.[92]

The claim that numerous patients and family members of patients complained is spurious.

Although the plaintiff was disciplined because of alleged complaints by patients and family

members, the defendant has now  admitted that they cannot  identify a  single patient or family

---

[91]   The defendant's general documentation policies suggest that the place to document patient concerns is in the patient record.  (Ex. 49)  The hiring committee, including Maynard and Levine,   had similarly been  told that a chaplain had a right, under JCAHO, to document in patient records.  (Ex. 50)

[92]   The defendant is perhaps suggesting that it was the content of the notations that were inappropriate.  (See: Ex. 46; Ex. 48).   However, the defendant does not suggest that the plaintiff failed to accurately record  the content of the patient complaints reported to her.   Thus, she is not responsible for the content of the complaints.

member of a patient that ever complained about the plaintiff.[93] (Ex. 6 at 14)    A reasonable jury could find that these complaints were manufactured by the defendant to justify the discipline of the plaintiff, and are pretextual.

Similarly, the claimed staff complaints have been invented, exaggerated, or developed long after the litigation in a transparent attempt to justify the decision.    When anonymous complaints and third and fourth hand reports are ignored, it appears that the only complaints or concerns about personal space expressed to management by staff during the plaintiff's employment were by Moore and Begansky.[94]    Moore testified that on one occasion Barbara Campbell put her hand on Moore's shoulder and said, "if there is anything I can do for you, call me", while Begansky testified that she was uncomfortable because Campbell would stand within two feet of her.    Obviously a jury could conclude that a minister's conduct in standing within two feet of a co-worker and/or offering to help someone does not constitute poor performance!

Even if the Court were to credit the anonymous complaints, the allegations which are clearly hearsay, and the concerns from 4Shea nurses which they have testified were not reported

---

[93]  Nor does the anecdotal, hearsay evidence about patient complaints justify the discipline.  Apparently two unidentified patients, out of the more than 600 visited by the plaintiff, may have complained.  One purportedly complained about the plaintiff's manner of preaching, and the second was allegedly "uncomfortable" in some unidentified way.  A reasonable jury could find that the Hospital would not generally discipline an employee based on such gossip.

[94]    Breault has claimed that Kathy Clairmont, Leigh Johnson, Teresa Carey, and/or Shirley Dayton also complained that they were uncomfortable with the plaintiff, felt that the plaintiff did not respect their personal space, and/or "got in their face".    Unfortunately for the defendant, Clairmont, Johnson, Carey, and Dayton have denied that they made such complaints to Breault or even communicated to Breault about the plaintiff prior to the plaintiff's termination. A reasonable jury could find that after this litigation was filed, the defendant, seeking to justify its decision, sought out criticism of the plaintiff by staff, and that Breault's testimony about receiving numerous unsolicited complaints is not credible.

until long after the plaintiff was terminated, there is at best a handful of complaints that the plaintiff seemed too friendly or stood too close to them  and two or three complaints that she did not seem friendly enough.[95]    Since the plaintiff interacted with hundreds of  staff, a jury could find that- absent the discriminatory complaints-  an employer would not discipline an employee based on the subjective perceptions of a tiny percentage of people with whom the plaintiff interacted.[96]

A jury could also find the claims of poor performance with respect to the creation  of the draft policies to be pretextual. It is undisputed that before the plaintiff communicated the changes in policy to the clergy, the plaintiff discussed the changes with the defendant, and had the  policies approved by Quality Assurance, Breault and Maynard.    In addition, the policy for which the plaintiff was specifically criticized- the policy requiring that the Hospital notify the plaintiff of all requests for spiritual care - was described by both CEO Brvnik and Marty Levine as reasonable.[97] A jury could obviously find that the plaintiff's creation of reasonable policies, which were approved by her supervisor, does not justify discipline.

---

[95]  Perhaps realizing that the weakness of the evidence of staff complaints with respect to "personal space",   the defendants have identified other purported complaints by staff which were allegedly relied upon, including "hovering" ,  listening to a medical discussion, interrupting during an ICU emergency, and failing to show "cultural sensitivity".   However, the evaluation, meeting minutes, and meeting notes make clear that these allegation were not relied upon at the time.    An inconsistency between offered explanations, "raises a genuine issue of material fact with regard to the veracity of this non-discriminatory reason".  Carlton, 202 F.3d 137. See Also: Belfi v. Prendergast, 191 F.3d 129, 139 (2nd  Cir. 1999); EEOC v. Ethan Allen Inc., 44 F.3d 116, 120 (2nd Cir. 1994).   In addition, since these all  involve disputed issues of fact, they cannot be accepted as true for the purposed of this motion.

[96]  Although the defendant claims that these complaints somehow prove that the plaintiff was doing a poor job, it is unclear what the defendant expected her to do differently in the face of complaints that she was either too intrusive or too distant.

[97]  The policy is also remarkably similar to the policy established by Gerns.

44

The suggestion that the plaintiff improperly communicated the policies is also specious. There is no evidence of any complaints from any clergy person with respect to the manner in which she communicated the changes in policies. In fact, the testimony makes clear that the clergy at the PCAC meeting were upset at the substance of the changes. While the defendant does claim that the plaintiff was defensive and failed to acknowledge their concerns, this is an issue of disputed fact. Viewing the facts in the light most favorable to the plaintiff, a reasonable jury could find that the claims concerning the communication of the draft policies are pretextual.

Finally, a reasonable jury, crediting the plaintiff's evidence, could find that the plaintiff had excellent relationships with the vast majority of the local clergy.[98] Poulin, Heald, Larsen-Lawling, Mendez, West and Beaulieu allegedly complained about the plaintiff,[99] but Breault explained that in disciplining the plaintiff for her poor relationships, she did not rely on the complaints of Poulin or Mendez,[100] and a jury could find that the plaintiff was able to resolve the concerns of Heald, and Larsen Lawling. A reasonable jury could find, therefore, that the claim of poor relationships with clergy is true only with respect to the relationships between the plaintiff and Beaulieu and/or West.

As was explained above, an employer may not discipline an employee because of poor relationships or complaints from third parties, like West and Beaulieu, if the complaints or poor

---

[98] Indeed, the defendant has not disputed the plaintiff's claims that she interacted with dozens of clergy that were supportive.

[99] The defendant suggests that Falcon-Garcia complained about the PCAC meeting. (Defendant's Memorandum at 7) However, she was not at the meeting, (Ex. 13) and Maynard explained that she merely repeated complaints she heard from the others. (Ex. 7 at 146-148)

[100] As was stated earlier, the plaintiff believes that the defendant did, in fact, rely on these complaints in terminating the plaintiff for her protected speech.

relationships are the result of discrimination.   Pascal v. Storage Technology Corp., 152 F.Supp.

2d. 191, 201 (D.Conn. 2001).   As one court has explained,

> one cannot justify otherwise unlawful discrimination on the grounds that one's customers do not like to deal with members of a protected class.... the role of equality is best served by eliminating the ability of customers to undermine the employment discrimination laws by imposing their prejudices on employers as well as the ability of employers to continue in discriminatory practices by blaming their customers.

Feder v. Bristol-Myers Squibb Co., 33 F. Supp. 2d. 319, 333 (SDNY 1999).

Since it is apparently undisputed that the complaints of West and Beaulieu influenced the

defendant's decision to extend the plaintiff's probation,[101] summary judgement must be denied if a

reasonable trier of fact could find that these complaints were the result of discriminatory animus.

Again, the plaintiff is not required to produce evidence of animus.   Evidence that the criticism

was pretextual is sufficient. (See Supra at 34-35)   The defendant contends that no reasonable trier

of fact could find that these complaints were pretextual because: (1) West's complaints were

valid; (2) Beaulieu's complaints were based on the plaintiff's insensitivity and (3) there is no

direct evidence that the plaintiff genders or religion was a factor.[102]   However, in making these

---

[101]Indeed, the defendant could not credibly deny this.   West complained about the policy changes on a number of occasions to Maynard and Noel and virtually every witness in this case testified  that Beaulieu had complained to them about the plaintiff.  This constant criticism, combined with the total absence of any legitimate performance problems, could convince a jury that it was the complaints of Beaulieu and West that caused the plaintiff's probation to be extended.

[102]The defendant also suggests that no discriminatory animus could be found because Heald, Falcon- Garcia and Larsen-Lawling also complained.   As was explained above, a reasonable jury could find that Falcon Garcia did not, in fact, complain.  Moreover, the fact that three clergy members apparently each complained on one occasion about the changes in the policies, does not mean that the repeated complaints of Beaulieu and West were not based on discriminatory animus.   A jury could find that the opposite was true- that the fact that the plaintiff was able to reassure other clergy but not Beaulieu and West- tends to show that their complaints were based on animus.

claims the defendant again insists upon viewing the facts in the light most favorable to itself.

The defendant contends that West had legitimate concerns about the changes in policies, but the plaintiff refused to take these concerns seriously, and instead became defensive and accused the clergy of picking on her. Again, this is simply not true. She tried to address his concerns, first at the PCAC meeting, then through a mailing, then through group meetings, and finally individual meetings. Unfortunately West was unwilling to listen.

The defendant claims that Beaulieu's complaints about her were justified because she: (1) chastised him when he attempted to convene a meeting of the PCAC; (2) "interrogated" him about who had called him in to see a patient, "admonished" him for seeing the patient, and appeared not to value his services; (3) removed a workspace donated by church funds, leaving the Beaulieus less than 3 feet of workspace; and (4) locked him out of the office. The plaintiff has explained that she never chastised, admonished, or interrogated him, and that the removal of the counter and the changing of the locks were the result of her trying to provide him with a more usable workspace and protect confidential records. Since a reasonable trier of fact could find that the criticism expressed by Beaulieu and West influenced the decision, and that this criticism was false, the defendant's motion for summary judgment must be denied.

While direct evidence is not necessary to withstand a motion for summary judgement, there is such evidence in this case. With respect to the gender discrimination claim, Beaulieu twice threatened the plaintiff with physical harm- specifically referencing her gender as he did so. A reasonable jury could find that these threats indicated animosity toward women.[103]  He also

---

[103]  In determining whether an individual is motivated by discriminatory animus, the Court will consider remarks reflecting animosity towards women along with any conduct tending to diminish the respect accorded to the protected class.  See: Gregory v. Daly, 243 F.3d. 687

took steps to undermine her authority with others- repeatedly complaining about her, not only to management, but to physicians, nurses- indeed almost everyone he came into contact with.   A reasonable jury could find that in making these complaints, and in lying about the events when he did so, Beaulieu was attempting to diminish the respect accorded to the plaintiff.[104]

 The plaintiff has also produced evidence that  Beaulieu treated men and women differently when it came to the provision of spiritual care.   He did not interrupt Heald or West, but Beaulieu constantly interrupted both the plaintiff and Larsen Lawling.   He complied with Chaplain Gerns' polices, but refused to comply with the plaintiff's similar policies- even getting angry at her for suggesting that she needed to be notified of requests for spiritual care.[105]

 While West did not make any gender related comments in the plaintiff's presence, he also demonstrated a lack of respect for female clergy.  He interrupted the plaintiff when she spoke and made faces and rolled his eyes when another female minister tried to express her opinion.  He did not engage in such behavior with men.   Furthermore, both West and Beaulieu are members of the Roman Catholic clergy.  Neither the plaintiff, nor the defendant, has questioned their  legitimate commitment to their religion.    One of the tenets of that religion is a belief that women should not be ordained as clergy.   Consequently, a jury could find- as Maynard and Breault did- that Beaulieu and West would have difficulty  accepting direction or supervision on spiritual matters from a female minister.

_____

(2nd. Cir. 2001), citing Howley v. Town of Stratford, 217 F.3d. 141, 154-156 (2nd. Cir. 2000).

[104]This is also shown by the inflammatory nature of some of the false complaints.  He claimed that she did not call a priest in a last rites situation, and gave an unconsecrated host. Clearly, these type of claims about a minister would tend to harm her reputation with clergy.

[105]    In fact, he admittedly walked away when she tried to explain the rationale for her policies, and become upset at the idea that she was entitled to call meetings.

With respect to the claim of religious discrimination, it is apparent that religious differences were a factor in at least some of Beaulieu's complaints about the plaintiff.   The plaintiff attempted to put an end to the Hospital's practice of promoting specific religions[106] by placing Bibles in patient rooms and  permitting the distribution of Roman Catholic literature.[107] It is undisputed that Beaulieu objected to any changes with respect to the Hospital's provision of Bibles and distribution of religious literature.   A reasonable trier of fact could conclude that this opposition was based on his religious beliefs.[108]   Indeed, it is difficult  to conceive of a secular reason for insisting upon distributing religious literature- particularly by  a Roman Catholic Eucharistic Minister.

While it is true that there is no evidence of discriminatory comments relating to the plaintiff's religion made by Beaulieu, there is evidence from which a trier of fact could find that his opposition- on religious grounds-  infected the process.  After the plaintiff's termination the hiring committee discussed their desire to replace her with someone who was "a good fit" and

---

[106]A reasonable jury could  find that the plaintiff's objections to these practices were based, in part,  on her religious beliefs .  The plaintiff   is a member of the Unitarian Universalist Church and is not Christian.   Her religious beliefs include the belief that all faiths are worthy of respect but that none is the exclusive source of religious truth.

[107]  The defendant claims that no reasonable jury could find that the Hospital promoted any religion, because other groups could have distributed religious  literature. However, the Hospital did not simply permit Beaulieu to place the Bibles in patient rooms.   Instead, Beaulieu, "assisted the Hospital in placing copies of Gideon's Bibles in patient rooms".  (Ex. 14 at ¶25)  It is undisputed that the Hospital did not place any other religious literature in patient rooms. Second, no other clergy person could distribute pamphlets in the same manner as Beaulieu, because no other religious volunteer or clergy person was permitted to visit all patients.

[108]  The term "religion" under Title VII includes, "all aspects or religious observance or practice, including belief".   42 U.S.C. 2000e(j).   The EEOC guidelines explain that, "in those cases in which the issue [of whether or not the practice or belief is religious] the Commission will define religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of religious beliefs".   29 C.F.R. 1605.

from a "standard" religion, rather than a "spiritualist". They then sought her replacement by placing advertisements in Catholic periodicals and speaking to seminaries. This evidence clearly supports an inference that the plaintiff's religion played a role in the adverse employment actions taken against her. See: Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 182 (2nd Cir.1992) ( noting that even discriminatory remarks, " in the workplace by persons who are not involved in the pertinent decision making process ... may indeed persuade the fact finder that the plaintiff has carried his or her ultimate burden of persuasion" under the McDonnell Douglas framework).

Thus, a reasonable jury could find that the stated reason for extending the plaintiff's probations was pretextual, and that the true reason was the complaints of Beaulieu and West. A reasonable jury could also find that these complaints were not valid, but resulted from discriminatory animus. Consequently the motion for summary judgment with respect tot he decision to extend the plaintiff's probation must be denied.

4.     A Reasonable Jury Could Conclude that the Stated Reasons for Terminating the Plaintiff Are Pretextual

A reasonable jury could similarly find that the stated reasons for the plaintiff's termination are pretextual. In its memorandum, the defendant contends that the plaintiff was given the choice of resignation or termination because: (1) she initially refused to meet with the Beaulieus; (2) she disregarded an instruction not to raise the issue about Mrs. Beaulieu making a patient hysterical; (3) she crossed out the name of the Beaulieus church on a handful of pamphlets, and (4) her response to her evaluation was argumentative and sarcastic. The defendant claims that there is no dispute that she engaged in each of these acts, and that such conduct warranted termination. A jury could find otherwise.

It is clear that the plaintiff never refused to meet as the defendant suggests. When asked by Maynard, she simply requested that they meet on a different date. He refused to accept this and became abusive, shouting at her and calling her insubordinate. However, Maynard was a peer and not a supervisor. As such, he had no authority to order her to attend a meeting on the

date he had selected.    It is undisputed that when Breault- the plaintiff's actual supervisor - told her to attend, the plaintiff  agreed.    A reasonable trier of fact could find that the plaintiff's conduct was not insubordinate, and did not justify her termination.

Similarly, the plaintiff's  response to her evaluation would not justify termination.   It is undisputed that the plaintiff was told that she could file a written response.   The defendant's policies also clearly permit such a response.  A reasonable jury could find that the plaintiff would not have been fired for engaging in such permissible conduct.

With respect to raising the issue about Mrs. Beaulieu, it is undisputed that Mrs. Beaulieu, albeit unintentionally,  had done something  that tremendously upset a patient.   The plaintiff was responsible for supervising the Beaulieus , and wanted to talk to Mrs. Beaulieu so she would not repeat the mistake.   She reasonably believed that she was being invited by Breault to raise the issue.   A jury could find that an employer would not terminate the plaintiff for speaking   under such circumstances, particularly as she did so politely.[109]

Finally, with respect to the plaintiff's conduct in crossing out a church name on a handful of  pamphlets, Breault testified that, "the point was not necessarily what she did, but how it was done".   (Ex. 5 at 237)   Breault claimed that this conduct justified the plaintiff's termination because the plaintiff did it without trying to talk to the Beaulieus first, and did it shortly after the evaluation in which she had been told that she needed to improve her relationships. Id.   However, the plaintiff has explained that she crossed out the names before her evaluation, and that she had spoken to Mr. Beaulieu a number of times prior to doing so.   Thus, a reasonable jury could find that each of the identified reasons for terminating the plaintiff were pretextual.

---

[109]   In claiming that the plaintiff's conduct justified termination, the defendant claims that: (1) notes created by the plaintiff show that the plaintiff intended to raise the issue despite instructions to the contrary; and (2) the plaintiff belittled Mrs. Beaulieu, trivialized the deaths of the Mrs. Beaulieu's sons, and acted without compassion.  However, based on the plaintiff's testimony a jury could find that the notes were created before the plaintiff was asked not to raise the issue,  that  the plaintiff did nothing inappropriate or insensitive in the meeting, and that her conduct did not justify termination.

A reasonable jury could find that the actual reason for the termination was the discriminatory complaints by Beaulieu, and West.  In fact, Breault, Levine and Maynard all testified that the plaintiff's inability to get along with Beaulieu and/or West  was a factor in the termination decision.[110]   As was explained in detail above, a reasonable trier could find that the complaints made by Beaulieu and West were false, and resulted from discriminatory animus.  Thus, the plaintiff has produced sufficient evidence that discriminatory complaints from West and Beaulieu influenced Maynard, Levine and Breault, and were a motivating factor in her termination.

Summary judgement, must be denied  because a reasonable jury could find that Breault, Levine and Maynard were influenced by the complaints made Beaulieu and West, and that they terminated her because she could not establish a constructive relationship with these two clergy.  A reasonable jury could find that the reason the plaintiff was unable to establish a constructive relationship was not her poor performance, but rather discriminatory animus.  The defendant therefore terminated the plaintiff, in motivating part, because of her gender and religion, and  the gender and religious preferences of certain clergy.   As one court has explained,

> this form of "client" preference is no more permissible than any other
> and will not justify the different treatment of [the plaintiff].  Instead of
> condemning [plaintiff] for not backing off when confronted with unjustified
> overtly racist reactions from students, the proper response would be to
> severely criticize and condemn such manifestations of racist attitudes
> and to call it to the attention of the highest levels of the .... administration
> for further appropriate action".

Ray, 868 F. Supp. at 1126-1127.

 For all of these reasons, the defendant's motion for summary judgement with respect to the claims of gender and religious discrimination  must be denied.


D.        A Reasonable Jury Could Conclude that the Defendant Violated

---

[110]Breault and Maynard testified that the relationship with Beaulieu was a factor. Maynard and Levine testified that the issues that led to the extension of her probations- which clearly included the complaints of Beaulieu and West- were a factor.

Title VII and CFEPA by Retaliating Against the Plaintiff Because
of her Complaints of Discrimination

Finally, the plaintiff contends that she was terminated in retaliation for her discrimination complaints.  It is undisputed that she reported first verbally and then in her evaluation that  West and Beaulieu were unwilling to accept her and were making her job more difficult because of her gender, that she was terminated shortly thereafter, and that the content of her evaluation was a motivating factor in the decision.  The defendant, however,  argues that  summary judgement must be granted as to the plaintiff's retaliation claim.   Specifically, the defendant claims that the complaints are not protected under Title VII or CFEPA because the plaintiff was complaining of harassing conduct[111] in the workplace by non-employees.[112]   (Defendant's Memorandum at 19-20)

In order to state a claim for retaliation under Title VII and CFEPA, the plaintiff need not establish that the underlying complaint is meritorious.  See: Manoharan v. Columbia University College of Physicians & Surgeons, 842 F.2d.  590, 593 (2nd. Cir. 1988) It  is sufficient if the plaintiff can establish that she had a good faith, reasonable belief that the conduct violated Title VII.  Id.   The defendant contends that the plaintiff could not have held  a good faith reasonable belief because Title VII does not protect employees from harassment by non-employees.   This is incorrect.    The EEOC Guidelines, ignored by the defendant, state that,

> an employer may also be responsible for the acts of non-employees, with respect
> to  sexual harassment in the workplace, where the employer (or its agents or
> supervisory employees) knows or should have known of the conduct and fails
> to take immediate or appropriate corrective action".

---

[111]  Sexual harassment is not limited to conduct that is sexual in nature, but includes all conduct indicating hostility to women in the workplace.   Oncale v. Sundowner Offshore Services, Inc., 523 US 75, 80-81 (1998).  The plaintiff was complaining that West and Beaulieu were working against her and would not accept her because of her gender.   Thus, she was making a complaint of sexual harassment.

[112]The defendant also argues that there is no evidence that its stated reasons for terminating her are pretextual.  However, as was explained above, a reasonable jury could find that the stated reasons for the termination are a pretext.

29 CFR 1604.11e.[113]

      While the Second Circuit has not directly ruled on this issue, the Court has suggested, in dicta, that an employer may be liable for the conduct of non-employees, where it either has failed to provide a reasonable complaint procedure, or knows of the harassment but fails to act. See: Quinn v. Green Tree Credit Corp., 159 F.3d. 759, 766-767 (2nd. Cir. 1998) abrogated in part on other grounds by, National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002). See Also: Murray v. New York College of Dentistry 57 F.3d. 243. 250 (2nd. Cir. 1995); Viruet v. Citizen Advice Bureau, 2002 WL 1880731, at *17 ( SDNY 2002); Flower v. Mayfair Joint Venture, 2000 WL 272187, at * 9 (SDNY 2000).    Moreover, several courts within the Second Circuit have expressly found that an employer may be liable for harassment in the workplace by a non-employee within the employer's control - where the employer knew or should have known of the harassment and failed to take appropriate action. See: Kudatzky v. Galbreath Co., 1997 WL 598586 at 4-5 (SDNY 1997); Peries v. New York City Bd. of Educ., 2001 WL 1328921 at *5-6 (EDNY 2001); McDonald v. B.E. Windows Corp. 2003 WL 21012045 at *4 (SDNY 2003).

      The plaintiff reported that she was being subjected to gender related harassment in the course of performing her duties. She was complaining about volunteers, and local clergy whose conduct within the hospital was within the defendant's control. Her belief that the defendant had an obligation to protect her from such harassment in the workplace was made in good faith and was reasonable under all of the circumstances. Thus, the court should find that her complaints constituted protected activity within the meaning of Title VII and CFEPA, and the defendant's motion for summary judgement as to the plaintiff's retaliation claim should be denied.

---

[113] The EEOC further explains that in determining liability for the acts of non-employees, the court is to consider, "the extent of the employer's control and any other legal responsibility which the employer may have with respect to conduct of such non- employees". Id.

V.    **CONCLUSION**

For all of the foregoing reasons, the Plaintiff, Barbara Campbell , respectfully requests that the Court deny the Defendant's  Motion for Summary Judgment.

RESPECTFULLY SUBMITTED,
THE PLAINTIFF

By:   _____
Mary E. Kelly ct# 07419
Livingston, Adler, Pulda,
Meiklejohn & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
(860) 233-9821

## <u>CERTIFICATION OF SERVICE</u>

This is to certify that a copy of the foregoing Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment has been hand delivered on this 8th day of November, 2004 to the following counsel of record:

Stephen B. Harris
William J. Albinger
Wiggin & Dana LLP
One Century Tower
265 Church Street
New Haven, CT 06510-7001


_____
Mary E. Kelly