# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

| | | |
|---|---|---|
| BARBARA CAMPBELL | : | CIVIL ACTION NO. |
| Plaintiff | : | 3:03 CV 0520 (JCH) |
| | : | |
| V. | : | |
| | : | |
| WINDHAM COMMUNITY HOSPITAL, | : | |
| INC. | : | |
| | : | |
| HATCH HOSPITAL CORP. | : | |
| Defendants. | : | November 8,  2004 |

_____    :

### PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT
### IN SUPPORT OF MEMORANDUM OPPOSING SUMMARY JUDGMENT

The plaintiff provides the following statements of material facts in dispute, pursuant to D.

Conn. L. Civ. R. 56(a)2.

I.    PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1.      During the 1980's and early 1990's the Hospital had a chaplain named Andrew  Geans.

(Testimony of Delphis Beaulieu attached hereto as Exhibit 1 at pages 8-11)[1].

2.      Under Chaplain Geans,  the Hospital had detailed policies and procedures governing the

provision of spiritual care.  (Policies attached hereto as Exhibit 2)  Pursuant to these policies,

patients, on admission were permitted to identify their religion and/or congregation.  (Ex 2 at

0587-0588)   If the patient identified a religion and congregation it appeared in the Hospital

Census which was made available to clergy.  (Ex. 2 at 0587; 0599-0600)  Each patient was also

permitted to indicate that they did not want clergy to visit them  and/or that they did not want

_____

[1]The deposition testimony of Delphis Beaulieu will  hereinafter be  referred to as "Bealieu at
____."

their congregation notified of their presence in the Hospital. (Ex. 2 at 0587-0588) If the patient indicated no objection to having their congregation notified, Hospital volunteers would notify the congregation. (Ex. 2 at 0597-98)

3.    Under the policies in effect under Chaplain Geans, clergy and lay clergy were not permitted to proselytize, and could visit only patients who had requested such a visit or who were members of the clergy persons specific congregation. (Ex. 2 at 0599-0600; 0582) The policies also prohibited the distribution of religious literature in common areas of the Hospital, and prohibited the distribution of religious literature to any person who had not requested such literature. (Ex. 2 at 0581-0588)

4.    Chaplain Gerns co-ordinated the provision of spiritual care with the help of associate chaplains, on-call chaplains, and religious volunteers. (Ex. 2 at 0608-0611) Associate and on-call Chaplains were volunteers who had undergone Clinical Pastoral Education. (Ex. 2 at 0608-0611) The associate and on-call chaplains attended pastoral care staff meetings. (Ex. 2 at 0608-0611)

5.    In 1991, there were thirteen associate and on-call chaplains at the Hospital, reporting to Chaplain Andrew Gerns. (Ex. 2 at 0642). Among the associate and on-call chaplains were Delphis and Juanita Beaulieu. (Ex. 2 at 0642).

6.    Delphis and Juanita Beaulieu are Roman Catholic Eucharist Ministers for the Norwich Diocese. (Beaulieu at 6; Deposition Testimony of Dawn Noel at 57 attached hereto as Exhibit 3)[2]

7.    As associate chaplains, the Beaulieus were permitted to visit patients who were not

---

[2]The deposition testimony of Dawn Noel will hereinafter be referred to as "Noel at ____".

members of their congregation or faith tradition. (Ex. 2 at 0583-0586; 0603-0605; 0608-0611)

However, they were not permitted to proselytize, or to distribute religious literature to non-

Roman Catholics.  (Ex. 2 at 0581-0582)

8.    In approximately 1992, Chaplain Geans left the Hospital's employment.  (Beaulieu at 11;

Minutes of the Staff Chaplain Task Force dated 3/10/00 attached hereto as Exhibit 4)   Geans

was not replaced.    (Ex. 4)    Shawn Maynard, the Administrative Director of Communications

and Volunteer Services, was assigned responsibility for the volunteer clergy, including the

Beaulieu's.   (Deposition of Allison Breault at 41, attached hereto at Exhibit 5)[3]

9.     The Hospital did not rescind the policies adopted under Chaplain Geans.  (Defendants

Supplemental Responses to Plaintiff's Requests for Admissions dated 6/14/04 at 1, 2, and 3

attached hereto as Exhibit 6) They continued to be used as a reference.   (Deposition testimony of

Shawn Maynard at 18 attached hereto as Exhibit 7)[4]

10.    After Chaplain Geans left, the Hospital created  a Pastoral Care Advisory Committee

 (PCAC), which included members of the local clergy.   (See Ex. 4)   The PCAC was supposed to

co-ordinate the provision of spiritual care at the Hospital and provide input as to how the

Hospital could better provide for the spiritual needs of patients.  (Deposition Testimony of

Richard Brvnik at 29-30, attached hereto as Exhibit 8)[5]    The PCAC was also supposed to help

---

[3] The deposition testimony of Allison Breault  will  hereinafter be  referred to as "Breault  at ____".

[4] The deposition testimony of Shawn Maynard  will  hereinafter be  referred to as "Maynard at ____".

[5] The deposition testimony of Richard Brvnik  will  hereinafter be  referred to as "Brvnik  at ____".

frame and modify the policies surrounding the provision of spiritual care at the Hospital.

(Brvnik at 160)

11.     In the years after Chaplain Gerns left the pastoral care policies were not modified or

updated. (Breault at 295-296)   No training or education concerning the provision of spiritual

care was offered to local clergy.   (Beaulieu at 25; 27)   By 2000, the Beaulieus were the only

clergy members permitted by the Hospital to visit patients who were not members of their

congregation.  (Maynard at 22-29)    Other clergy volunteers were only permitted to make

telephone calls, informing the various congregations that their members had been admitted as

patients.  (Maynard at 22-29)

12.     In 2000 or early 2001, Delphis and Juanita Beaulieu were provided with an updated job

description governing their  provision of spiritual care.   (Maynard at 21-22)  This description

stated that when performing pastoral care, the Beaulieus were to, "minister as inter-faith and

ecumenical chaplains and pastoral visitors".  (Job description attached at 0543 attached as

Exhibit 9)   They were also required to, "respect and be open to the needs, traditions and

sensibilities of the persons for whom they were caring".   (Id.) They were provided no new

training on how to perform their duties.   (Maynard at 22-29)

13.     Clergy could become members of the PCAC only by invitation from the existing

members of the Committee.   (Beaulieu at 13-14)

14.      As a result, by 2000, the PCAC did **not** represent the breadth of faith communities in the

 area.    The area  clergy included Congregational, Jewish, Methodist, Episcopalian, Unitarian,

Baptist, Seventh Day Adventist, Roman Catholic, Lutheran , Pentecostal, Greek Orthodox,

Ukrainian, Quaker, Evangelical, Spiritual, Nazarene, Presbyterian, Christian Fellowship,

Buddhist, Mormon, Muslim, and Church of Christ.   (See Local Clergy Lists attached as Exhibits 10-12)      The clergy members of  PCAC consisted of  Delphis Beaulieu, Roman Catholic, Monsignor Willis West, Roman Catholic,  Pastor John Heald, Light of the Hill Christian Fellowship,   Reverend Ana Maria Falcon-Garcia, Pentecostal, and Cheryl Larsen-Lawling, Lutheran.  (See 6/19/01 Pastoral Care Advisory Committee Meeting Minutes attached hereto as Exhibit 13, Exhibits 10-12)

15.     Delphis Beaulieu was the Chairperson of the PCAC.  (Beaulieu at 14)

16.      The Hospital arranged to have the Beaulieu's place Bibles  in every patient room, despite the policy that prohibited the distribution of religious literature.     (Defendant's Answer at ¶25 attached hereto as Exhibit 14)  Shawn Maynard had tried for five years to get these Bibles. (Beaulieu at 29)  The Hospital also allowed the Bealieus to place Roman Catholic religious literature in common areas of the Hospital.    (Ex. 14 at ¶ 25)

17.     The Hospital also stopped enforcing the policies concerning the circumstances under which the Hospital would give out patient information to clergy and the circumstances under which clergy could visit patients who were not parishioners.    For example, the Hospital began to provide patient information about all  Roman Catholic patients  to St. James Church without first getting the patient's permission. (Maynard at 74-77; 165-168) The Hospital reached an agreement with the Roman Catholic  Diocese to provide patient information for Roman Catholics to this  church, even if the patient identified another Roman Catholic Church upon admission as the church to be contacted.   (Id.)   Roman Catholic clergy members Monsignor West, Father Poulin and Father Luke regularly  visited patients who were not members of their church and who had not requested such visits, in violation of the written policies.  (Ex. 6 at 35)

18.    The Hospital also provided an office to the Beaulieus, despite the fact the Hospital was required to be non-denominational.   Although the Hospital suggests that the office was provided for all clergy,  the Beaulieus were the only clergy given a key,    (Maynard at 83) , and no other clergy used the office.  (Affidavit of Barbara Campbell attached hereto as Exhibit 15)

19.    In early 2000, the Hospital  decided that a Chaplain should be hired to coordinate pastoral and spiritual care at the Hospital.    A committee of Hospital officials, local clergy, employees and medical staff was created  to help in the hiring process. (Ex. 4)

20.    The defendant's officials cannot agree on the identity of the members of the committee. Some witnesses testified that Allison Breault, the Vice President of Patient Care Services was on the committee, but she has denied it.   (Deposition testimony of Robin Begansky at 17-18 attached hereto as Exhibit 16; [6]  Breault at 52-54).   Some witnesses have claimed that religious volunteer Delphis Beaulieu was on the committee, but he has denied it.   (Begansky at 14-15; Deposition testimony of Mary Barry at 20-22, attached hereto as Exhibit 17;  [7] Beaulieu at 19-20).   Some witnesses said CEO Brvnik was on the committee  (Barry at 20-22; Begansky at 17-18)   The Hospital's records indicate that initial interviews were conducted by Vice President of Human Resources, Marty Levine, Maynard and human resources employee Robin Surdel. (5/13/00 Task Force Minutes attached hereto as Exhibit 18).  However, Levine testified that Breault took part in these initial interviews.  (Deposition testimony of Marty Levine at 58-61

---

[6] The deposition testimony of Robin Begansky will hereinafter be referred to as "Begansky at____ ____".

[7] The deposition testimony of Mary Barry will hereinafter be referred to as "Barry at _____".

attached hereto as Exhibit 19 ).[8]   Breault denies involvement.  (Breault at 50-54).

21.    An effort was initially made to have the Roman Catholic church fund the position.
Deposition testimony of Vincent Stevens at 56, attached hereto as Exhibit 20; [9]  Brvnik at 183;
189-191; 211- 212).  Brvnik, who is Roman Catholic, attempted to get the local Catholic Diocese
to fund a portion of the Chaplain position, knowing that if the Diocese did so, it would require
that a Catholic person be hired.   (Brvnik at 183,189-191; 211-212)

22.     None of the most qualified applicants were Roman Catholic.   (Ex 6 at 9)

23.    Seven candidates were eventually asked to come for in-person interviews.   (See
Interview documents attached hereto as 21-24)  However, not all of these were serious
candidates.   The  interviews of Reverend Joseph Lucia and Reverend Carolyn Tanquey were
merely a matter of courtesy because each had connections to the Hospital.  (Maynard at 14-17)
Reverend William Pearl,  was initially  considered but lacked the proper credentials.   (Maynard
at 14-17)   A Reverend John Siverls was considered by the Committee to be too weak, and to
lack experience.   (Maynard at 17)

24.    Thus, only three of the interviewees were considered reasonably strong candidates-
 Christopher Beukman, Susan Stewart, and Barbara Campbell.  (Maynard at 13-14)

25.     Beukman, who lived in Boston, refused to consider moving to the area, indicating that he
 intended to commute and to be present at the Hospital only a few days per week.   (Maynard at
12-14)   Because the position required that the Chaplain be on call, this was unacceptable.
(Maynard at 13-14)

---

[8] Deposition testimony of Marty Levine will hereinafter be referred to as "Levine at _____".

[9] Deposition testimony of Vincent Stevens will hereinafter referred to as "Stevens at_____".

26.    Stewart was dependant on public transportation, making it unlikely that she could fulfill the duties of the position.  (Begansky at 14)

27.    This left only the Plaintiff- a female Unitarian Universalist minister.   (Ex. 15 at ¶ 4)

28.    It is not clear how many of the committee members interviewed the seven who were brought in.   Begansky recalls interviewing of three people.  (Begansky at 11-14).  Barry recalls only two. (Barry at 22-24) Beaulieu recalls six.  (Beaulieu at 19-22). Dawn Noel interviewed four. ( Ex. 3 at 17)  Stevens  testified that he did not interview anyone. (Stevens at 10) Noel also claims that an individual named Dick Duvall was involved in the interviews and discussions of candidates. (Noel at 19-20). Allison Breault testified that she did not interview anyone.  (Breault at 52-54)    Some members of the committee, including Dawn Noel, a Roman Catholic Hospital employee,  wanted to continue the search rather than offering the plaintiff a position.   (Noel at 23-24)

29.    Delphis Beaulieu apparently believed that plaintiff should be offered the job. He was not aware of the plaintiff's religion at the time.   (Beaulieu at 20)

30.    On or about March 21, 2001, the plaintiff was hired as  Staff Chaplain and Director of Pastoral Care. (Offer letter attached hereto as Exhibit 25)

31.    It is not clear who made the decision to hire the plaintiff.   Dick Brvnik, claimed that  the decision was made by Alison Breault with input from Levine, Maynard and the committee. (Brvnik at 48-49)   However, Breault denied having any involvement in making the decision. (Breault at 55)  Dr. Stevens, who was on the task force, indicated that he did not interview anyone and did not  take part in the discussions of hiring after the interviews took place. (Stevens at 10)   Dr. Barry, another member, unambiguously testified that the hiring decision had

8

to have been made by someone else because the committee was, "not charged with the actual hiring process".  (Barry at 25)

32.     The plaintiff  was told by Allison Breault that the  position would be a 30 hour position until fall when it would definitely become a 40 hour position.   (Exhibit 15 at ¶ 5)   Based on that representation, she accepted the job. (Exhibit 15 at ¶ 5)

33.     Campbell  was given an offer letter that  informed her that the position was going to be 30 hours at first, and that she would be given a probationary period.   (Exhibit 25)   It also stated that she  would report directly to Ms. Breault, and that she would be, "working with Shawn Maynard as necessary".   (Exhibit 25)

34.     The plaintiff began work for the Hospital on  May 7, 2001. (Exhibit 25) When she began she did not embrace Beaulieu.  (Ex. 15 at ¶ 88)

35.     When the plaintiff began her employment she was provided with a detailed written job description. (Job description attached hereto as Exhibit 26) The job description  made clear that as Chaplain, Campbell was to report to the Vice President of Patient Care Services.   (Ex 26; See Also Organizational Chart attached hereto as Ex. 27 )     This job description stated that the plaintiff was  responsible for coordinating and supervising all of the spiritual support and pastoral care, that she was to insure that appropriate clergy or spiritual care givers in the community were contacted as needed, that she was to perform religious rites when appropriate, or make arrangements for such rites with appropriate spiritual leaders as requested by patients, families or staff, that she was work with members of the Executive Team to ensure that  policies complied with relevant regulations, and that she  was to  provide training to area clergy on subjects related to the spiritual health and welfare of patients.   (Ex. 26) The job description acknowledged that

9

as Chaplain the plaintiff was to function both, "interfaith and ecumenically".    (Ex. 26)

36.    Among the relevant regulations for which the plaintiff was responsible for ensuring compliance, was the standards of the Joint Commission on Accreditation of Health Care Organizations (JCAHO).    (Ex. 15 at ¶ 9; Brvnik at 61-62; Comprehensive Accreditation Manual attached hereto as Exhibit 28)   While technically voluntary, a hospital must be accredited by JCAHO or the state in order to be approved for medicare payments. (Maynard at 55-57)  The defendant has chosen to be accredited by JCAHO. (Maynard at 55-57)   Meeting JCAHO standards is very important to the Hospital. (Brvnik at 65)   One of the JCAHO standards requires that the Hospital demonstrate respect for patient needs concerning to confidentiality, privacy, and pastoral care and other spiritual services.  ( Ex 15 ¶ 9; Ex 28) While JCAHO does not explain precisely how the Hospital is to show such respect, it indicates that patients have a right to treatment which respects their personal privacy and the confidentiality of their information.  (Id.)   The JCAHO standards on spiritual care require that the Hospital and its staff respect the patient's spiritual traditions including the patients decision to worship as he or she chose or to choose not to worship at all.  (Brvnik at 65; Breault at 48- 49). Under these standards  "Respect"  includes the Hospital not promoting other spiritual values. (Breault at 77-78).

37.    When the plaintiff began employment at the Hospital she was aware that policies concerning Health Insurance Portability and Accountability Act of 1996 (HIPAA), PL 104-191, would have to be adopted.   (Ex. 15 ¶ 10)   HIPAA is a comprehensive statute governing the disclosure of confidential health information.  (Ex. 15 ¶ 10) Among other provisions it contained limitations on a health care provider's right to share patient information

with non-employee clergy.        (Ex. 15 ¶ 10; Breault at 28)   When the plaintiff  was hired

HIPPA had not yet gone into effect.   (Ex. 15 ¶ 10)   However, the Hospital was required to

create policies complying with HIPPA  and  train employees with respect to such policies by

April 2003, and was beginning to start work on this process in 2000 and 2001.  ( Ex. 15 at ¶ 10;

Brvnik at 66) The plaintiff  was one of the employees responsible for ensuring that the defendant

was in compliance with HIPAA by 2003.  (Ex. 15 at ¶ 10)

38.        When the plaintiff  began at the Hospital she  was assigned an office.

 (Ex. 15 at ¶ 11, Maynard at 82)  She was aware that Delphis and Juanita Beaulieu had previously

been assigned the office by the Hospital.  ( Ex. 15 at ¶ 11; Maynard at 82) No other clergy  used

the office.  (Ex. 15 at ¶ 11) In fact, the Beaulieus were the only persons with keys to the office.

(Maynard at 83, 238-239)    Because the plaintiff wanted to get along with the Beaulieus, who

she knew had been volunteers at the Hospital for a long time, she told them that she  was willing

to share the office- with them and with any other area clergy.    (Ex. 15 at ¶ 11) The plaintiff did,

however, explain that when she  was engaged in confidential spiritual counseling, the need for

privacy would have to be respected. ( Ex. 15 at ¶ 11)    The Beaulieus indicated that they

understood.   (Ex. 15 at ¶ 11)

39.        Breault told the plaintiff that she could  rearrange the office and could order new

 furniture.     ( Ex. 15 at ¶ 12)     The plaintiff re-arranged the office to ensure that there were

work spaces for the local clergy and herself.   (Id.)    At her request the Hospital provided  filing

cabinets, a telephone and an updated computer.     (Id. )    In addition, the Hospital provided a

second desk for the Beaulieus and other clergy to use while working in the office.    (Id.)      In

order to make room for this new furniture, the plaintiff  had part of a counter removed.    ( Id.)

She  believed that the Beaulieus would be pleased by the changes to the office.    (Ex. 15 at ¶ 12-13)    They were not.    (Id.)

40.    Unfortunately nobody had informed the plaintiff  that the counter and some of the other furniture had been donated by the various area churches. (Ex. 15 at ¶ 13)  The plaintiff did not learn this until after the counter had been removed, when Mr. Beaulieu began shouting angrily at her. (Id.)  Beaulieu was angry at the removal of the counter, believing that she should have spoken to PCAC before making the decision.  (Beaulieu 46-47) Had the plaintiff  known that the counter had been donated, she certainly would have done so.  (Ex. 15 at ¶ 13) Beaulieu complained to Maynard. (Beauliei 46-47)

41.     Because the office contained confidential patient information and the plaintiff  did not know  who might have been given keys over the years, she asked to have the  locks changed. (Ex. 15)  She  did not know when this would occur.     (Ex. 15 at ¶ 14)  Maintenance apparently changed the locks over the weekend, and Mr. Beaulieu was inadvertently locked out. (Id.)  He was understandably quite angry. The plaintiff  apologized for any  inconvenience that this might have caused him, and made sure that he received a key.  (Ex. 15 at ¶ 14 )

42.    The plaintiff  spent her first few weeks at the Hospital trying to educate herself about the  policies and practices at the Hospital with respect to the provision of spiritual care, and trying to educate the local clergy, patients and Hospital staff as to the services that she could provide as Chaplain.     (Ex. 15 at ¶ 15)

43.    The plaintiff  asked if the Hospital had any written policies concerning pastoral care, and  was falsely informed by Shawn Maynard that they did not.  (Ex. 15 at ¶ 16)

44.    During the plaintiff's first weeks, she  created informational pamphlets which she

distributed.  (Ex. 15 at ¶ 17; Pamphlet and Informational material attached hereto as Exhibit 29)

She was asked to take part in several Hospital committees, including those dealing with the

bereaved.  (Ex. 15 at ¶ 17)  She agreed to do so.  (<u>Id.</u>)  She also began to introduce herself to

the local clergy, and began making contact sheets, identifying the various faith groups in the area

and the  local clergy who could be available to patients.  (<u>Id.</u>)  She  set a goal of trying to visit all

newly admitted  patients to let them know that she was available, and began counseling patients,

family and staff as requested. (<u>Id.</u>)

45.    Some of the plaintiff  counseling sessions took place in the office.  (Ex. 15)   On one

occasion, Mr. Beaulieu walked in and interrupted a session without knocking- embarrassing the

woman that she  was counseling. (Ex. 15 at ¶ 18)    The plaintiff  spoke to Mr. Beaulieu and

explained that he should not walk in during counseling as the identity of the person she   was

counseling was confidential.   (<u>Id.</u>) He refused to listen- explaining that he needed something

from the office.   (<u>Id.</u>) The plaintiff explained that if he knocked she  could fetch whatever he

needed for him and thereby preserve confidentiality.    (<u>Id.</u>)  He was unwilling to agree.   (<u>Id.</u>) In

order to ensure that this did not happen again, the plaintiff   began posting  a sign during her

sessions.   (<u>Id.</u>)    Again, Mr. Beaulieu walked in without knocking.  (Beaulieu at 84-85; Ex.15 at

¶ 18)  He interrupted a woman to whom the plaintiff was offering counseling for the second

time.  (Ex. 15 at ¶ 18) After this second interruption, the woman did not return for further

counseling.  (<u>Id.</u>)

46.    The plaintiff had been offering counseling to a wife  of a patient.  (Ex. 15 at ¶ 19)   This

 person  informed the plaintiff that Mr. Beaulieu had been discussing this outside of the Hospital-

telling people that she had been meeting with the plaintiff and that her husband was in the

Hospital.  (Id.)

47.     The plaintiff believed that  Mr. Beaulieu's conduct in interrupting pastoral care sessions
 and  in speaking about these sessions and about patients outside of the Hospital violated the
confidentiality and privacy rights of patients and their families.   (Ex. 15 at ¶ 20)        She  also
believed that his conduct was inconsistent with the JCAHO standard requiring respect for each
patient's right to privacy and confidentiality.    (Id.)     The plaintiff  spoke to Shawn Maynard
and/or Allison Breault about her concern that Mr. Beaulieu was failing to respect privacy and
confidentiality.    (Id.)         Neither disagreed with her interpretation of the standards, or
suggested that her concerns about patients were invalid.   (Id.)        Neither criticized her
demeanor or behavior.    (Id.)     However, the defendant never  mentioned the concerns to Mr.
Beaulieu.  (Beaulieu at 85-86)

48.     The plaintiff  learned that the Hospital had a practice of asking patients for their
 religious  affiliation, and their specific church.   (Ex. 15 at ¶ 21)       This information, along with
room number, patient name, diagnosis and doctor, were put into a Hospital Census or Directory.
(Ex. 15 at ¶ 21; Census Information attached hereto as Exhibit 30)[10]       Patients could also refuse
to identify a religion or chose to identify a religion but not a specific place of worship.   (Ex.15)

   This information was given to local clergy so that they could visit patients who had identified
themselves as members of such clergy persons church.    (Ex. 15 at ¶ 21)

49.     The Beaulieus and other clergy informed the plaintiff  that the religious coding system
 used by the Hospital was apparently not easy to use and mistakes were made.   (Ex. 15 at ¶ 22)
The plaintiff  informed the Hospital of a universal coding system, used in other institutions that

---

[10] For reasons of privacy, last names have been redacted from the census information.

she believed would help resolve with these problems. (Id.)   She offered to help the Hospital adopt this system. (Id.)   Eventually, the universal coding system was adopted. ( Id.)   The Hospital is still using this system. (Beaulieu at 90)

50.     While the plaintiff was supportive of allowing clergy to visit their parishioners- a very important part of any pastoral care program- she did not think it was appropriate that the clergy were given the entire census for review. (Ex. 15 at ¶ 23)  Because each clergy person had the entire directory, and not just the information concerning the patients who had identified themselves as that clergy person's parishioners, the clergy person was able to review patient information for non-members without that patients permission or knowledge.  (Id.) The plaintiff knew that this practice would violate HIIPA when enacted. (Id.) She also believed that the practice violated the privacy rights of patients and was inconsistent with the JCAHO standards requiring respect for each patient's right to privacy and confidentiality. (Id.)

51.     The plaintiff also learned that there had been problems with the Hospital's notification of the proper local clergy in response to a patient request. (Ex. 15 at ¶ 23 - 24)     The practice of the staff at that time was to try to reach the patient's own clergy person, and if that person was not available to go to the telephone book and try to find someone of the same religion who might be available. (Begansky at 27-28) With respect to the smaller denominations, there were sometimes difficulties in getting someone to come in to provide spiritual care. (Noel 37-38)  In May 2001, Ken Rice, a spokesperson for the Hospital, publicly reported that prior to the hiring of the plaintiff there had been some difficulties with the Hospital's notification of the proper local clergy in response to a patient request.  (Ex. 6 at 40; Newspaper article attached hereto as Ex. 31 ) Rice described the Hospital's practice as "hit or miss at times". ( Id.)

15

52.     The plaintiff believed that ensuring prompt and accurate notification of clergy in response to a patient request  was of critical importance- particularly in cases of emergency. (Ex. 15 at ¶ 24)   She therefore asked to be notified of all patient requests for spiritual care, indicating that she would take responsibility for notifying the appropriate clergy.   (Ex. 15 at ¶ 24; Begansky at 50-52)   She carried a beeper at all times so that she could carry out this important responsibility day or night.  (Ex. 15 at ¶ 24)   The plaintiff spoke to Maynard and/or Breault about this.   (Ex. 15 at ¶ 24)  Neither suggested that her concerns about patient notification  were invalid.   (Id.)  Unbeknownst to the plaintiff, her suggestion was very similar to the policies adopted by the Hospital under Reverend Gerns and never rescinded.  (Ex. 2) The plaintiff's desire to be notified of requests was consistent with her job description and entirely appropriate according to Maynard, Levine and CEO Dick Brvnik .  (Maynard at 127-129; Brvnik at 86; Levine at 200-203).

53.     As Chaplain, the plaintiff was responsible for the PCAC, including for scheduling meetings of this Committee.   (Ex. 15 at ¶ 25)  The plaintiff did not believe that the Committee was sufficiently inclusive.   (Ex. 15 at ¶ 25; Maynard at 156)  In addition, there was no process to ensure turnover on the Committee, or to ensure that the PCAC represented the breadth of faith communities in the area.   (Brvnik at 138-140)     The plaintiff also believed that it would be helpful to have Hospital employees on the committee.   (Ex. 15 at ¶ 25; Maynard at 156)   As a result the plaintiff decided that it would be a good idea to expand the membership of PCAC. (Id.) She began talking to many members of the local clergy about the Advisory Committee.  (Ex. 15 at ¶ 25) She invited Rabbi Schwartz to become a part of the Committee. (Id.) She also invited Noel and Robin Begansky.   (Id.)

54.     In May 2001, Delphis Beaulieu told the plaintiff that he intended to call a meeting of the Pastoral Care Committee.  (Beaulieu at 36; 52; Ex. 15 at ¶ 26) At this time, the plaintiff was unaware that Beaulieu was Chair of PCAC.  (Ex. 15 at ¶ 26)  Since  the plaintiff was intending to expand the membership and invite additional persons to the meeting, the plaintiff  told Beaulieu that she would call the meeting when she was ready to proceed.  (Id.)   The defendant claims that the plaintiff's demeanor was inappropriate, that she shouted and that she pounded on the table with her fist.  This untrue.  The plaintiff  was polite and did not raise her voice.  (Id.)   She did not bang her fist on a table.  (Id.) She simply informed Beaulieu that she was not yet ready to have a meeting and would call the meeting herself when she was.   (Id.)  Beaulieu  promptly complained about the plaintiff to numerous persons, including Maynard.   (Maynard at 149)

55.     In May  2001, the plaintiff  learned that the Hospital was  notifying the local churches when  patients were admitted, without first getting permission from the patient.  (Ex. 15 at ¶ 27) She  believed that it violated the privacy rights of patients and was inconsistent with the JCAHO standard requiring respect for each patient's right to privacy and confidentiality.  (Id.)

56.     The plaintiff  learned that  certain catholic priests, including   Monsignor West, Father Poulin and Father Luke, regularly went to see Catholics who were not members of their particular church.  (Ex. 15 at ¶ 28)  In addition, she learned  that William Mendez, deacon of the Alpha and Omega Pentecostal Church, was supposedly going  room to room at the hospital praying over and preaching to persons of other faiths.  (Id.) Mendez would go from patient to patient in the Hospital, "pushing his own religion".  (Beaulieu at 86-87) Mendez had apparently just started his own church, "and was trying to fill the pews".  (Beaulieu at 87).   The plaintiff believed that such visitation and proselytizing invaded the privacy of patients and failed to show

17

respect for the spiritual values of such patients. (Ex. 15 at ¶ 28) She also believed that it was inconsistent with the JCAHO standard requiring respect for each patient's right to privacy, and confidentiality, and failed to show respect for each patient's own faith tradition. (Id.)

57.    The plaintiff began to consider the need for  policies to ensure that clergy visitation and the provision of patient information to clergy  would be consistent with HIPPA, JCAHO and general considerations of patient privacy.  (Ex. 15 at ¶ 29)

58.    On or about May 29, the plaintiff learned from Delphis Beaulieu that  William Mendez, deacon of the Alpha and Omega Pentecostal Church, had approached a Jewish patient and begun to pray over him and speak with him about Jesus.   (Beaulieu at 86; Ex. 15 at ¶ 30) Beaulieu promptly notified the Plaintiff.    When the plaintiff arrived she tried to calm the patient, who was highly offended.   (Ex. 15 at ¶ 30)    She apologized to him on behalf of the Hospital.   (Id.) She documented his complaint, the resolution and her apology on his chart.  (Id.)    The plaintiff believed that  Mr. Mendez' conduct was inconsistent with the patient's right to privacy and his right to have his own faith respected.  (Ex. 15 at ¶ 30)

59.    The plaintiff  met with Mr. Mendez and explained that he was not permitted to proselytize  and should only visit members of his own church or persons who had requested a visit from him.  (Ex. 15 at ¶ 31) The plaintiff  notified Allison Breault and Shawn Maynard about the problem.  (Id)    Neither disagreed with her interpretation of the standards, or suggested that her concerns about patients were invalid.  (Id)  Neither criticized her demeanor or behavior.  (Id)

60.    On or about May 30, 2001, Mr. Mendez complained to the plaintiff about being barred from praying over all hospital patients.   (Ex. 15 at ¶ 32)  Because Mendez did not speak English very well, she had Jaunita Vazquez interpret.  (Id)   Mendez told the plaintiff that the Bible said

18

to visit the sick, and to pray over them and to lay hands on them.  (Id) The plaintiff  explained

that it was not appropriate for him to proselytize to all hospital  patients, and informed him that

he should only visit members of his congregation or patients  who had  requested that he provide

spiritual care. (Ex. 15 at ¶ 32)    Mendez complained to Shawn Maynard. (Maynard at 136 )

61.    In late May or early June the plaintiff also learned that the Hospital had a practice of

 placing Bibles in   patient rooms.  (Ex. 15 at ¶ 34; Ex. 14 at ¶ 25) This was at the request of all

the Christian PCAC . (Maynard at 72)   The plaintiff  believed that it was not appropriate for a

non-denominational Hospital to place Christian  religious literature in patient rooms.  (Ex. 15 at ¶

33)   The plaintiff also  believed that placing Christian religious literature in  patient rooms

showed a lack of respect for the spiritual values and faith of non-Christian patients.  (Id) She

believed  that by showing such a lack of consideration and respect for the spiritual values of non-

Christians, the Hospital was acting in a manner that was inconsistent with JCAHO  standards.

(Id)

62.    While JCAHO does not specifically mention Bibles, and does not provide specific

 requirements, it does indicate that patients have a right to care that respects their spiritual values.

 (Ex. 28)

63.    The plaintiff asked Mr. Beaulieu if he would  remove the Bibles from the patient rooms

 where he had placed them.  (Ex. 15 at ¶ 34) She  explained that this was an interfaith Hospital,

and that while Christian Bibles could certainly be available upon request,  it was not appropriate

to place them in every room. (Ex. 15 at ¶ 34) She   further explained that placing any type of

religious literature in the rooms of patients who had not requested such literature was

inconsistent  with the  JCAHO standard concerning the need to show respect for each patient's

faith traditions, and might offend persons who were not Christian.  (Id)   In making this request, she was polite.  (Id)

64.    Mr.  Beaulieu was furious about the idea of removing the Bibles, and refused to do so.  (Ex. 15 at ¶ 35 )  He insisted to the Hospital that Bibles should remain in all patient rooms.   (Ex. 15; at ¶ 35 Maynard at 112; 257 -258; Breault at 104)

65.    At around the same time, the plaintiff  learned that  Delphis Beaulieu was placing Catholic Prayer booklets in common areas of the Hospital.    (Ex. 15 at ¶ 36; Ex. 14 at ¶ 25) She found these booklets in the Chapel and in waiting areas around the Hospital.   (Ex. 15 at ¶ 36) On one occasion she found that he had placed the booklets in empty patient rooms on top of the Bible- set out prominently on the bedside table.    (Id)   She  believed that the distribution of pro-Catholic prayer booklets in patient rooms and other common areas, showed a lack of respect for the beliefs of non-Catholics, was inconsistent with JCAHO standards, and was inappropriate in  a non-denominational Hospital.    (Ex. 15 at ¶ 36) She felt that non-Catholic patients who were assigned to a room which included a Bible and Catholic prayer booklets might feel uncomfortable.    (Id)

66.    The plaintiff  repeatedly collected these booklets from any common areas and placed them  in the office.  (Ex. 15 at ¶ 37) She  explained to Mr. Beaulieu that it was not appropriate to randomly distribute religious literature.    (Id) She was not overbearing or insulting to him or about his beliefs.  (Ex. 15 at ¶ 37)   She  simply explained that the placement of Roman Catholic literature in patient rooms and in common areas of a non-denominational Hospital might be viewed by non-Catholics as showing a lack of respect for other  faiths.  (Id) Mr.  Beaulieu appeared  angry when she  explained this to him. (Id)    He continued to distribute the Roman

Catholic prayer booklets in common areas.    (Id)

67.    Mr. Beaulieu often visited  Catholic patients who were not of his parish- which he  was permitted to do as clergy volunteer.  (Ex. 15 at ¶ 38)  In making such visits on behalf of the Hospital, he  was supposed to minister as an inter-faith and/or ecumenical chaplain.  (Ex15 at ¶ 38; Ex. 9)   However, the plaintiff  learned that Mr. Beaulieu would offer Roman Catholics copies of  prayer  booklets which he had created and which contained the name of his church. (Id)  She explained that since he was acting on behalf of the Hospital as  as a pastoral visitor, he was not to provide literature which promoted or  advocated a particular church to persons who were not members of that church. (Id) She  explained that a Roman Catholic who attended a different church might feel that this was proselytizing or that he was showing a lack of respect for their church. (Id)   She also explained that  there would be no problem with him handing out Roman Catholic material to other Roman Catholics if the name of the specific church was deleted, and that he could always provide the booklets containing the church name to members of his church or to anyone who asked for the literature.  (Id)     Mr.  Beaulieu appeared upset when she explained this to him.  (Id) He continued to distribute the Roman Catholic prayer booklets, promoting his church, to members of other Roman Catholic churches.  (Id)

68.    The plaintiff  spoke to Maynard and Breault about her concerns with respect to the Bibles,  and the distribution of the prayer booklets,  including her concern that this conduct was inconsistent with JCAHO. (Ex. 15 at ¶ 39; Maynard at 114-117; 122-123)    Neither disagreed with her interpretation of the standards, or suggested that her concerns about patients were invalid.  (Ex. 15 at ¶ 39)  Neither criticized her demeanor or behavior. (Id)   However,  no action was taken.   The Bibles were even permitted to remain in the rooms.  ( Brvnik at 74; Maynard at

21

114-117; Breault at 36-37)

69.     In May or June  2001, the plaintiff learned from Delphis Beaulieu that he had been contacted by the Hospital on behalf of a patient who had  requested that he come to the hospital to administer spiritual care. (Ex. 15 at ¶ 40; Beaulieu at 36-37) The plaintiff  reminded Mr. Beaulieu  that she needed to be  notified about any patient request for care, so that she could ensure that the appropriate  clergy were notified.  (Id)   She then  asked who had contacted him, explaining that while she did  not object to Mr. Beaulieu being the person who counseled the patient, she  needed to be notified of all requests. (Ex. 15 at ¶ 40)    During this conversation, she was polite and appropriate.  (Id) She  did not "interrogate" him or lose her temper. (Id)   She  was not dictatorial.(Id)   Mr. Beaulieu indicated that he did not agree that the plaintiff  needed to be notified.   (Ex. 15 at ¶ 40)

70.     Beaulieu objected to  the Plaintiff being notified of all patient requests for spiritual care.  (Ex. 15 at ¶ 40)   He would not listen to her explanation and walked away while she was trying to talk to him.   (Ex. 15 at ¶ 40; Beaulieu at 36-37)    Although Beaulieu had complied with a similar policy under Chaplain Gerns, he was infuriated at the plaintiff for wanting to be notified of patient requests.  (Ex. 15; at ¶ 40; Beaulieu at 36-37; Ex 2)  He complained to Maynard and to Noel about the plaintiff.   (Beaulieu at 43-55)

71.  Noel went to the plaintiff to talk about what had happened.    (Ex.15 at ¶ 41; Noel at 42-45) The plaintiff again explained why she needed to be notified of any patient requests for spiritual care that went through the Hospital.  (Ex.15 at ¶41; Noel at 42-45)   The plaintiff was polite. (Ex. 15; at ¶41)  Noel also objected to having to tell the plaintiff about requests for spiritual care.  (Ex. 15; Noel at 42-45)   Noel complained to Allison Breault. (Noel at 42-45)

72.     During June, the plaintiff  began to draft policies concerning clergy access to patient

 information, clergy visitation of patients, and the distribution of religious literature.  (Ex. 15 at ¶

42; Draft Policies attached hereto as Ex. as 32, 33 and 34) She drafted policies that she  believed

were JCAHO compliant, would be HIPAA compliant, and which showed respect for each

patient's right to  privacy, to confidentiality and to worship as he or she  chose.  (Id)  In addition,

she took care to ensure that each policy was appropriate for a non-denominational Hospital, in

that it did not discriminate against any religion or prefer any religion.   (Ex. 15)   The draft

policies indicated that the plaintiff was to be notified of any patient request for pastoral care, and

would be responsible for notifying the appropriate clergy. (Ex. 15 at 42; Ex. 32-34; Ex. 6 at 44)

The draft policies indicated that religious literature could not be placed in common areas, and

that literature espousing a particular church could only be given to persons belonging to that

church or to persons who requested the literature.   (Ex. 6 at 42)   The draft policies indicated that

clergy could only view the census or directory data for patients who had identified themselves as

belonging to that particular clergy persons church.  (Ex. 15 at ¶ 42)  The draft policies indicated

that clergy could only visit patients who had identified themselves as belonging to that particular

clergy persons church, or who had otherwise requested visitation. (Ex. 15 at ¶ 42 ; Ex. 6 at 41)

The draft policies prohibited proselytization and room to room visiting.  (Ex. 15 at ¶ 42)  The

draft policies also indicated that the Hospital would not notify a church of a church members

hospitalization without permission from the patient.   (Ex. 15 at ¶ 42; Ex. 6 at 43)

73. The plaintiff gave Cathy Young, the Hospital's JCAHO Quality Assurance Manager, copies

of these draft  policies to review.  (Ex. 15 at ¶ 43)   Ms. Young approved of the draft policies

with certain changes.  (Id) The plaintiff  then  presented the draft policies, along with a mission

statement to Breault and Maynard.   (Ex. 15 at ¶ 43 Draft; Mission Statement attached hereto as

Ex. 36)  They did not indicate any objection to the general direction of the policies or the subject

matter.  (Ex. 15 at 43; Breault at 120- 130)  Ms. Breault did suggest some minor changes which

the plaintiff made. (Id)

74.     On June 19, 2001, the plaintiff held the first meeting of the PCAC. (Ex. 15 at ¶ 44)  The

only clergy  present were Mr. Beaulieu, John Heald, Monsignor Willis West, and Cheryl Larson

Lawling.  (Ex. 15 at ¶ 44; Ex. 13)   At this meeting the  plaintiff discussed her plans for the

provision of spiritual care at the Hospital.    (Id)    She explained that she was trying to make the

clergy admission codes more accurate.   (Id) She talked about wanting to make PCAC   more

inclusive.   (Id)   She also talked about the necessity of changing the Hospital's practices with

respect to clergy access to the census, clergy visitation of non-parishioners, and clergy

notification by the Hospital.  (Id)  Specifically, she explained that because of JCAHO and other

regulations it would be necessary for  clergy to limit their visitation and their  distribution of

religious literature to : (1) members of their own congregation; (2) others who specifically

requested it or whose family had made such a request; and (3) members of their own faith group

for such occasions as communion.  (Id)   She explained that because of patient privacy and

confidentiality issues, clergy would only be permitted to look at the census information for

members of their own church, and that the church would only be notified of the presence of a

member at the Hospital if the patient consented.  (Id)  Finally, she explained that it was important

that she be notified whenever a patient or family member requested spiritual care through the

Hospital since she was the individual responsible for ensuring that the Hospital properly

responded to such requests.  (Id)

75.    The plaintiff  tried to explain why the changes were necessary but found that the PCAC clergy members  seemed unwilling to listen. (Ex. 15 at ¶ 45)  Dephis Beaulieu, explained that when the plaintiff tried to explain her plans and changes to the policies  the clergy members of the PCAC began cutting her off, "mouthing off" and "talking at once because they didn't like what they were hearing".  (Beaulieu at 54- 57)    He explained that they were  simply  not interested in her proposals, noting, "they were not interested in where she wanted to go.... they were interested in what [she] was going to do for [them]".  (Beaulieu at 54-57)  He described the Clergy  behavior as, "throwing stones", and noted that the meeting got, "out of hand". (Beaulieu at 54-57 ) The plaintiff  did not say that she was being "picked on", and Maynard did not step in.   (Ex. 15 at ¶ 45) She simply tried to reassure the clergy and to explain the reasons for the changes.  (Id)

76.   Several of the clergy members of the PCAC, including Beaulieu, John Heald,  and Monsignor Willis  West,  were very upset at these changes in policy. (Ex. 15 at ¶ 45; Maynard at 253- 255)  Some  of the clergy concerns were reasonable.  For example,   Monsignor West initially took exception to the plaintiff saying that she needed to  be notified whenever a request for spiritual care was made through the Hospital.   (Ex. 15)  He was concerned that a priest might not be notified promptly enough in emergencies when baptisms or last rites would need to be provided.  (Ex. 15 at ¶ 45;  Maynard at 148; 256)   However, the plaintiff  was able to reassure him that she wore a beeper at all times and would make certain that a priest was promptly notified. (Ex. 15 at ¶ 45)

77.    Heald, West and Beaulieu   took issue with being told that they could only visit  their own church members, and could only see the census concerning their own church

25

members. (Maynard at 148-149)  Larsen Lawling was also upset about the substance of the

changes and the fact that the policies were being changed without  PCAC input.  (Maynard at

260-261)

78.    Beaulieu, Poulin, Falcon-Garcia West, and Heald felt that they should be

 afforded the opportunity to look at the entire census, and go see anyone that they wanted to see.

(Beaulieu at 98-100) In fact, they wanted to be able to see patients who had deliberately not

identified themselves in the census as belonging to a certain church.    (Beaulieu at 98-101) As

Mr. Beaulieu explained,

> a lot of the people for their own reasons would say, "I'm a Catholic
> unaffiliated."   Now that meant, if they were unaffiliated, then no priest
> could go and see them.   Now, sometimes a lot of these people go to
> church once or twice a year, but they didn't want to say that they went to
> church at St. Joe's because they only showed up once or twice a year,
> and they don't want the priest to come in there and give them a hard time.
>
> So you had all different kinds of reasons.   But [Father Poulin, Pastor
> Heald, Monsignor West and Reverend Falcon-Garcia] wanted to see who
>  was in there so they could see them."

(Beau at 97-98)

79.    Prior to the PCAC meeting the plaintiff had noticed that Delphis Beaulieau consistently

 interrupted her, spoke over her and paid little attention to her opinions.  (Ex. 15 at ¶ 50)   During

the meeting he continued to do so.  (Id)   During the meeting she noticed that Beaulieu treated

female minister  Cheryl Larsen Lawling in the same manner- cutting her off, speaking over her,

and appearing to disregard her opinions. (Ex. 15 at ¶ 50)  However, Mr. Beaulieu did not do any

of these things when Pastor Heald, Monsignor West or Mr. Maynard spoke.  (Ex. 15 at ¶ 50)

80.    At the PCAC  meeting, the plaintiff  noticed that Monsignor Willis West also interrupted

her and refused to listen to her explanation.   (Ex. 15 at ¶ 51)  When Reverend Larsen-Lawling

spoke,  Monsignor Willis West would roll his eyes or make faces, even when the opinions she

was expressing were similar to his.  (Id)  Monsignor Willis West did not behave like this when

Pastor Heald, or any other male spoke.   (Id)

81. After the meeting, the plaintiff decided to try again to explain the rationale for the policies,

 and decided to try to do so  in writing.  (Ex. 15 at ¶ 46) On or about July 18, 2001, the plaintiff

communicated the changes to  the clergy visitation policy  and the rationale underlying the

changes to the policy. (Ex. 15 at ¶ 46; Letter to clergy attached hereto as Ex. 37)    The letter to

the clergy was approved by Allison Breault. (Breault at 129-130)   She sent documentation to

local clergy to explain why the changes were necessary, and mailed the same documents to each

member of the PCAC.  (Ex. 15) The plaintiff also held several meetings with local clergy to

explain the reasoning for the visitation policy.  (Ex. 15 at ¶ 46; Ex. 37) Finally, she met

individually with any member of the clergy  who had questions to further explain the reason for

the changes.(Ex. 15 at ¶ 46)

82.     Most of the local religious leaders appeared to be responding positively. (Ex. 15 at ¶ 47)

 The plaintiff spoke to many of the area clergy and was received positively.   (Id) She  went to a

Windham Area Interfaith Ministry meeting where she was well received. (Ex. 15 at ¶ 47)    She

was even asked to preach at several  local churches. (Ex. 15 at ¶ 47)

83.      After the PCAC meeting, the plaintiff had a private conversation with Heald, and he

seemed to accept the changes. (Ex. 15 at ¶ 47)

84.     However, the plaintiff  continued to have difficulty with some of the Roman Catholic

 clergy. (Ex. 15 at ¶ 47- 48)   She  learned that one of the Roman Catholic churches was upset

about the changes in the church notification policy. (Ex. 15 at ¶ 48)  Father Poulin, Monsignor

Willis West and Mr. Beaulieu continued to want to view the census for all patients, and to be free

to  visit patients who were not members of their church. (Beaulieu at 97-101; Ex. 15 at ¶ 48)

Mr. Beaulieu continued to express disagreement with the draft policies regarding distribution of

religious materials.  (Ex. 15 at ¶ 48)

85.     Beaulieu felt particularly strongly that the Catholic clergy should continue to be permitted

 to follow these practices.  (Beaulieu at 97-101)       Beaulieu complained to Drs. Stevens and

Barry,  to Dawn Noel and to several members of the nursing staff about the plaintiff.  (Barry at

31-32; Stevens at 13-14; Deposition of Leigh Johnson at 9, attached hereto as Exhibit 38;[11]

Deposition of Kathleen Clairmont at 9-11,[12]  attached hereto as Exhibit 39; Deposition of Teddi

Moore at 9 attached hereto as Exhibit 40) [13]  West also complained about the policies.  (Maynard

at 146-149; 255-256; Noel at 54-55; Beaulieu 97-101) Father Poulin apparently complained

about the changes in policies.  (Beaulieu 97-101) In particular Poulin complained about the

Hospital no longer automatically notifying the church when a  patient was admitted, and about

the changes with respect to visiting only parishioners  ( Beaulieu 92; 97-101; Breault at 166-167,

179-187, Meeting Minutes attached hereto as Exhibit 41)

86.     In a discussion with the plaintiff in June or July, Beaulieu informed her that "if she were a

man" he would bounce her off a wall.   (Ex. 15 at ¶ 50)

---

[11] The deposition testimony of Leigh Johnson will hereinafter be referenced as "Johnson at ___".

[12] The deposition testimony of Kathleen Clairmont will hereinafter be referenced as "Clairmont at ___".

[13] The deposition testimony of Teddi Moore will hereinafter be referenced to as "Moore at ___".

87.      On July 11, 2001 Dr. Barry reported to Marty Levine that the clergy - by which she meant the Beaulieus- were complaining to her and to the nursing staff, and asked if the defendant would be reviewing the plaintiff's performance.      (Barry at 31-32; E-mail attached hereto as Exhibit 42)

88.      By late June or July , the plaintiff became concerned that she was not going to be able to get Monsignor Willis West or Mr. Beaulieu to work with her.  (Ex. 15 at ¶ 50-53) She believed that this was related to their unwillingness to accept changes in policy from a female minister. (Id)  Her belief was related- in part - to what she had observed about how each had treated her and Reverend Larson Lawling, as compared to men.  (Id)  In addition, the gender-related nature of the threat that Mr. Beaulieu had made caused her to believe that part of the problem was his unwillingness to accept a female minister.   (Id) Finally, the plaintiff was aware that one of the tenets of the Roman Catholic church was that women should not be ordained.  (Id)   Because she understood that both Monsignor Willis West and Mr. Beaulieu sincerely believed in the teachings and tenets of the Roman Catholic church, the plaintiff thought that it was likely that they would have difficulty accepting a female ordained minister.  (Id)

89.      The plaintiff complained to Alison Breault and Shawn Maynard that she believed that Monsignor West was making her job more difficult, and that she believed that he would never accept her as a minister because of her gender. (Ex. 15 at ¶ 53; Ex. 6 at 50)  Breault and Maynard admitted that West probably believed that women should not be ordained, and might have a difficult time accepting me.    (Ex. 15 at ¶ 53; Maynard at 28-29; Breault 217-219) Breault and Maynard admitted that West, 'was the kind of person who believes that ordained– people being ordained more than likely should be of the male gender".   (Maynard at 31-32)

90.     The plaintiff also complained  to Alison Breault and Shawn Maynard that she believed

that Mr. Beaulieu would never accept her  as a minister because of her  gender. (Ex. 15 at 54; Ex.

6 at 50)  Breault and Maynard agreed that like Monsignor West, Mr. Beaulieu might have a

difficult time accepting a female ordained minister. (Ex. 15 at ¶ 54)

91.     Despite the negative reaction by West and Beaulieu  the plaintiff continued to reach out

 to the patients, staff, and local clergy.   (Ex. 15 at ¶ 55)  During the period between May and the

beginning of August, the plaintiff  met with hundreds of patients, family members and staff.

(Ex. 15 at ¶ 55,  See Statistics as kept by Plaintiff attached hereto as Exhibit 43)  She continued

working on simplifying and updating the church codes so that they would be more accurate, and

would include all area religions.  (Ex. 15 at ¶ 55).  She counseled patients, families, and staff

whenever requested.   (Id) She  notified the appropriate clergy of patient requests,  attended

meetings, and even preached when asked. (Id)    She kept statistics of what she did, acted as a

liaison to local clergy and to the local community,  worked in Hospital committees, and

continued to work on explaining the  changes in policies. (Id)   The feedback she received was

very positive.  (Id)

92.     There continued to be issues with respect to the provision of spiritual care by the

 Beaulieus.   The plaintiff continued to find  prayer pamphlets in the common areas.   (Ex. 15 at

¶ 57) Every time that she saw them, she collected them and returned them to the office.  (Ex. 15

at ¶ 57)   The plaintiff was also aware that Mr. Beaulieu continued to give out prayer pamphlets

promoting St. Mary's when he visited or gave communion to Catholics from other parishes.   (Id)

On one occasion in July, the plaintiff blacked out the name St. Mary's on a handful of the

pamphlets so that he could give the pamphlets to Catholics without promoting a specific church.

(Ex. 15 at ¶ 57) She hoped that by doing so she could make Mr. Beaulieu understand that it would be very easy to make the pamphlets consistent with JCAHO without changing the content. (Id)

93.    The plaintiff met on a weekly or bi-weekly basis with Allison Breault and Shawn Maynard to discuss her efforts and concerns. (Ex. 15 at ¶ 56) At no time during this period did they indicate any problems with her performance. (Id)

94.    In July or early August, a nurse came to ask the plaintiff to speak with a patient who was crying and very upset. (Ex. 15 at ¶ 58)  When the plaintiff spoke with the patient, she learned that Juanita Beaulieu had apparently upset the patient by talking about the fatal accident of her sons. (Id)  The plaintiff believed that Mrs. Beaulieu meant well, but had shown poor judgement and/or lack of training.  (Id)  The plaintiff wanted to speak with her about it.  (Id)  Before doing so, the plaintiff spoke to Breault and Maynard about her concerns. (Id) They told the plaintiff not to discuss the issue with Mrs. Beaulieu, and that the Hospital would handle the issue "later".  (Ex. 15 at ¶ 58) Nobody from the Hospital ever did so.  (Beaulieu at 70-74)

95.    In or about July, the plaintiff was told by Allison Breault that her position would not be increased to 40 hours as she had been promised.(Ex. 15 at ¶ 59; Maynard at 24)    No explanation for this change was given. (Ex. 15 at ¶ 59)

96.  The Hospital has detailed policies and practices governing discipline.   ( Discipline Policies and Practices attached hereto as Ex. 44)     These policies require that discipline be applied in a "uniform, fair and systematic method".  ( Ex. 44 at 0306) Managers are trained that before administering discipline they must engage in a fair and objective investigation, "thoroughly examine all evidence associated with the allegation."  (Ex. 44 at 168)  Every employee, including

those in their introductory or probationary period  are  entitled to an investigation of the

complaints against them before discipline can be applied.   (Levine at 23-24; Brvnik at 20-21)

In addition, there must be substantial evidence to support an accusation  of misconduct or poor

performance  before a probationary employee is disciplined.  ( Ex. 44 at 168) Any such

investigation is to be documented. (Brvnik at 26)  In fact, there is no difference in the amount of

proof required to terminate a probationary employee and a permanent employee.   (Levine at 35-

36)   Extension of a probationary status is considered a "serious level" of discipline.   (Levine at

36-37)

97.       The Hospital also has detailed policies and practices concerning the evaluation of

employees. (Policies and Evaluation Practices attached hereto as Exhibit 45)  With respect to

evaluations, the policies require that the supervisor conduct a, "thorough, impartial, and timely

performance review".  (Ex. 45 at 0091)    Performance is to be assessed, "against each of the

written standards, independently of other standards, and should be based on measurable or

observable job-related results or behaviors".   (Ex. 45 at 0092; Levine at 31-32)   The evaluating

supervisor must look for objective evidence of these job related results or behaviors. (Levine at

31-32) All available evidence is to be reviewed.  (Levine at 27-29) In evaluating an employee,

the supervisor is to use the best available evidence; the supervisor is to try to go to the source.

(Levine at 158)

98.       A supervisor is  not to negatively evaluate an employee based on an observable but not

measurable criteria, if they have not observed the performance and have not done an

investigation to determine if the observations of others were accurate.  (Levine at. 33)   This is

because in the case of complaints, the best available evidence would be the person who had the

complaint.   (Levine at  206-208)

99.     On  August 1, 2002, the Defendants held a secret meeting to discuss the plaintiff's

performance.    (See Minutes attached hereto as Exhibit 46; Notes attached hereto as Exhibit 47

statement by participants attached hereto as Exhibit 48) Levine, Maynard (by telephone), and

Breault held the meeting on behalf of the Hospital.     (Ex. 46)     Some, but not all of the non-

managerial members of the clergy task force also  attended.  Specifically,  Drs. Barry and

Stephens, Nurse Robin Begansky, Dawn Noel and Delphis Beaulieu attended.    (Ex. 46)  Both

doctors were quite friendly with the Beaulieus.   (Beaulieus at 44-45 ).   The plaintiff did not

attend. (Ex. 46)

101.    According to the Hospital's records,  the persons present at the August meeting  indicated

 concerns over: (1) the plaintiff's  documentation of certain patient complaints; (2) the plaintiff's

relationship with local clergy and Delphis Beaulieu; and (3) the plaintiff's approach to patients

and/or staff.  (Ex. 46)

102.    With respect to the issue of documentation, the concerns allegedly involved the plaintiff's

 having documented on a patient chart Mr. Mendez's inappropriate proselytizing. and her having

noted that a patient did not like her night nurse. (Ex. 46)   With respect to Mendez, the plaintiff

wrote that it was, "inappropriate what the clergyperson had done and Barbara apologized to the

patient".  (Ex. 46) The defendant claimed that this disparaged the clergyperson.  (Ex. 46)

Interestingly, the defendant, in its meeting notes refers to this clergyperson  as a, "little Spanish

guy".   (Ex. 47)

103. The persons at the meeting did not believe that the documentation issues involved a

deliberate refusal to follow charting procedures.  (Stevens at 30)    In fact, the Hospital did not

33

have any guidelines explaining how a Chaplain was to document patient concerns. (Breault at 178-179; Ex. 6 at 63) The Hospitals general charting guidelines provided that all clinical staff were to document any patient problems on the chart. (See Guidelines attached hereto as Exhibit 49) The persons present at this meeting also knew that a Chaplain will sometime document in the patient record. (3/3/00 minutes of Clergy Task Force attached hereto as Ex. 50; Ex. 6 at 63) During the meeting, it was decided that guidelines on documentation were needed and should be developed. (Breault at 177- 179; Ex. 46)

104.    The alleged problems with local clergy concerned the  Beaulieus and the members of the PCAC.  (Breault at 179)   Beaulieu reported some of his own complaints about the plaintiff, and criticized the plaintiff for the events of  the PCAC meeting.    (Barry at 59-61)   Maynard and Noel also reported complaints allegedly  made by Mendez and the members of the PCAC. (Breault at 181, 194-198)   Noel testified that the only complaints by clergy made to her during the plaintiff's employment were by Monsignor West and the Beaulieus.   (Noel at 50-55) Maynard explained that the concerns expressed were by the Beaulieus,  Monsignor Willis West, Pastor John Heald, and Cheryl Larsen Lawling.  (Maynard at 146-149) Maynard testified that Ana Maria Falcon Garcia did complain on occasion, but was only repeating complaints made by other members of the PCAC.    (Maynard at 147)

105.    The concerns of the PCAC  primarily involved disagreement with the substance of the  plaintiff's new policies. Larson-Lawling's complaint had to do with the fact that she did not like the changes in the policies, and that there had been no input from the committee.  (Maynard at 258-262)   Noel testified that she could not recall the substance of West's complaints to her. (Noel at 54-55)   Beaulieu testified it was the changes in policy West and Heald objected to.

34

(Beaulieu at 97-101)  Maynard admitted that he could not recall complaints from West or Heald

dealing with Campbell's demeanor, just complaints about the substance of the changes in policy.

(Maynard at 147-149; 253-255; 260).

106.    The plaintiff  interacted with approximately  100 members of the medical staff, and one

to two hundred Hospital staff.  (Breault at 147)   During the time that she was employed by the

Hospital she also met with more than 600 patients, met with family or staff about a patient over

400 times, and provided pastoral care to over 100 staff members.   (Ex. 43; Ex. 15 at 78)

107. It is impossible to reconstruct the complaints/concerns about staff reported in the meeting

with any specificity.  The minutes of the meeting suggest only that the alleged problems with

patients and staff  involved criticism  by some of the staff on the Hospital's  4Shea unit.  (Ex.

46) However, most of the persons present at the meeting were deposed and testified about the

complaints and concerns they were aware of.

108.    Marty Levine testified that  had received no complaints from patients, family members or

staff.  (Levine at 112; Ex. 6 at 64, 65)

109.    Shawn Maynard received no patient complaints or complaints from families.  (Maynard

at 92; 100; Ex. 6 at 64, 65)  He did allegedly receive criticism from ICU nurses Sandy Minchew

and Susan Nosal, who informed him that  on one occasion the plaintiff offered to help support

staff during an emergency in a manner that they found to be "hovering" and/or intrusive.  (See

Defendant's 10/10/03 responses to Interrogatories at Response 8,  attached hereto as Exhibit 51;

Defendants 4/2/04 responses to Plaintiff's Second Set of Interrogatories at Response 2, attached

hereto as Ex. 52).   He allegedly observed her hovering himself on another occasion.  (Maynard

at 86-87; 100) These were the only  concerns that any staff person, other than Dawn Noel,

reported to him.   (Maynard at 100)

110. Dawn Noel  had received no complaints from any patients or family members.   (Noel at 38)
 She had allegedly  heard second or third hand about one patient complaint from a nurse on
4Shea.  (Noel at 38-39)   According to this unidentified nurse, the  patient allegedly did not like
the plaintiff's form of ministering, considering it too "new age".   (Noel at 38-39)   Noel's only
concerns about the plaintiff at that time involved: (1) her belief that it was inappropriate for the
plaintiff to inform Noel and Beaulieu that she needed to be notified of any patient request for
spiritual care that went through the Hospital; and (2) on one occasion the plaintiff saw Noel, and
walked towards Noel  flapping her arms like an airplane in what Noel described as an attempt,
"to be very friendly and fit in".  (Noel at 45; 49-50)

111.    Noel believed that she heard staff criticism from: (1) one CCU or ICU nurse saying that
on one occasion  Barbara Campbell  tried to offer support to the staff during an emergency which
was allegedly distracting; (2) Teddi Moore and perhaps other 4 Shea nurses allegedly reported
that on one occasion two physicians were talking and Campbell allegedly inappropriately listened
to the conversation; and (3) a discharge nurse named  Patricia Butler once commented to Noel
that the plaintiff did not seem friendly.  (Noel at 65-67; 70-71)

112.    Robin Begansky also received no complaints or criticism from any patients or family
 members of patients.  (Begansky at 31-33)   Ms.  Begansky may  have shared her personal
concerns that  that Ms. Campbell would stand within two feet of her which made her
uncomfortable, and that on one occasion she observed  the plaintiff standing to close to two
doctors who were talking and appeared to be listening to them.   (Begansky at 45)   Ms.
Begansky may also have reported a discussion that she had with some of her co-workers.

According to Begansky,  there was one informal group lunch discussion on 4Shea in which several of her co-workers may have complained that they were uncomfortable with Barbara Campbell with respect to her standing too close. (Begansky at  32-41)    In particular, she believed that Kathy Clairmont, Teresa Carey, Ellen Scheriber and/or Colleen Corcoran  may have expressed that Campbell  stood too close. (Begansky at 32-41) Begansky heard this criticism only once and that, "it was nothing bad about the patients, it was just that she did not know to leave you in your own personal space".   ( Begansky at 32-41)

113.    Dr. Stevens had no personal complaints about his interactions with the plaintiff.   (Stevens at 11)   No patients or family members of patients complained to him.   (Stevens at 11-12) However, Dr. Stevens had apparently gone to the nursing staff on 4 Shea and on the emergency ward to ask them what they thought about the plaintiff.    (Stevens at 18-23) The emergency room staff had no complaints about the plaintiff.   (Stevens at 18-23)    However , one or more of 4 Shea nurses allegedly made  negative gestures  including eye-rolling.   (Stevens at 18-23) One mentioned that she found the plaintiff's way of ministering "unusual".   (Id) There was also a criticism by about the plaintiff, "praying to the moon and the stars".   (Stevens at 18-23)   Finally, an unidentified nurse from 4Shea allegedly told  Dr. Stevens  that a patient, on one occasion might  have been uncomfortable with the plaintiff or might not have wanted to be seen by the plaintiff.  (Stevens at 18-23)

114.    Dr. Barry had no personal knowledge about any performance problems, and had no  negative interactions or observations of the plaintiff.    (Barry at 26-27)  However, Dr. Barry had also heard  that the plaintiff had once appeared to be listening to a conversation between two doctors.  (Barry at 52-53; 80)   She had also allegedly been told from  a nurse named Janice  that

during an emergency in ICU the plaintiff, in some unidentified way,  made it difficult for the staff

to do their work.   (Barry at 54-55) Finally, Dr. Barry  believed that one patient may have

complained that she was uncomfortable.   (Barry at 27, 29)   Dr. Barry did not look any further

into the complaint and did not know the name of the patient who was allegedly unhappy. (Barry

at 27, 29) She was aware of no family member complaints. (Barry at 30)

115.    Sharon Verrenault, a nurse who was apparently not present at the August meeting but

 had been part of the Clergy Task Force, reported that the staff of the ICU did **not** have any issues

with the plaintiff.  ( Ex. 46; Breault at 310)

116.   Allison Breault reported that she was not aware of any complaints from patients .  (Breault

at 140; 185; Ex. 6 at 64, 65)    Breault claims that she heard criticism directly from Kathleen

Clairmont, Colleen Corcoran, Teresa Carey, Shirley Dayton and/or  Teddi Moore prior to

extending the plaintiff's probation.  ( Breault at 311-322) She claims that some or all of these

4Shea nurses came to her to complain about being uncomfortable calling the plaintiff to see

patients, and told her that the Plaintiff was "in my face" , "had no respect for personal space" and

on one occasion touched someone .   (Breault at 323-324)

117.    This testimony was, in large part, contradicted by these nurses. Leigh Johnson testified

 that she never complained about the plaintiff to Allison Breault or Dawn Noel.  (Johnson at 9)

Indeed, she had nothing to complain about.   Johnson explained that she had no concerns about

any interactions of Barbara Campbell  that she observed.   (Johnson at 8)   Furthermore, she

heard no complaints from patients, doctors or  family members about Barbara Campbell.

(Johnson at  7, 9)   The only complaints from clergy that she recalled about Barbara Campbell

were from Delphis Beaulieu.  (Johnson at 9) The only staff persons she ever heard making a

negative comment about Barbara Campbell were Robin Begansky and Dawn Noel. (Johnson at 9-11) Johnson did believe that Campbell seemed unapproachable, but did not mention this to anyone in management until long after the plaintiff was fired. (Johnson at 111-14; 18-19) She only shared this in October 2003, when Levine and Breault came to her and asked how she felt about Barbara Campbell. (Johnson at 15-16)

118.    Teresa Carey LaFleur testified that she never saw any conduct by Barbara Campbell that caused her concern. (Deposition of Teresa Carey at 8; LaFluer attached hereto as Ex. 53) [14] She heard no complaints about Campbell from patients, doctors, staff or family members. (Carey at 7-8) On one occasion a doctor had been rude and unprofessional to Carey on the telephone, and she needed to get away because she was upset. (Carey at 9-11) She went into the kitchen and Barbara Campbell came in and asked if there was anything that she could do for Carey. (Carey at 9) Campbell also told Carey, "that she mattered". (Carey at 9) Carey was uncomfortable because she felt that Campbell was standing too close and, "speaking to me as if she knew me so well, and I wasn't comfortable sharing whatever I was feeling with her". (Carey at 10-11) She did not tell Campbell she was uncomfortable. (Carey at 14) She never complained about this to Breault or Noel during the period that Campbell was employed. (Carey at 14) In fact, she mentioned it only when Breault came to her after the litigation was filed asking if she had any negative interactions with the plaintiff. (Carey at12-14)

119.    Kathleen Clairmont also had no concerns about how the plaintiff interacted with patients and/or families. (Clairmont at 7) She received no complaints from patients, family members,

---

[14] The deposiotion testimony of Teresa Carey LaFleur will hereinafter be referred to as "Carey at___".

or doctors.   ( Clairmont at 7-8) In fact, the only concerns she recalled being expressed were

from Beaulieu and Carey.  (Clairmont 9-11) Clairmont's only criticism of the plaintiff was that

on the day that she met her, the plaintiff stood close to her and said, "I'm here for you".

(Clairmont at 11) However, Clairmont did not report this during the time that the plaintiff was

employed.  (Clairmont 11-12)   The only time that Clairmont recalls speaking to Breault was in

2003-2004, after the plaintiff had been fired, when Breault and Levine came to her to solicit

complaints.  (Clairmont at 12-13)

120.    Teddi Moore testified that she never observed anything about how Barbara Campbell

 interacted with anyone else that made her uncomfortable.   (Moore at 8) She never received any

complaints from patients, family members or doctors.  ( Moore at 8-9)   The only clergy person

who ever complained was Delphis Beaulieu.  (Moore at 9)   She herself had only one concern

about Campbell and that was that on one occasion Barbara Campbell put her hand on Moore's

shoulder and said, "If there is anything I can do for you, call me".   (Moore at 7-8, 12)   Moore

felt a little uncomfortable with being touched on the shoulder, and may have reported that to

Noel or Breault. (Moore at 8, 11)

121.  Shirley Dayton, an ICU nurse heard no complaints from patients, family members, doctors

or clergy.  (Deposition of Shirely Dayton at 5-6, attached hereto as Exhibit 54)[15] She herself had

no concerns about any interactions that she had,  or  observed regarding Barbara Campbell.

(Dayton at 7-9) The only criticism she recalls from anyone was a story that during an emergency

the plaintiff had offered to help or support staff.  (Dayton at 9-11) Dayton never observed this,

---

[15] The deposition testimony of Shirely Dayton will hereinafter be referred to as "Dayton at___".

and cannot recall who she heard the story from.   (Dayton at 9-11)   She never complained or

even discussed Barbara Campbell with Breault.  (Dayton at 9).

122.    Breault  never spoke to Heald, Mendez, Larsen-Lawling or any other area clergy to see if

 the complaints reported at the meeting were accurate.   (Breault at 194-198)

123. The Hospital never  investigated to determine whether or not any patients complaints

reported at the meeting were accurate.   In fact, the defendant concedes that it is unaware of any

patient or family member complaints  about the plaintiff  that it relied upon.  (Ex 6 at 14)

124.    Breault extended the plaintiff's probation in part because of alleged complaints about

how she was interacting with patients.  (Breault at 144)

125.    The only investigation into the alleged staff complaints was Breault's discussion with one

or two staff members. (Breault at 145-147)   She relied on the perception of the few people she

spoke to.  (Breault at 149; 263)

126.    The persons present at the meeting, including Breault, decided  that the plaintiff had

 engaged in poor performance with respect to clergy, families, patients and staff. (Ex. 46)

127.    Ultimately Breault decided to extend the plaintiff's  probation instead of terminating her.

 (Stevens at 30-31)   Breault made this decision even though she had not yet evaluated the

plaintiff against the detailed standards identified in her job description.  (Breault at 185-187)

128.    After making the decision to extend the plaintiff's probation,  Breault and/or Maynard

created an evaluation  (Breault at 185-187)  With respect to the alleged problems with clergy,

Breault relied  upon the communications from the persons at the August meeting.  (Breault at

194-198)   Breault  admittedly based the evaluation on the perceptions of others, many of whom

she had not spoke to, rather than on observable or measurable behaviors.  (Breault at 262-264)

41

129.     In this written evaluation, the plaintiff was evaluated on her: excellence, accountability, compassion, commitment and teamwork.     (Evaluation and response attached hereto as Ex. 55) She was rated as fully achieving or exceeding expectations in all applicable areas involving excellence and accountability.     (Ex. 55)   She was rated as fully achieving expectations with respect to  compassion, commitment and teamwork in all areas in which she was rated.     (Ex. 55)

130.     However she was not given a rating with respect to four specific areas.  (Ex. 55)   A narrative referenced in the evaluation, criticized the plaintiff for: (1)  alleged problems with local clergy with respect to her requests that she be notified of patient requests for spiritual care; (2) alleged problems with local clergy concerning the plaintiff's requests for JCAHO compliance; (3) problems regarding a alleged failure to respect personal space and an alleged failure to take appropriate time to establish relationships; and (4) allegedly improper documentation in  patient records.     (Ex. 55)   The plaintiff was told that she had to immediately: (1) improve her relationship with lay volunteers and local clergy; (2) modify her approach to patients, family and staff, (3) address documentation issues, (4) initiate a statistical log, and (5) make patients and local clergy aware that patients could contact clergy directly, and inform them that any patient requests to staff would be honored immediately.     (Ex. 55)

131.     On or about August 15, 2001,   Breault and Maynard gave the plaintiff the evaluation and discussed it with her.  (Ex. 15 at ¶ 60)  The plaintiff was told that Maynard had written the evaluation, and that her probation was being extended because of performance problems.  (Ex. 15 at ¶ 60)   Breault and Maynard went over the evaluation in detail with the plaintiff, and the plaintiff expressed some of her concerns and disagreements.  (Ex. 15 at ¶ 60; Breault at 202-

203) The plaintiff did not agree with the evaluation and tried to explain this to Breault. (Ex. 15 at ¶ 60) Breault would not agree to change the evaluation. (Ex. 15 at ¶ 60) Instead, the plaintiff was was encouraged to provide feedback and suggestions. (Ex. 15 at ¶ 60)

132. On or about August 22nd 2001, the plaintiff responded to the evaluation in writing in order to correct the inaccurate information, and in hopes that the Hospital would reconsider and change the evaluation. (Ex. 15; at ¶ 61; Ex. 55)

133. In this response, the plaintiff explained that with respect to the alleged problems building relationships and respecting personal space, these were impossible to objectively measure, and pointed out the positive response she had received from most patients, families, staff, and community clergy. (Ex. 55) She also asked for specific direction on how to modify her behavior to meet the Hospital's expectations and/or information as to who she had offended so that she could repair the relationships. (Ex. 55)

134. With respect to the alleged improper documentation, she explained her belief that documentation of proselytizing was necessary and that her practices with respect to documentation was consistent with industry practices. (Ex. 55) However, she agreed to comply with the Hospital's instructions not to document such behavior in patient records in the future. (Ex. 55)

135. With respect to the statistics, the plaintiff provided the statistics she had been keeping, and reminded Breault that when she had asked how to report these in the past, she had been told not to report the statistics until the end of the year. (Ex. 55) She also asked to whom she should provide such statistics to in the future. (Ex. 55)

136. With respect to her relationships with clergy including the Beaulieus, the plaintiff

explained that the majority of the local clergy had responded to her positively and had supported the new policies. (Ex. 55)   She stated that with respect to notification of requests for spiritual care and changes in policies, she was simply seeking compliance with her job description, regulations and Hospital policy. (Ex. 55)  She stated that she had explained the practice to patients and clergy and had further explained in pamphlets which she placed throughout the hospital. (Ex. 55)   She also asked the identity of the persons who allegedly did not understand the changes so that she could clarify the problem, and informed Breault that she had made arrangements to address unit staff meetings about clergy and chaplain notification. (Ex. 55)   She also explained that the problems with a few members of the clergy were due to certain religious persons having difficulty with having a female Chaplain. (Ex. 55)   In doing so she was again complaining of discrimination. (Ex. 55)

137.    The plaintiff gave the response to Breault, who indicated that she would not discuss the plaintiff's concerns with her at that time, but would review it and get back to her. (Ex. 15 at ¶ 61) She never did so. (Id.)

138.    Breault then discussed the response with Levine. (Breault at 205-206) The Hospital had an obligation to investigate the areas of the evaluation which the plaintiff had claimed were inaccurate. (Levine at 210-211) However Breault did no such investigation. (Breault at 205-211) No investigation was conducted to determine whether or not the plaintiff actually had good relationships with clergy. (Breault at 205-206)   Similarly, the Defendants never bothered to determine whether or not the plaintiff's explanation with respect to documentation practices was accurate. (Ex. 6 at 62-63) Although the Hospital has a detailed harassment policy that requires discrimination complaints about volunteers or clergy to be investigated, the Hospital never

investigated the Plaintiff's complaint of having been treated poorly by certain clergy because they would not accept a woman chaplain.  (See Harassment Policies attached as Exhibit 56; Brvnik at 14-16; Ex. 6 at 51-52)

139.     On August 22, Maynard asked the plaintiff to  attend a meeting along with him and the  Beaulieus.  (Ex.15 at ¶ 63) The plaintiff did not want to meet without an objective third party present. (Id.)   She felt that neither she, Maynard, nor the Beaulieus were sufficiently objective about the issues that were likely to be discussed.  (Id.)     The plaintiff wanted to wait until Cathy Young was available to attend the meeting.   (Id.) Consequently, when Maynard suggested the 29th, for a meeting date, the plaintiff indicated that she would not be able to meet with on the date suggested, and offered other possible dates .  (Ex. 15 at ¶ 64; Breault at 219; Maynard at 221-222)

140.  Maynard then came to her office,  shouted at her, and accused her of insubordination for refusing to meet.   (Ex. 15 at ¶ 64;)   The plaintiff explained that she was not unwilling to meet, but was simply unwilling  to meet on the 29th.   (Id; Maynard at 221-223) While  Maynard continued to shout at her, the plaintiff walked into a hallway.   (Ex. 15 at ¶ 64; Maynard at 221-223)  He continued to shout at her there.  (Ex. 15 at ¶ 64) She then walked into a nearby office where  there were other people.   (Id.)  He asked what she was doing.  (Id.) The plaintiff explained that she  wanted witnesses to his behavior. (Ex.15; at ¶ 64; Maynard at 222-223) Maynard told her that it was inappropriate for her to try to get others involved.   (Id.) Although Maynard had "ordered" the plaintiff to a meeting and had accused her of insubordination when she wanted to meet on a different date, he was a peer and not a supervisor.  (Ex. 25; Levine at 75-77)

140.    The plaintiff was very upset and went to Human Resources and complained about Maynard's behavior.  (Ex. 15 at ¶ 65)    Breault was notified.  (Ex. 15 at ¶ 65; Breault at 224) The plaintiff told Breault what had happened, including explaining that she had wanted to reschedule the meeting so that Cathy Young could be present.    (Ex. 15 at ¶ 65; Breault at 224-225) Breault offered to attend, instead.  (Id.)   The plaintiff agreed to attend.    (Ex. 15 at ¶ 65; Breault at 224-229)    When the plaintiff told Breault that Maynard had been threatening, Breault indicated that she found it hard to believe.  (Ex. 15 at ¶ 65; Breault at 224-226) The plaintiff called and left a message apologizing  to Maynard.(Ex. 15) She  never heard back from him about this.  (Ex. 15 at ¶ 66)

141.  The plaintiff created notes for her meeting with the Beaulieus.  (Ex. 15 at ¶ 67; Notes attached as Exhibit 57) She hoped that the she could find a way to get Mr. Beaulieu to work with her and not against her.   (Ex. 15 at ¶ 67)

142.    On or about August 29, 2001, the plaintiff  met with Maynard, the  Beaulieus and Breault.  (Ex.15 at ¶ 69)    Shortly before this meeting, she  went over her concerns with Breault and Maynard,  including the need to change the policies, the need to respect confidentiality, and the issue with Mrs. Beaulieu making a patient hysterical. (Ex. 15 at ¶ 68; Breault at 243)    Breault and/or Maynard said that she  should not bring up the criticism of Mrs. Beaulieu in the meeting. (Ex.15 at ¶ 68)

143.    When the meeting began, the plaintiff  read a prayer, and acknowledged the good things  that the Beaulieus had done for the Hospital.  (Id.; Breault at 230) She also said that they had gotten off on the wrong foot, but that she wanted to rebuild the relationship. (Ex. 15 at ¶ 69)   Mr. Beaulieu did not respond in a positive manner. (Id.)   He expressed anger about the plaintiff

having re-arranged the office, and about her referring to it as her office. (Ex. 15 at ¶ 69; Breault at 230-231)  He expressed anger at the changes in furniture and about the lock, and the removing of the counter.  (Ex. 15 at ¶ 69; Breault at 230-231)   Breault confirmed that it was the plaintiff's office, and  indicated that the Hospital  would find someplace else for the Beaulieus to work. (Ex. 15 at ¶ 69; Breault at 230-232)

144.    Mr. Beaulieu also complained about the plaintiff  wanting to  be notified about patient  requests for spiritual care, about her  wanting the Bibles removed, and about her   having redacted the church name from a handful of prayer pamphlets in the office.  (Ex. 15 at ¶ 70; Breault at 232-236) The plaintiff   again tried to explain that she  wanted to be notified so that she could ensure that  patients received prompt, appropriate  spiritual care.  (Ex.15 at ¶ 70; Breault at 232-236)  She tried to explain that the placing of Bibles in patient  rooms in a non-denominational, interfaith Hospital showed a lack respect for non-Christian patients. (Ex. 15; at ¶ 70; Maynard at 219-220; Breault at 232-236)   She explained that she  had redacted the name on a few of the pamphlets so that he could give those pamphlets to Catholics who belonged to other churches,  without behaving inconsistently with the JCAHO standards.  (Ex. 55 at ¶ 70; Breault at 232- 236; Maynard at 219-220)

145.    The plaintiff tried to explain the need to change the practices to ensure that the Hospital  protected patient privacy and patient rights. (Ex. 15 at ¶ 71)   In doing so, she  pointed out that it was important for Mr. Beaulieu to respect confidentiality and privacy  when she was engaged in counseling.  (Id.) The plaintiff expressed her concerns about his having spoken about a patient outside of the Hospital, thereby violating the patient's right to privacy and confidentiality.  (Ex. 15; Beault at 232)  Mr. Beaulieu refused to take the concerns seriously- indicating that the

47

woman he had spoken about frequently and openly  talked about her personal business. (Ex. 15 at

¶ 70)  When the plaintiff  tried to explain that this was not the point, he again got angry.  (Id.)

146.    At the end of the meeting, Breault asked if there were any other unaddressed

 issues.  (Ex. 15 at ¶ 72; Breault at 246-247)   The only issue that had not been addressed  had to

do with Mrs. Beaulieu's poor judgement with respect to upsetting the  patient with the story

about the death of her sons.   By her asking the question, the plaintiff  thought Breault might

have changed her mind about not bringing up the issue.  (Ex. 15 at ¶ 72) The plaintiff  turned to

Breault her and quietly said something about the issue. (Ex. 15 at ¶ 72)   Breault turned to the

Beaulieus and began to explain the concern. (Id.)  He stated that if the plaintiff  had been male,

he would bounce her off a wall. (Ex. 15 at ¶ 72)  No comment or action was taken with respect to

this threatening comment.  ( Beaulieu at 250-251)

147.  During this meeting the plaintiff  did not in any way  belittle or trivialize  the death of the

Beaulieus sons, and she did not fail to show  compassion. (Ex. 15 at ¶ 72)    In an attempt to

explain, she said that it was not always appropriate, in offering pastoral care, to share your own

personal story with the patient.  (Id.)  Beaulieu was upset in the meeting, not because of the

plaintiff's demeanor, but because neither he, nor his wife, had ever heard the allegation about his

wife before.   ( Beaulieu at 71-73)

148. After this meeting Breault, Maynard and Levine met and decided to terminate the plaintiff.

(Breault at 250-251)

149.    Levine testified that the reasons for the termination were: (1) the  reasons that her

 probation had been extended; (2) the initial refusal to meet with the Beaulieus on the specific

date requested by Maynard; (3) the bringing up of the issue about Mrs. Beaulieu at the meeting;

and (4) the plaintiff's response to the evaluation. (Levine at 108-109)   With respect to the evaluation, he claimed it was the tone in the statement, "what I can and will do" and in the statement, "I realize that I need to continue to educate management on what chaplains do, how they do it where and why". (Levine at 150-152) However, Levine also testified that he believed that it was inappropriate for Ms. Campbell to inform the Hospital in what ways she thought her evaluation was inaccurate and how she thought it should be revised. (Levine at 163) This was one of the reasons the plaintiff was terminated. (Levine at 163)

150.    Breault testified that the plaintiff was terminated because of her response to the evaluation and her relationship with the Beaulieus.   (Breault at 251-253)   With respect to the evaluation, Breault felt it was sarcastic, argumentative, and contained inaccurate information abut how nurses chart. (Breault at 204)   With respect to the Beaulieus, Breault stated,

> her job was to figure out as the professional and as the pastoral care
> Individual how to negotiate that relationship so that it was a constructive
> relationship.   And in opposition to that at that meeting she brought up
> that was highly charged that she was instructed not to bring up and
> would not be conducive to a good working relationship.   In addition the
> issue of defacing the pamphlet was raised that was also not conducive to a
> good working relationship".

(Breault at 252-253)

151.    Maynard initially testified that the termination did not have anything to do with the Plaintiff's response to her evaluation. (Maynard at 218) He  testified that the termination was based in part on her conduct in crossing out the church name on the pamphlet, her refusal to meet on the date initially suggested, her inability to deal effectively with the Beaulieus and because of the reasons raised at the August 1, meeting. (Maynard at 219-221; 227-229)  Maynard later conceded that the content of her response- with respect to her unwillingness to address the issues

with the local clergy were a factor. (Maynard at 240-241) Specifically, he believed that she was terminated in part because she stated, "I am striving to be in right relationship with patients, staff, family and clergy. Anonymous feedback is not constructive, attacking and divisive. In order to immediately address, I need: Names of clergy who perceive the policy as a "barrier" and names of patients, staff and clergy who perceive that patients and family cannot contact their clergy themselves" and because she stated that she needed, "specific direction on how to modify my behavior regarding other's personal space". (Maynard at 241) Maynard was unable to identify what was inappropriate about these portions of the response. (Maynard at 241-243)

152.    On or about September 3, 2001, the plaintiff met with Breault. (Ex. 15 at ¶ 73) Breault told the plaintiff to resign. (Ex. 15 at ¶ 73; Breault at 254-255) When the plaintiff asked what would happen if she refused to resign, she was told that she would be fired, "no other discussion". (Ex. 15 at ¶ 73; Breault at 254) When the plaintiff complained about Beaulieu's threat, Breault stated only that it was too bad that times had gotten to that point. (Ex. 15 at ¶ 73) When the plaintiff explained that she could not resolve the relationship with Beaulieu because he would not accept a female clergyperson, Breault disagreed. (Ex. 15 at ¶ 73; Breault at 256)

153.    After the plaintiff was terminated, several local clergy wrote the Hospital a letter explaining that the plaintiff had been working on her assigned goals, that the PCAC did not represent the breadth of faith communities, and that the clergy suspected that, "plain old sexism" was involved in the friction between Campbell and, "at least one of the interested parties". (Clergy letter attached hereto as Ex. 59) The defendant never investigated this complaint. (Brvnik at 141)

154.    The Hospital reconvened the Clergy Task force to hire the Plaintiff's replacement. (See

Task Force minutes attached as Exhibit 59)  In committee meetings Dr. Barry discussed the importance of a "good fit".  (Ex. 59)  The search committee notes indicate that Robin Begansky reported that the 4Shea nurses wanted the Hospital to hire a Chaplain from a "standard" religion, rather than a "spiritualist".  (Ex. 59)  Falcon-Garcia reported that the local clergy concurred with the desire for someone from a "standard religion".  (Ex. 59)

155.    In addition to advertising on the internet, the Hospital advertised for the plaintiff's replacement in: the National Catholic Reporter; the Catholic Observer; and Catholic Health World.  (Advertisements attached hereto as Exhibit 60)  They also contacted seminaries.  (Ex. 66)

156.    Despite targeting Catholic publications, no qualified Roman Catholics applied for the position.  (Ex. 6 at 61)

157. The Hospital hired a Disciples of Christ Minister named Steven Scott, a male.  (Resume of Scott attached hereto as Exhibit 61)

158.    The Plaintiff never gave a Catholic an unconsecrated host, or fail to notify a priest in a last rites situation as Beaulieu alleged.  (Ex. 1 at 58; 64-64; Ex. 20 at 16-17; Ex. 15 at ¶ 74)

159.  Prior to the 8/29 meeting the plaintiff never spoke to Mrs. Beaulieu or her husband about the incident in which she upset a patient.  (Ex. 15 at ¶ 75)

160.    The plaintiff never told Mrs. Beaulieu to pray over all patients as Beaulieu alleged.  (Ex. 15 at ¶ 75; Ex. 1 at 51)

161.    During her employment the plaintiff was never informed about any clergy complaints or concerns other than by Mendez, Heald, Monsignor Willis West and Beaulieu. (Ex. 15 at ¶ 77) The concerns expressed to her by Mendez, Heald, and West all had to do with their disagreement

with the substance of the new policies. (Id.)  Beaulieu's complaints had to do with office issues, and disagreement with the substance of the new policies. (Id.)

162.    The plaintiff cannot recall interfering or "hovering" over staff at the ICU.  (Ex. 15 at ¶ 79)  Nobody ever spoke to her or indicated that her behavior at the ICU was distracting or inappropriate. (Ex. 15 at ¶ 79)

163.    The plaintiff cannot recall attempting to listen to a conversation between two doctors in which she was not involved. (Ex. 15 at ¶ 80)  Nobody ever spoke to her to indicate that her behavior on 4Shea with respect to listening to a conversation was  inappropriate. (Id.)

164.    Breault never investigated the allegation in the evaluation that the plaintiff failed to take appropriate time to establish relationships with patients.  (Breault at 194)

165.    Breault had no reason to doubt the accuracy of plaintiff's claim that she had resolved all claims with John Heald before she received the evaluation.  (Breault at 198)

166.    The Hospital never investigated to determine whether or not it was inappropriate for Beaulieu to hand out Roman Catholic pamphlets promoting a particular church to Roman Catholics who belong to another church.  (Breault at 236-239; Maynard at 220-221)

167. The claim that the plaintiff allegedly  told someone to pray over patients was not considered in any way in extending her probation or terminating her employment.  (Breault at 259-260)

168.    The allegation that the plaintiff was somehow not "culturally sensitive" to Mendez was not a factor with respect to the decision to extend her probation or terminate her employment. (Breault at 260)

169.    The complaints that Dawn Noel made about the plaintiff's behavior when Noel's son was hospitalized were never investigated and were not a factor in the decision to extend the plaintiff's

probation or terminate her employment.  (Breault at 261-262)

170.    Because the Hospital is non-denominational, there is to be no religious sponsorship. (Breault at 41)

171.    Hospital employees are permitted to file written responses to their evaluations.  (Maynard at 215)  In fact, they are encouraged to file a written response if they disagree.  (Levine at 29-30; Ex. 45)  It would violate the policies of the Hospital to discipline an employee based on a response to their evaluation.  (Ex. 46; Levine at 30-31)

172.    The plaintiff met with Breault and Maynard and indicated the many efforts she was making to reach out to the community and act as a liaison.  (See Notes attached hereto as Exhibit 62)

173.    Breault had no personal knowledge of how the plaintiff interacted with patients.  (Breault at 143-144)

174.    Breault did not investigate whether the plaintiff's interactions with patients were appropriate.  (Breault at 143)

175.    Breault testified that she extended the plaintiff's probation because of uninvestigated claims of poor interactions with patients, because she believed the claims of poor interactions with patients was consistent with the alleged complaints about poor interactions with staff. (Breault at 141-146)

176.    With respect to the claims of problems getting along with clergy, Breault relied on clergy perception as reported to her by other people.  (Breault at 263; 197-198)

177.    As a Unitarian Universalist, the plaintiff's religious beliefs include the belief that all

religious beliefs are equally valid and must be treated with respect.  (Ex. 15 at ¶ 90) She

is not a Christian.  (Ex. 15 at ¶ 90)

II.    **PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT**

1.    Admitted.

2.    Admitted.

3.    Admitted in part.  The plaintiff admits that Allison Breault is the Vice President for Patient Care Services.  The plaintiff would be unable to stipulate to Breault's religious affiliation because she does not have knowledge of  such affiliation.

4.    Denied in part.  The plaintiff admits that Delphis Beaulieu ("Mr. Beaulieu") and his wife Juanita Beaulieu ("Mrs. Beaulieu")(collectively "the Beaulieus") are volunteers.  To the extent that the defendant suggests that the Beaulieus visit only  Roman Catholic patients at the Hospital, denied.  (Ex. 15; Ex. 9)  The plaintiff would be unable to stipulate to the year that the Beaulieus began volunteering because she does not have knowledge of such date.

5.    Admitted in part.  The plaintiff admits that Mr. Beaulieu has served on the Hospital's Pastoral Care Advisory Committee ("PCAC") and was chair of the PCAC.  The plaintiff would be unable to stipulate to the years that  Mr. Beaulieu served on the Hospital's Pastoral Care Advisory Committee ("PCAC") or was chair of the PCAC.  The plaintiff would be unable to stipulate to role of the PCAC.

6.    Denied in part.  The plaintiff would be unable to stipulate to whether or not in approximately 1996, the PCAC solicited funds from various local parishes and congregations in order to furnish a chaplain's office at the Hospital.  To the extent that the defendant suggests that the office was used during plaintiff's employment, by religious volunteers and local clergy other than the Beaulieus, denied.  (Ex. 15 at ¶ 11; Maynard at 83; 238-239)  To the extent that the

defendant contends that Maynard advised plaintiff of the history of the chaplain's office, denied. (Ex. 15 at ¶ 13).

7.    Admitted in part.  The plaintiff would be unable to stipulate as to when the Hospital began placing Bibles in patient rooms, where the Bibles came from or whether any patients complained.

8.    Denied in part.  The plaintiff admits that the Joint Commission on the Accreditation of Healthcare Organizations ("JCAHO") does not require documentation of pastoral care in patient records or explicitly mention Bibles.  To the extent that the defendant suggests that the JCAHO does not maintain a position on Bibles in patient rooms, denied.  The JCAHO requires that the Hospital show respect for the spiritual beliefs of the patient.  (Ex. 15; at 9; Ex. 28)  "Respect" includes not promoting other values.  (Breault at 77-78) A reasonable jury could find that the placement of a Bible in non-Christian patients' rooms at a non-denominational Hospital at the request of Christian clergy failed to show respect for the faith traditions of non-Christians.

9.    Admitted.

10.    Denied  in part.  The plaintiff admits that before plaintiff was hired, and following her termination, the Hospital considered whether the Roman Catholic Diocese would provide funding for a Staff Chaplain and Director of Pastoral Care ("Staff Chaplain").  The plaintiff admits that after the plaintiff was terminated  Dick Brvenik ("Brvenik") (President and Chief Executive Officer) spoke with some local clergy persons about the possibility of church groups providing funding for a Staff Chaplain, and made efforts to obtain grants to subsidize a Staff Chaplain position.  Finally,  the plaintiff admits that after the plaintiff was terminated the Defendant may have considered whether the Episcopal Diocese would provide funding for a

Staff Chaplain and Director of Pastoral Care ("Staff Chaplain").  The plaintiff denies that there is

any evidence that prior to her termination the Hospital attempted to have any group other than the

Roman Catholic Diocese provide funding, as the testimony relied upon by the Defendant does

not support this claim.  (Brvenik at 183, 189-191; Maynard at 11-12)

11.     Denied in part.   The plaintiff admits that Shawn Maynard ("Maynard")(Administrative

Director of Communications and Volunteer Services) and Marty Levine ("Levine")(Vice

President of Human Resources) conducted preliminary telephone interviews with the applicants.

The plaintiff admits that following the preliminary screening interviews, some of the applicants

were invited to the Hospital for additional interviews with some of the members of the Hospital's

Staff Chaplain Task Force ("Task Force").   The plaintiff admits that among the members of the

Task Force were:  Maynard, Levine, Mary Barry, M.D. ("Dr. Barry"); Robin Begansky

("Begansky"); Dawn Noel ("Noel"); Vincent Stephens, M.D. ("Dr. Stephens"); Reverend Ana

Maria Falcon-Garcia ("Reverend Falcon-Garcia"); Reverend Scott Stevens ("Reverend

Stevens"); and Sharon Verraneault ("Verraneault").  The plaintiff denies that  Breault took part in

the  preliminary telephone interviews.  (Breault at 52-54)  The plaintiff denies that the interviews

were limited to members of the task force, and denies that all members of the task force took part

in all the interviews.  (Stevens at 10; Begansky at 11-14; Barry at 22-24; Beaulieu at 14-22; Noel

at 17, 19-20)

12.     Admitted in part.   The plaintiff admits that Mr. Beaulieu participated in the recruitment

process for a Staff Chaplain.  The plaintiff admits that Mr. Beaulieu was present during her

interview and did not ask her religion.  The plaintiff  would be unable to stipulate as to whether

or not he was  a member of the Task Force.  Certain members of the task force claimed he was

but he disagreed.  (Begansky at 14-15; Barry at 20-22; Beaulieu at 19-20)  The plaintiff  would be unable to stipulate as to whether Mr. Beaulieu provided his opinion of the applicants during meetings of the Task Force, or asked other applicants to disclose their religion.

13.     Denied in part.  The plaintiff  would be unable to stipulate as to whether the members of the Task Force were unanimous in the opinion that plaintiff was the best candidate for the job, and/or whether Mr. Beaulieu made favorable comments about plaintiff during this meeting.  The plaintiff denies that Dr. Stephens made favorable comments about plaintiff during this meeting, as he has testified that he never interviewed the plaintiff.  (Stephens at 10)  To the extent that the defendant suggests that Dawn Noel supported the hiring of the plaintiff, denied.  Noel has testified that she recommended continuing to look for additional applicants.  (Noel at 23-24)  To the extent that the defendant suggests that Dr. Barry was involved in hiring the plaintiff, denied. Dr. Barry testified that she was not involved in hiring.  (Barry at 25)

14.     Denied in part.  The plaintiff would be unable to stipulate as to what Mr. Beaulieu thought or believed about the hiring decision.  The plaintiff denies that after she was hired she hugged Mr. Beaulieu, and does not recall whether or not she thanked him for his purported support.  (Ex. 15 at ¶ 88).

15.     Denied in part.  The plaintiff admits that before plaintiff was hired, the Hospital  determined that the Staff Chaplain would report to Breault, and further determined that Maynard was to serve as a resource for  her.  The plaintiff admits that she was advised of her reporting relationship with respect to Breault before she was hired.  The plaintiff denies that she had a "dotted-line" reporting relationship to Maynard, and further denies that Maynard was to have input into the Staff Chaplain's job performance, or would supervise her intermittently.

( Ex. 25; Ex. 26; Ex. 27; Levine at 75-77)

16.    Denied in part.  The plaintiff admits that on March 21, 2001, the Hospital hired plaintiff as Staff Chaplain. The plaintiff admits that a March 21, 2001 letter from the Hospital to plaintiff stated in part that the Staff Chaplain position is a "30-hour professional benefitted position" and that the first three months of plaintiff's employment is an "introductory" period during which plaintiff's "performance will be evaluated."  The plaintiff admits that she signed the March 21, 2001 letter accepting the Staff Chaplain job.  The plaintiff admits that she began work at the Hospital on May 7, 2001.  The plaintiff denies that the March 21, 2001 letter contained all of the terms of her position.  (Ex. 15 at ¶ 5-6; Ex. 25)  Specifically, she had explicitly been told by Allison Breault that the position would become a 40 hour position.  (Ex. 15 at ¶ 5-6)  The plaintiff accepted the position, and signed the offer letter based, in part, on this representation. (Ex. 15 at ¶ 6)

17.    Denied in part.  The plaintiff admits that during plaintiff's employment at the Hospital, Breault advised her that she had submitted a request to the Hospital's senior leadership team to convert the Staff Chaplain position to 40-hours per week and that the request had been denied. To the extent that the defendant suggests that these were the only conversations with Breault, denied.  Breault first told the plaintiff before her hire that the position would become a 40 hour position.  (Ex. 15 at ¶ 5-6)  However, shortly after the clergy began complaining about the changes in policies, and the plaintiff began complaining about gender discrimination, Breault indicated that the position would not become a 40 hour position.  (Ex. 15 ¶ 59; Maynard at 24) No reason was given.  (Ex. 15 at ¶ 59)

18.      Admitted in part.  The plaintiff admits that her duties included: planning and coordinating pastoral care at the Hospital; serving as a liaison to the local religious community and to coordinate the work of the volunteer lay clergy; serving as the Hospital's representative to the religious community and to other appropriate entities; serving as a liaison with local religious groups; and supporting, advancing, and exemplifying  the Mission, Vision, Values and Expectations of the Hospital in all interpersonal interactions within and across departments, and in the community as appropriate.  To the extent that the defendant suggests that these were the plaintiff's only duties, denied.  ( Ex. 26)

19.      Denied in part.  The plaintiff admits that when she was hired, the Hospital's practice was to provide local clergy, upon arriving at the Hospital, with copies of patient lists, which included patient names, patient room numbers, and patient religious affiliations.  The plaintiff also admits that local clergy could review the patient lists to determine whether any of their parishioners were patients in the Hospital.  To the extent that the defendant suggests that the patient lists contained no other information, or that local clergy only used the list to determine whether any of their parishioners were in the Hospital, denied.  The census also included patient diagnosis and doctor.  (Ex. 15 at ¶ 21; Ex. 30)  Clergy were permitted to view this private patient information, not just for their parishioners but for all patients.  (Ex. 15; Ex. 6 at 28; Beaulieu at 97-103)  Some Roman Catholic clergy used the list to visit patients who were not parishioners, and/or to identify and visit parishioners who had chosen not to identify a parish.  (Ex. 15 at ¶ 21; 23; Ex. 6 at 35; Beaulieu at 97-101)

20.      Denied in part.  The plaintiff admits that during her employment at the Hospital, plaintiff was advised that there were no Hospital policies or procedures concerning pastoral care. To the

extent that the Defendant suggests that there were no Hospital policies or procedures concerning

pastoral care, denied.  In fact, there were policies and procedures that had never been rescinded

and that were used as a reference.  (Ex. 2; Ex. 6 at 1-3; Maynard at 18)

21.     Admitted.

22.     Denied in part.  The plaintiff admits that in late May, Mr. Beaulieu advised plaintiff that

he intended to convene a meeting of the PCAC.  At this time, the plaintiff was unaware that

Beaulieu was Chair of the committee.  (Ex. 15 at ¶ 26)  Since the plaintiff was intending to

expand the membership and invite additional persons to the meeting, the plaintiff told Beaulieu

that she would call the meeting when she was ready to proceed.  (Ex. 15 at ¶ 26)  Denied that the

plaintiff's demeanor was inappropriate, that she shouted or that she pounded on the table with her

fist. (Ex. 15 at ¶ 26)  The plaintiff was polite and did not raise her voice.  (Id.)   Admitted that

Beaulieu complained about the Plaintiff to numerous persons, including Maynard.  (Maynard at

149) Denied that Beaulieu accurately reported the events.  (Ex. 15 at ¶ 26)

23.     Denied in part.  The plaintiff cannot stipulate as to what an unidentified person may have

told Noel.  Admitted that in May or June 2001, Beaulieu and Noel told the plaintiff that a patient

made a request for spiritual care from the Hospital, that the plaintiff was told that the patient

spoke to Noel, and that the plaintiff was told that the patient had requested that Mr. Beaulieu

come to the Hospital to visit with her prior to her surgery and provide such care.   The plaintiff

further admits that she was concerned that she had not been notified of the patient's request for

spiritual care since she was responsible for coordinating all care and knew that there had been

problems in the past with prompt, appropriate notification.  To the extent that the defendant

suggests that the plaintiff's motive, conduct or demeanor was inappropriate in any way,

denied.(Ex. 15 at ¶ 40-41)  The plaintiff reminded Mr. Beaulieu that she needed to be notified

about any patient request for care, so that she could ensure that the appropriate clergy were

notified.  (Ex. 15 at ¶ 40-41; Beaulieu at 36-37)  She then asked who had contacted him,

explaining that while she did not object to Mr. Beaulieu being the person who counseled the

patient, she needed to be notified of all requests. (Ex. 15 at ¶ 40; Beaulieu at 36-37)  During this

conversation, she was polite and appropriate.  (Ex. 15 at ¶ 40) She did not "interrogate" him or

lose her temper.  (Ex. 15 at ¶ 40)  She was not dictatorial.  (Ex. 15 at ¶ 40)   Mr. Beaulieu

indicated that he did not agree that the plaintiff needed to be notified.  (Ex. 15 at ¶ 40; Beaulieu

at 36-37)  He would not listen to her explanation and walked out.   (Id.)  Although Beaulieu had

complied with a similar policy under Chaplain Gerns, he was infuriated at the plaintiff's wanting

to be notified of patient requests.  (Ex. 2; Beaulieu at 36-37 at ¶ 40)  He complained to Maynard

and to Noel about the plaintiff.   (Beaulieu at 43-55)  The plaintiff admits that she also spoke to

Noel.  To the extent that the Defendant suggests that the plaintiff s motive, conduct or demeanor

was inappropriate in any way, denied.  (Ex. 15 at ¶ 41)  The plaintiff again explained why she

needed to be notified of any patient requests for spiritual care that went through the Hospital.

(Ex. 15 at ¶ 41; Noel at 42-45)  The plaintiff was polite.  (Ex. 15 at ¶ 41)  Noel also disagreed

about having to tell the plaintiff about requests for spiritual care.  (Noel at 42-45; Ex. 15 at ¶ 41)

The plaintiff admits that Noel and Beaulieu complained.  To the extent that the Defendant

suggests that the versions of  events reported by Noel or Beaulieu are accurate, denied.  (Ex. 15 at

¶ 40-41)

24.     Denied, in part.  The plaintiff admits that she arranged for the removal of a portion of a

counter top in the pastoral care office that had previously been utilized by the Beaulieus and that

she did not consult with the Beaulieus before making this change.  The plaintiff denies that as a result, the Beaulieus were left with approximately three feet of work space. (Ex. 15 at ¶11-13) The Hospital, at plaintiff's request, had provided a second desk. (Id.)  To the extent that the Defendant suggests that the Hospital had not told the plaintiff that she could replace the furniture without consulting with the Beaulieus, denied.  Breault had told the plaintiff to rearrange the office and order furniture.  (Id.)

25.     Denied in part. The plaintiff admits that she requested that the lock be replaced to protect confidential information, and that Mr. Beaulieu was inadvertently  locked out.   To the extent that the Defendant suggests that this was the plaintiff's fault, denied.  The plaintiff was not informed of when maintenance would replace the lock. (Ex. 15) It was done when she was not present, and Mr. Beaulieu was inadvertently locked out.  (Id.)

26.     Denied in part.  Admit, that prior to and during plaintiff's employment at the Hospital, Mr. Beaulieu distributed prayer pamphlets to Roman Catholic patients to whom he offered the sacrament of Holy Communion, and to other patients who requested them.  Admit that the pamphlets identified Mr. Beaulieu and that he reproduced some of the pamphlets at his own expense using his home computer.  Admitted that on one occasion, plaintiff blacked-out the name of Mr. Beaulieu's church from the front cover of several pamphlets, which Mr. Beaulieu had left in the pastoral care office.  The plaintiff denies that Mr. Beaulieu distributed the pamphlets only to Roman Catholic patients to whom he offered the sacrament of Holy Communion, and to other patients who requested them.  (Ex. 15 ¶ 34-37)  To the extent that the defendant suggests that the plaintiff  blacked-out the name of Mr. Beaulieu's church from the front cover of several pamphlets, without first discussing the issues with Mr. Beaulieu and the

63

Hospital, denied.  (Ex. 15 ¶ 34-37)  To the extent that the defendant suggests that the church donated the pamphlets, denied.  As the defendant has stated, the pamphlets were created and donated by Mr. Beaulieu, and promoted his church.

27.     Denied in part.  The plaintiff is unable to stipulate as to Dr. Barry's observations, or what she communicated at a meeting to which  the plaintiff was not invited.  To the extent that the defendant suggests that the plaintiff: (a) showed a lack of compassion towards Mrs. Beaulieu; (b) instructed Mrs. Beaulieu to pray with all of the patients in the Hospital's maternity unit; (c) admonished  Mr. Beaulieu; (d) treated Mrs. Beaulieu disrespectfully; and/or (e) did not value the Beaulieus' services, denied.  (Ex. 15)  To the extent that the defendant suggests that the above issues were the true reason that Mr. Beaulieu was upset, denied.  (Ex. 15)

28.     Denied.  The plaintiff denies that her relationship with the Beaulieus became so strained that the Beaulieus, rather than share the pastoral care office with plaintiff, worked from a table set up in a Hospital corridor.  (Ex. 15 ¶ 87)

29.     Denied in part.  The plaintiff admits that on June 19, 2001, she attended a meeting of the PCAC, and that during the meeting, plaintiff discussed her proposed changes to the Hospital's pastoral care practices.  The plaintiff admits that among other things she said at the meeting, she communicated that under the proposed pastoral care policies she would to be the first person contacted when patients or family members request visitation from a particular clergy person and that she would contact the appropriate clergy person.  The plaintiff admits that among other things she said at the meeting, she communicated that clergy would no longer have access to patient lists but only to information regarding their respective parishioners.  The plaintiff admits that some members of the PCAC objected to plaintiff's proposed policies at that meeting.  The

plaintiff denies that she refused to acknowledge their concerns, became defensive, and/or accused them of "picking" on her.  (Ex. 15 at ¶ 44-45)  The plaintiff denies that Maynard had to intercede in order to restore order to the meeting.  (Ex. 15 ¶ 44-45)

30.     Denied in part.  The plaintiff admits that among the local clergy that objected to plaintiff's proposed change in Hospital practice whereby clergy would no longer have access to patient lists in order to allow them to identify their respective parishioners were Father Poulin ("Father Poulin"), Pastor John Heald ("Pastor Heald"), and Monsignor Willis West ("Monsignor West").   The plaintiff denies that Reverend Falcon-Garcia was upset, in that she was not even present.  (Ex. 15 at ¶ 44; Ex. 13)

31.     Denied in part.  The plaintiff is unable to stipulate as to communications which were not made to her.  To the extent that the defendant suggests that Reverend Falcon-Garcia had complaints or concerns about what she observed about the plaintiff's behavior during the PCAC meeting, denied.  Reverend Falcon-Garcia was not even present at this meeting. (Ex. 15 at ¶ 44; Ex. 13)  To the extent that the defendant suggests that Pastor Heald, Monsignor West and/or Reverend Cheryl Larson-Lawling ("Reverend Larson-Lawling") had complaints about the plaintiff's performance or demeanor, denied.  Reverend Falcon-Garcia, Pastor Heald and Reverend Larson-Lawling were critical about the plaintiff's communications about changes in policies designed to protect patients.  (Ex. 15 at ¶ 44-45; Maynard at 147-149, 253-255, 260; Beaulieu at 97-101)  In addition, the plaintiff believes that Monsignor West and Mr. Beaulieu was unwilling to listen to the plaintiff due to her gender.  (Ex. 15)  To the extent that the defendant suggests that Monsignor West initially expressed concerned that plaintiff's proposed policies would result in a delay in the provision of pastoral care to Roman Catholic patients,

admitted.  However, the plaintiff was able to reassure him as to this point. (Ex. 15 at ¶ 45)

32.     Denied in part.   The plaintiff is unable to stipulate as to what Ms. Vazquez ("Vazquez"), a Hospital employee, may have said to Ms. Noel.  This of course is complete hearsay.  To the extent that the defendant suggests that the plaintiff did not request an interpreter or had been insensitive, denied. (Ex 15 at ¶ 30-32)  The plaintiff admits that she created notes which state in part, "Met with William Mendez (Deacon at Alpha and Omega Pentecostal [sic] Church) upset that I 'barred' him from visiting all people in hospital."  To the extent that the defendant suggests that this is a complete description of events,  denied.   (Ex. 15 at ¶ 30-32)

33.     Denied in part.  The plaintiff is unable to stipulate as to what Ms. Minchew, a Hospital employee, may have said to Ms. Noel.  This of course is complete hearsay.  To the extent that the defendant suggests that the plaintiff interfered with the nurses in the Hospital's critical care unit while they were providing emergency care to a patient, denied.  (Ex. 15 at ¶ 79)

34.     Denied in part.  The plaintiff is unable to stipulate as to what unidentified staff members may have said to unidentified persons at an some unidentified time.  This of course is not evidence, and at best would be complete hearsay.  To the extent that the defendant suggests that the plaintiff actually made staff uncomfortable, stood too close to them, did not respect their personal space and/or made them too uncomfortable to call upon her to consult with their patients, denied.  (Ex. 15 at ¶ 78-84)   To the extent that the defendant suggests that Carey made such comments during the plaintiff's employment to Breault and/or Maynard, denied. (Carey at 12-14)   To the extent that the defendant suggests that Clairmont made such comments during the plaintiff's employment to Breault and/or Maynard, denied.  (Clairmont at 11-13)  To the extent that the defendant suggests that Corcoran made such comments during the plaintiff's

66

employment to Breault and/or Maynard, denied.  ( See 6/14/04 Discovery responses attached

hereto as Ex. 63)  To the extent that the defendant suggests that Minchew made such comments

during the plaintiff's employment to Breault and/or Maynard, denied.  (Ex. 643; Ex. 52; Ex. 51)

To that extent that defendant suggests that Begansky made such comments during the plaintiff's

employment to Breault and/or Maynard, it is admitted that during the August 1, meeting, when

questioned, Begansky may have stated that on occasion she felt that the plaintiff stood too close

to her - by which Begansky meant that the plaintiff stood within two feet of her.   (Begansky at

45)

35.     Denied in part.  The plaintiff is unable to stipulate as to what Drs. Leach or Petro may

have said to some unidentified person.  To the extent that the defendant suggests that the plaintiff

had made inappropriate notations in patient charts, denied.  (Ex. 15 at ¶ 76)

36.     Denied in part.  The plaintiff admits that on or about August 1, 2001, Begansky, Barry,

Beaulieu, Breault, Stephens, Noel, Levine and Maynard (via phone) met to discuss the plaintiff.

To the extent that the defendant suggests that the reason that they met was to discuss any

legitimate performance problems, denied.  (Ex. 15)  The plaintiff is unable to stipulate as to the

consensus of the group at a meeting to which she was not invited.   The plaintiff is unable to

stipulate as to the reasons for Breault's decision.  To the extent that the defendant suggests that

Breault decided to extend plaintiff's probationary employment period, admitted.   To the extent

that the defendant suggests that the plaintiff's probation was extended due to legitimate

performance problems or that the plaintiff was given a legitimate opportunity to improve, denied.

(Ex. 15)

37.     Denied in part.  The plaintiff admits that on or about August 15, 2001, Breault and

Maynard met with plaintiff to discuss her evaluation, and that her probationary employment period was extended for an additional three months. The plaintiff is unable to stipulate as to who prepared or reviewed the evaluation.  At the time the plaintiff received the evaluation, she was told that Maynard prepared the evaluation so to the extent that the defendant now suggests it was Breault, denied.  (Ex. 15 at ¶ 60)  To the extent that the defendant suggests that the plaintiff's probation was actually extended due to performance problems or that the plaintiff was given a legitimate  opportunity to  address and improve her relationships with local clergy and the Beaulieus, address documentation issues, and modify her approach with Hospital staff so as to acknowledge their need for personal space, denied.  (Ex. 15)

38.     Denied in part.  The plaintiff admits that on  August 22, 2001, she met with Breault and provided her with two documents entitled, respectively:  "Evaluation Reply" and "Evaluation Suggestions."  The plaintiff is unable to stipulate to how Breault perceived these documents or with whom she discussed them.  To the extent that the defendant suggests that the response was argumentative and sarcastic and indicative of plaintiff's unwillingness to work cooperatively with Breault in order to improve her job performance, denied.  (Ex. 15 at ¶ 60; Ex. 55)

39.     Denied. The plaintiff did discuss her performance evaluation with Breault or Maynard before she prepared her "Evaluation Reply" and "Evaluation Suggestions" in the meeting in which they gave her the evaluation.  (Ex. 15 at ¶ 60; Breault at 202-203)

40.     Denied in part.  The plaintiff admits that on or about August 22, 2001, Maynard attempted to arrange a meeting between plaintiff and the Beaulieus.   The plaintiff is unable to stipulate as to the reason that he requested this meeting.  The plaintiff denies that she refused to meet with the Beaulieus as Maynard requested. (Ex. 15 at ¶ 63-64; Maynard at 222-223)  She

simply indicated that she could not meet on the date he requested, offering other days. (Ex. 15 at ¶ 63-64; Maynard at 222-223) The plaintiff denies that when Maynard attempted to speak with plaintiff to discuss the issue, she would not speak with him. (Ex. 15 at ¶ 63-64) She did speak with him, explaining that she was available on other days. (Ex. 15 at ¶ 63-64; Maynard at 222-223) However, he shouted at her and would not listen. (Ex. 15 at ¶ 63-64) The plaintiff admits that when he would not stop screaming at her, she moved into the hallway and when he continued to shout at her there, she moved into another office where there would be witnesses. (Ex. 15 at ¶ 63-64; Maynard at 222-223) The plaintiff denies that she tried to "recruit" these individuals as witnesses. (Ex. 15 at ¶ 63-64) The plaintiff denies that she later advised Breault that she would not meet with Maynard and the Beaulieus unless Cathy Brunson Young ("Young"), a temporary Hospital employee, was present as a witness. (Ex. 15 at ¶65) When Breault asked the plaintiff why she did not want to meet on the date that Maynard was insisting upon, the plaintiff explained that she had wanted Cathy Young to be present at the meeting as a witness. (Ex. 15 at ¶ 65; Breault at 224-226) When Breault offered to attend, and instructed the plaintiff to go, the plaintiff immediately indicated that she would. (Ex. 15 at ¶ 65; Breault at 224-226)

41.     Admitted.

42.     Denied in part. The plaintiff admits that during the August 28, 2001 meeting involving plaintiff, Maynard, Breault and the Beaulieus, plaintiff referred to an incident whereby Mrs. Beaulieu upset a patient by discussing the death of Mrs. Beaulieu's two sons. The plaintiff is unable to stipulate as to the defendant's intention in requiring this meeting. Deny that the plaintiff referred to the death of the Beaulieus sons as their "story." (Ex. 15 at ¶ 72) However,

plaintiff may have stated that it was not always appropriate, in offering pastoral care, to share

your own personal story with the patient.  (Ex. 15 at ¶ 72)  The plaintiff admits that shortly

before the meeting she had been told by Maynard or Breault  not to discuss this incident.  To the

extent that the defendant suggests that the plaintiff deliberately disregarded that instruction,

denied. (Ex. 15 at ¶ 72) At the end of the meeting, Breault asked if there were any other

unaddressed issues.  (Ex. 15 at ¶ 72; Breault at 246-247)  By her asking the question, the plaintiff

thought Breault might have changed her mind about not bringing up the issue.  (Ex. 15 at ¶ 72)

The plaintiff turned to Breault and quietly said something about the issue. (Id.)  Breault turned to

the Beaulieus and began to explain the concern. (Ex. 15 at ¶ 72)  Admit that  Mr. Beaulieu stated

that "if you were a man I'd jack you up against the wall" or words to that effect.  The plaintiff is

unable to stipulate as to why Mr. Beaulieu made this comment.  However to the extent that the

defendant suggests it was due to any inappropriate behavior by plaintiff, denied. (Ex. 15 at ¶ 72)

Beaulieu testified that he was angry that this was being brought up in front of Breault when it had

never been discussed with them.  (Beaulieu at 71-73)

43.    The plaintiff is unable to stipulate as to these events as she has no personal knowledge.

44.    The plaintiff is unable to stipulate as to these events as she has no personal knowledge.

45.    Admitted.

46.    Denied.  The plaintiff contends that she was asked to resign for impermissible reasons

and that the defendant stated reasons are pretexual.  (Complaint attached hereto as Exhibit 64;

See also Ex. 15)

47.    Admitted that some time following the meeting with Breault on September 4, 2001,

plaintiff prepared written notes, which state in part, "Annadell – I did not know anything about

this. `I am surprised and grateful there is no security to escort me out' `What happened?' `A volunteer form [sic] hell."

48.    Admitted.

49.    Admitted in part.  The plaintiff admits that following plaintiff's resignation, the Hospital advertized the Staff Chaplain position as a 40-hour per week position.  The plaintiff cannot stipulate as to why the position was promised to her as 40 hours, cut to 30 after she spoke out about patient concerns and complained of discrimination, and was restored to 40 hours after her termination.

50.    Admitted.

51.    Admitted in part.  The plaintiff admits that in or about December 2002 or January 2003, the Hospital's administration decided to cease funding for the Staff Chaplain position.  The plaintiff admits that the Hospital also laid off two nurse practitioners and reduced the hours of approximately five other non-union employees.  The plaintiff cannot stipulate as to why these decisions were made.

52.    Admitted in part.  Admit that the plaintiff  believes that she was discriminated against on the basis of gender and religion.   Admitted that the plaintiff believes that Mr. Beaulieu and Monsignor West do not believe that females should be ordained and made it difficult for her to do her job.   Denied that the plaintiff believes that she was the victim of gender discrimination only because West and Beaulieu objected to being denied access to patient lists.  (See Ex. 15; Ex. 64)

53.    Denied in part. The plaintiff admits that the only direct evidence of gender related animus known to plaintiff to have been made by Hospital staff, volunteers or local clergy was by Mr.

Beaulieau.  Deny that this was a lone comment.  Beaulieu twice threatened the plaintiff, stating that "if [plaintiff] was a man [he] would bounce [her] off the wall" or words to that effect.  (Ex. 15)

54.     Admitted in part.  The plaintiff admits that she is not aware of any Hospital staff who believe she should not be Staff Chaplain because of her gender.  However, she cannot stipulate as to whether or not there are such individuals.

55.     Admitted.

RESPECTFULLY SUBMITTED,
THE PLAINTIFF

By:_____
        Mary E. Kelly  ct# 07419
        Livingston, Adler, Pulda,
        Meiklejohn & Kelly, P.C.
        557 Prospect Avenue
        Hartford, CT  06105-2922
        (860) 233-9821
        mekelly@lapm.org

72

## **CERTIFICATION OF SERVICE**

This is to certify that a copy of the foregoing  Plaintiff's Local Rule 56(a)2 Statement In Support of Memorandum Opposing Summary Judgment has been hand delivered on this 8th day of November, 2004 to the following counsel of record:

Stephen B. Harris
William J. Albinger
Wiggin & Dana LLP
One Century Tower
265 Church Street
New Haven, CT 06510-7001


_____
Mary E. Kelly