UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BARBARA CAMPBELL, | ) |
| | ) Civil No. 3:03 CV 0520 (JCH) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WINDHAM COMMUNITY MEMORIAL | ) December 7, 2004 |
| HOSPITAL, INC. and | ) |
| HATCH HOSPITAL CORP. | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' MEMORANDUM IN FURTHER SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Notwithstanding plaintiff's valiant effort to save her Complaint from summary dismissal (an effort which includes the submission of a 55-page memorandum of law, a 177-paragraph "Statement of Material Facts in Dispute," a 90-paragraph affidavit, and 64 exhibits totaling hundreds of pages), plaintiff has failed to raise a *genuine* issue of *material* fact as to any of her claims.[1] Instead, plaintiff's opposition papers consist chiefly of a description of the resistance she encountered from Windham-area clergypersons and Hospital volunteers to her efforts to implement pastoral care policies at the Hospital, which she personally believed were mandated by JCAHO regulations and the anticipated confidentiality requirements of HIPAA; her legally

---

[1] Plaintiff does not oppose defendants' motion for summary judgment directed at Count 6 of her Complaint, in which she had alleged that she was terminated on account of her opposition to religious discrimination at the Hospital in violation of the public policy set forth in C.G.S. § 46a-64, and, thus, the Court should grant defendants' motion for summary judgment on that claim. *See* Local Rule 7(a)1; *Royal Ins. Co. of America v. Zygo Corp.*, 212 F.R.D. 444, 447 (D. Conn. 2003). Plaintiff's decision not to pursue her public policy claim premised upon C.G.S. § 46a-64 is noteworthy since it mirrors her claims of religious discrimination under Title VII and the CFEPA. *See* discussion in Section A *infra*.

unrecognizable contention that she was disciplined on account of her opposition to the Hospital's allegedly discriminatory pastoral care practices and that her discipline is tantamount to religious discrimination under Title VII and the CFEPA; her personal opinion that Mr. Beaulieu and Monsignor West resisted her policies because they are Roman Catholic and *ipso facto* believe that females should not be ordained ministers; and her after-the-fact explanations for a series of interactions between herself and the Beaulieus, which she characterizes as "unfortunate" "miscommunications" and that resulted in irreconcilable damage to their relationship.

Plaintiff's protracted discussion of the foregoing issues is nothing more than a "red-herring" and does not compensate for the complete absence of evidence to support her claims that she was discriminated against on account of her religion and gender and retaliated against because of her opposition to gender discrimination at the Hospital. Nor is there any factual dispute regarding the circumstances under which plaintiff prepared two documents, which her supervisor perceived to be sarcastic and argumentative, and that plaintiff now claims constitute explanatory statements within the meaning of Connecticut's Personnel Files Act. Rather, there is only plaintiff's unpersuasive legal argument that C.G.S. § 31-182e provides her with an unqualified privilege to direct inflammatory statements at her supervisor and co-workers. Finally, there is no factual dispute that plaintiff, in her zeal to institute pastoral care policies at the Hospital, disregarded the contributions that the PCAC had made to the Hospital prior to her tenure, ignored the PCAC's role as an "advisory" body with regard to pastoral care at the Hospital, and alienated the very individuals whose cooperation was essential to the effective performance of her job as Staff Chaplain. Accordingly, because there is no factual dispute that plaintiff's unrelenting demands that clergy and volunteers strictly comply with her proposed

policies "substantially and materially" interfered with her ability to perform her job as Staff Chaplain, she cannot establish an essential element of her claim under C.G.S. 31-51q.

Plaintiff has failed to identify any *genuine* issue of *material* fact in this case and summary judgment, therefore, should be granted to defendants on each of plaintiff's claims.

## Argument

**A.   Defendants are Entitled to Summary Judgment on Plaintiff's Religious Discrimination Claims.**

As is evident from plaintiff's opposition papers, her claims of religious discrimination are premised entirely upon her contention that "she opposed the practices at the Hospital which promoted Roman Catholic and other Christian faiths, that [Mr.] Beaulieu objected to this, and that his complaints played a substantial role in the Hospital's decisions." (Pl.'s Memo., at p. 35). Notwithstanding plaintiff's efforts to "fit a square peg into a round hole," it is apparent that her religious discrimination claims, when viewed in their proper light, are in reality nothing more than plaintiff's assertion that she was retaliated against on account of her opposition to *non-employment* based religious discrimination at the Hospital, for which neither Title VII nor the CFEPA provides relief.

It is axiomatic that Title VII prohibits an employer from discriminating against an employee "with respect to [her] . . . terms, conditions, or privileges of employment, *because of such individual's . . . religion.*" 42 U.S.C. § 2000e-2(a)(1). *See also* C.G.S. § 46a-60(a)(1)(same). Here, the essence of plaintiff's claim is not that she was discriminated against because of her religion, Unitarian Universalism, but rather that she was disciplined and ultimately terminated because she "opposed" the Hospital's preferential treatment of certain religious groups and "attempted to put an end to the Hospital's practice of promoting specific religions." (Pl.'s Memo., at pp. 35 & 49). Unfortunately for plaintiff, her claims suffer from a

3

fundamental weakness – she does not allege (nor can she) that she opposed a discriminatory "employment practice" within the meaning of Title VII or the CFEPA. *See* 42 U.S.C. § 2000e-3(a); C.G.S. § 46a-60(a)(4). Instead, plaintiff maintains that she objected to the Hospital's pastoral care practices, which she contends provided preferential treatment to certain non-employees and religious groups with regard to such things as patient visitation and access to patient information. As discussed in defendants' original memorandum, even if it is assumed that plaintiff was disciplined on account of her opposition to the Hospital's so-called discriminatory pastoral care practices, her opposition does not amount to "protected activity" under either Title VII or the CFEPA and, thus, she cannot establish a *prima facie* case of retaliation under either of those statutes. (Defs' Memo., at pp. 19-20).

Plaintiff, perhaps recognizing the weakness inherent in her religious discrimination claims, attempts to lend support for those claims by way of a conclusory statement, supported by her affidavit and made for the first time in a footnote to her opposition papers, that suggests that her religious beliefs prompted her to create pastoral care policies at the Hospital, which curtailed the preferential treatment that had allegedly been accorded Roman Catholics and non-Christians. (Pl.'s Memo., at p. 49, n.106). The undisputed record evidence, however, conclusively demonstrates that plaintiff never maintained that her policies were motivated by her religious beliefs, which she did not make known to the Hospital, but rather by her personal opinion that they were mandated by JCAHO regulations and the proposed provisions of HIPAA. Indeed, during her employment, plaintiff sent correspondence to many clergypersons explaining that her proposed policies were "required due to a regulatory agency's increased emphasis on patient confidentiality/privacy and safety/security; as well as an increased emphasis in the importance of

4

pastoral care as an integral part of health care." (Pl.'s Local Rule 56(a) Statement, at Ex. 37).[2] Accordingly, plaintiff's eleventh-hour attempt to save her religious discrimination claims from summary dismissal by expanding the contours of those claims is disingenuous and improper. *See Bourguignon v. Guinta*, 247 F.Supp.2d 189, 190 (D. Conn. 2003)(citing *Securities & Exchange Comm'n v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978))("A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements").[3]

**B.     Defendants are Entitled to Summary Judgment on Plaintiff's Gender Discrimination Claims.**

Plaintiff, in her opposition papers, continues to cling to her novel and sweeping theory that because Mr. Beaulieu and Monsignor West are Roman Catholic and, therefore, according to plaintiff, believe that females should not be ordained ministers, the resistance they expressed to her pastoral care policies was the result of gender bias. (Pl.'s Memo., at p. 48). In addition, she makes the bald assertions that: (1) on two occasions, Mr. Beaulieu told plaintiff that "if she were a man, he would bounce her off the wall;" and (2) on one occasion during a meeting of the PCAC, during which plaintiff communicated her changes to the Hospital's pastoral care practices, Mr. Beaulieu and Monsignor West interrupted her and a female clergyperson,

---

[2] In addition, plaintiff, in her affidavit, states "I had come to the conclusion that there was a need for policies at the Hospital to ensure that clergy visitation and the provision of patient information to clergy would be consistent with HIPA [sic], JCAHO and general considerations of patient privacy and confidentiality." (Pl.'s Local Rule 56(a) Statement, at Ex. 15, ¶ 29).

[3] It is noteworthy that plaintiff objects, on hearsay grounds, to defendants' reliance upon complaints made about her performance by some members of the Hospital's nursing staff yet relies upon a comment allegedly made by a Hospital nurse following her termination and to the effect that the Hospital should hire someone who was the "right fit" and from a standard religion in order to support her claims of religious discrimination. (Pl.'s Memo., at pp. 21-22). However, even if this alleged out-of-court statement was admissible to support plaintiff's religious discrimination claims, it does not further those claims. First, it is undisputed that the Hospital hired *plaintiff* based, in part, because she was believed to be a "good fit." (Defs' Memo., at p. 5). Second, the statement is entirely inconsistent with plaintiff's theory that Monsignor West and Mr. Beaulieu were solely responsible for the religious discrimination she allegedly experienced. Third, Robin Begansky, the individual who supposedly made the statement, explained during her deposition that she had remarked only that it was important to hire someone from a

5

disregarded their opinions, made faces and rolled their eyes. (Pl.'s Memo., at pp. 11, n.37, 13, n.43, 20-21 & 47-48).[4]

As an initial matter, plaintiff's unsubstantiated speculation that Mr. Beaulieu's and Monsignor West's resistance to her proposed polices was the product of gender bias simply because she is female and they are Roman Catholic collapses under the realization that it presumes that all Roman Catholics are sexist. *See Shannon v. New York City Transit Authority*, 332 F.3d 95, 99 (2d Cir. 2003)("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact"). Furthermore, as discussed in defendants' original memorandum, there is no dispute that several male and female clergy – and not just Mr. Beaulieu and Monsignor West – expressed opposition to plaintiff's proposed policies and to her unilateral approach to implementing them. For example, plaintiff concedes that, during a PCAC meeting, Reverend Cheryl Larsen-Lawling, a female, "expressed dismay . . . about the substance of the changes *and the fact that the policies were being changed without PCAC input*." (Pl.'s Memo., at p. 11, n.38). Plaintiff further concedes that a female Hospital employee did not agree with her proposed policies. (Pl.'s Memo., at p. 10, n.34).

Moreover, contrary to plaintiff's attempt to portray the concerns expressed by Mr. Beaulieu and male and female clergy with regard to her proposed policies as unreasonable, the nature of those concerns are undisputed, entirely legitimate and not in any way related to

---

religion "recognizable" and "familiar" in the Windham area, such as *Unitarian Universalism*. (Begansky Depo., at pp. 80-81 attached hereto as Exhibit A).

[4] Plaintiff, in her Rule 56(a) Statement, makes reference to a letter sent by a local clergy person to the Hospital's President and Chief Executive Officer following plaintiff's termination, which contains the statement "we also all suspect that plain old sexism was involved in the frictions between [plaintiff] and at least one interested party." (Pl.'s Rule 56(a) Statement of Material Facts in Dispute, at ¶ 153). Clearly, plaintiff cannot avoid summary judgment on her gender discrimination claims based upon an inadmissible hearsay statement that was made after plaintiff's termination by an individual unaffiliated with the Hospital and that does not even identify the individual who is supposedly guilty of "sexism." *See Ozenne v. University of Connecticut Health Care*, 292 F.Supp.2d 425, 434 (D. Conn. 2003)(citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999))("court cannot consider hearsay statements in opposition to a motion for summary judgment").

plaintiff's gender. For instance, plaintiff herself describes as "reasonable" Monsignor West's concern that if plaintiff were to serve as a conduit for all patient requests for pastoral care a priest might not be contacted promptly when baptisms or last rites were needed. (Pl.'s Rule 56(a) Statement of Material Facts in Dispute, at ¶ 76). Moreover, Shawn Maynard testified that, on account of historical inaccuracies in the Hospital's admission records regarding patient religion codes, clergy were justifiably concerned that plaintiff's proposed policy, whereby each clergyperson was permitted to review only information concerning patients who had identified themselves as members of that clergyperson's congregation, would result in clergy being denied information regarding their congregants who were patients in the Hospital. (Maynard Depo., at pp. 163-64 attached hereto as Exhibit B). Maynard further testified that Monsignor West was concerned about the effect plaintiff's proposed policies would have upon an agreement that existed between the Norwich Roman Catholic Diocese and the Hospital and that was intended to address the limited number of priests in the Windham community who were available to visit with patients at the Hospital. Pursuant to that agreement, priests from Saint Joseph's Church were responsible for visiting with Roman Catholic patients at the Hospital, regardless of their affiliation with a particular congregation. (Maynard Depo., at pp. 165-69 attached hereto as Exhibit B). The fact that plaintiff, now more than three years later, is still unable and/or unwilling to recognize the validity of these concerns – which could have been addressed expeditiously had she properly heeded the role of the PCAC as an "advisory" body and included it in the development of the policies – speaks to the legitimacy of defendants' reasons underlying its employment decisions concerning plaintiff.

In addition to the legitimate concerns that Mr. Beaulieu and some of the male and female clergy voiced with regard to plaintiff's policies, it is undisputed that plaintiff, on several

occasions, whether purposefully or not, engaged in behavior that the Beaulieus perceived to be inconsiderate and disrespectful.[5] For example, plaintiff concedes that: (1) she removed a portion of a countertop from the chaplain's office, which had been furnished through funds solicited by the PCAC; (2) she made arrangements to have the lock changed to the chaplain's office and, as a result, Mr. Beaulieu was locked-out of the office; (3) in response to Mr. Beaulieu's statement that he intended to convene a meeting of the PCAC, she replied that she would call a meeting when she was ready to hold a meeting; (4) she blacked-out the name of the Beaulieus' church from some prayer pamphlets that Mr. Beaulieu had reproduced at his own expense for distribution to patients; and (5) in derogation of express instructions from her supervisor on two prior occasions, she discussed the fact that Mrs. Beaulieu had upset a patient by discussing the death of her own sons. (Pl.'s Memo., at pp. 5-6, n.16, 8, 13, n.43, 20, 47 & 51). Notwithstanding plaintiff's attempt to cast the foregoing undisputed occurrences as simply a series of "inadvertent" and "unfortunate" "miscommunications," there is no factual dispute that the Beaulieus', as a result of these occurrences, perceived plaintiff to be insensitive, inconsiderate and insulting.

Indeed, it is undisputed that Mr. Beaulieu became incensed when plaintiff reduced Mrs. Beaulieu to tears by bringing up an incident where she inadvertently upset a patient by discussing the death of her own sons in an attempt to comfort the patient. (Pl.'s Memo., at pp. 20-21). It is ironic that plaintiff now relies upon Mr. Beaulieu's spontaneous remark made in response to her insensitive comments to support her gender discrimination claims. Specifically, Mr. Beaulieu commented that if plaintiff were a man, he would "bounce her off a wall," or words to that effect. In addition, plaintiff contends that Mr. Beaulieu made a similar statement to her on

---

[5] Not surprisingly, plaintiff attempts to downplay the interpersonal conflicts that existed between her and Mrs. Beaulieu – a female.

an earlier occasion, although she provides absolutely no factual context for the statement. (Pl.'s Memo., at p. 13, n.43). Nevertheless, evidence of Mr. Beaulieu's stray remarks does not further plaintiff's claims of gender discrimination whatsoever. First, the statements themselves are not reflective of any gender animus on the part of Mr. Beaulieu. On the contrary, to the extent the statements demonstrate anything about Mr. Beaulieu's personal beliefs, it is that he holds women in high esteem. *See Bern v. United Mercantile Agencies*, 942 F.Supp. 217, 220 (S.D.N.Y. 1996)(granting summary judgment for employer on age discrimination claim based upon three stray and "facially innocent" age-related comments and one age-related comment that was "no more than a passing flippancy"). Second, even if Mr. Beaulieu's statements are presumed to reflect his personal animosity against women, they are insufficient to support a rational inference that plaintiff's gender was a determinative factor in any of defendants' employment decisions. *See Monte v. Ernst & Young LLP*, 330 F.Supp.2d 350, 363-64 (S.D.N.Y. 2004)(granting summary judgment for employer on age discrimination claim despite comments by *de facto* decision-makers that older employees cannot keep pace in the work environment and that plaintiff was "too old" to become partner).

It is interesting that plaintiff singles out Mr. Beaulieu as an individual who allegedly harbors a bias against her on account of her gender given his participation in the decision to hire her as Staff Chaplain. Plaintiff suggests that Mr. Beaulieu's expression of support for her candidacy for the Staff Chaplain position is of limited evidential value and that the "same-actor" inference is inapplicable to this case because, according to plaintiff, Mr. Beaulieu was essentially forced to recommend her for the Staff Chaplain position as there were no other qualified male applicants. (Pl.'s Memo., at pp. 37-38). Plaintiff's argument is unpersuasive because even if it is assumed that there were no qualified male applicants, Mr. Beaulieu could have simply refrained

from making a recommendation or, alternatively, suggested that the Hospital continue its search. Indeed, plaintiff concedes that at least one female staff member suggested that she was not comfortable hiring plaintiff and wanted to interview additional candidates. (Pl.'s Memo., at p. 4, n.13).

Finally, plaintiff relies solely upon her affidavit to support her contention that, during a PCAC meeting, Mr. Beaulieu and Monsignor West interrupted her and Reverend Larsen-Lawling, disregarded their opinions, made faces and rolled their eyes. (Pl.'s Local Rule 56(a) Statement, at Ex. 15, ¶¶ 50-51). However, even if defendants were to concede as accurate plaintiff's description of Mr. Beaulieu's and Monsignor West's demeanor during the meeting it does not create a genuine issue of material fact with regard to plaintiff's claims of gender discrimination. As discussed above, it is beyond reproach that plaintiff cannot rely upon conjecture and speculation in order to defeat defendants' motion for summary judgment. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Here, plaintiff seeks to do exactly that inasmuch as she offers only her personal opinion that Mr. Beaulieu's and Monsignor West's comportment during the PCAC meeting was the product of gender-based animus as opposed to some other non-discriminatory reason. *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996), *cert. denied*, 520 U.S. 1228 (1997)(plaintiff's subjective perceptions insufficient to show pretext and avoid summary judgment).

In light of the foregoing undisputed facts, no reasonable juror could find that the legitimate objections raised by Mr. Beaulieu, Monsignor West and other male and female clergy regarding plaintiff's proposed pastoral care policies were a product of gender discrimination. Nor has plaintiff put forth sufficient evidence from which a reasonable juror could infer that

defendants, by making plaintiff's ineffectual relationships with the Beaulieus a basis for some of its employment decisions, engaged in unlawful gender discrimination.

C.  **Defendants are Entitled to Summary Judgment on Plaintiff's Retaliation Claims Based Upon Her Alleged Opposition to Gender Discrimination.**

Plaintiff, in her opposition memorandum, sheds light on the scope of her retaliation claims and mischaracterizes the nature of defendants' response to those claims. Specifically, plaintiff contends that she complained of gender discrimination by Monsignor West and Mr. Beaulieu and that the Hospital failed to address her concerns and terminated her for raising them.[6] (Pl.'s Memo., at p. 53). Notwithstanding plaintiff's attempt to transform her off-hand remarks concerning her personal belief that some anonymous individuals would not accept her because she is female into complaints of "sexual harassment," the undisputed facts make plain that plaintiff's remarks had absolutely no bearing on defendants' employment decisions.[7]

Plaintiff relies principally upon a statement made in her written reply to her performance evaluation to support her retaliation claim. Specifically, plaintiff stated:

> I agree that some have their issue(s) with me. Some of their issues I can address, others I cannot. Most significantly, a few of the clergy are uncomfortable with a female ordained chaplain while the Hospital fully supports non-discrimination However, I will continue the effort to develop a better working relationship with them.

(Pl.'s Ex. 55). First and foremost, it is obvious that any statements made by plaintiff in her evaluation reply, coming as they did *after* she received her performance evaluation, had no

---

[6] Contrary to plaintiff's representation, defendants have *not* argued that plaintiff's claims of retaliation, limited to her casual remarks concerning her personal belief that certain unnamed individuals would not accept her because she is female, are not protected by Title VII or the CFEPA. Rather, defendants maintain that position to the extent plaintiff contends she was disciplined on account of her opposition to the Hospital's so-called discriminatory pastoral care practices. See discussion in Section A *supra*.

[7] Plaintiff's reliance upon the EEOC's Guidelines is completely misplaced. Those Guidelines simply reaffirm the definition of sexual harassment for purposes of Title VII as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature . . . ." 29 C.F.R. § 1604.11(a). Plaintiff's argument that her complaints that some unnamed individuals were unwilling to accept her because of her gender rises to the level of "sexual harassment" does not pass what is often referred to as the "straight-face" test.

bearing on the content of her evaluation or the Hospital's decision to extend her probationary period.[8] Moreover, Allison Breault's and Shawn Maynard's testimony makes apparent the inconsequential nature of plaintiff's off-hand remarks. For instance, Breault testified that she could not even recall when plaintiff commented that she believed Monsignor West would not accept a female ordained clergyperson and that she did not interpret plaintiff's comment as a complaint that Monsignor West had an aversion or hostility towards her because of her gender. (Breault Depo., at pp. 216-19 attached hereto as Exhibit C). Likewise, Maynard testified that plaintiff never complained that she had been harassed or discriminated against because of her gender and that he did not even believe that plaintiff's intent was to report a problem she was having with Monsignor West inasmuch as she had only had one meeting with him during her entire period of employment with the Hospital. (Maynard Depo., at pp. 28-31 attached hereto as Exhibit B).

As discussed in defendants' original memorandum, the reasons underlying plaintiff's termination are undisputed, non-pretextual and entirely unrelated to any perfunctory comments she may have made concerning her personal belief that certain unnamed individuals were "uncomfortable with a female ordained chaplain." (Defs' Memo., at pp. 25-26). Accordingly, because plaintiff has not introduced evidence sufficient to support a rational inference that her vague remarks were a determinative factor in the Hospital's decision to terminate her employment, defendants are entitled to summary judgment on plaintiff's retaliation claims.

---

[8] Plaintiff alleges that on an unspecified occasion she commented to Maynard and Allison Breault that she believed Monsignor West and Mr. Beaulieu "would never accept her as a minister because of her gender." (Pl.'s Local Rule 56(a) Statement of Material Facts in Dispute, at ¶¶ 89-90). Maynard and Breault, however, testified that they did not interpret plaintiff's vague comments regarding the alleged unwillingness of certain unnamed individuals to accept her because of her gender as being in reference to Mr. Beaulieu. (Maynard Depo., at pp. 31-32 attached hereto as Exhibit B; Breault Depo., at pp. 216-19 attached hereto as Exhibit C). Nor would they have any reason to do so considering Mr. Beaulieu's role in recommending plaintiff for the Staff Chaplain position.

12

D.  **Defendants are Entitled to Summary Judgment on Plaintiff's Wrongful Discharge Claim Premised Upon C.G.S. § 31-128e.**

In her opposition papers, plaintiff invites the Court to take the unprecedented step of recognizing an unqualified privilege for employees to direct inflammatory comments at their employers, supervisors and co-workers under the guise of responding to information contained in their personnel files. (Pl.'s Memo., at p. 30). For the reasons discussed below and in defendants' original memorandum, the Court should not undertake such a dangerous course.

Try as she might, plaintiff simply cannot distinguish the long line of cases since *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471 (1980), which have made plain that, in order for an employee to fit within Connecticut's narrow exception to the rule of at-will employment, she must demonstrate that her discharge *"violated [an] explicit statutory or constitutional provision [or a] judicially conceived notion of public policy."* See *Daley v. Aetna Life & Cas. Co.*, 249 Conn. 766, 798 (1999)(Emphasis added). The unambiguous terms of C.G.S. § 31-128e provide only that, where an employee disputes information contained in her personnel file and is unable to agree with her employer as to the removal or correction of the information, she may submit a written statement explaining her position and the explanatory statement must be maintained as part of the file and accompany the transmittal of the file to third parties. Here, there is no dispute that plaintiff's "Evaluation Reply" and "Evaluation Suggestions" were properly made a part of plaintiff's personnel file. Nor does plaintiff contend that her file was improperly transmitted to a third party sans these so-called "explanatory statements." Plaintiff, therefore, cannot show that her termination violated an "explicit statutory . . . provision." *Id.*[9]

---

[9] As discussed in defendants' original memorandum, the Connecticut Supreme Court has acknowledged the patent unfairness of subjecting an employer who maintains compliance with express statutory obligations to litigation for failing to "comply with a heretofore unrecognized public policy mandate." See *Daley*, 249 Conn. at 804.

13

Because plaintiff is unable to establish that her discharge violated either an express statutory or constitutional provision, her only recourse is to appeal to the Court to recognize a public policy, which, according to plaintiff, is inherent in C.G.S. § 31-128e and prohibits an employer from discharging an employee based upon the substance of her written statement made in response to disputed information in her personnel file, no matter how offensive or unconscionable the substance of that statement. Unfortunately, plaintiff cannot point to any case law or legislative remarks to support the creation of such a wide-ranging public policy. Indeed, plaintiff's reliance upon the legislative history of C.G.S. § 31-128e is misplaced inasmuch as that history makes clear that the statute was not intended to provide employees with an unqualified right to harass and annoy their employers. On the contrary, the statute was designed to address the integrity of personnel files and their disclosure to the employees themselves. (Ex. A to Pl.'s Memo.). *See also Giannecchini v. Hospital of St. Raphael*, 47 Conn. Supp. 148, 157-58 (2000).

According to plaintiff, unless the Court recognizes a public policy absolutely foreclosing employers from terminating employees based upon the substance of their written statements made in response to disputed information contained in their personnel files, employees will be presented with the "Hobson's Choice" of choosing between the right to file a response and their jobs. (Pl.'s Memo., at p. 31). That is nonsense. In the absence of the all-encompassing public policy proposed by plaintiff, employees may simply continue to respond to information in their personnel files, less any disrespectful and insulting comments directed at their employers, as they would in any other business-related communication.

For all of the foregoing reasons, and for the reasons set forth in defendants' original memorandum, defendants are entitled to summary judgment on plaintiff's wrongful discharge claim predicated on C.G.S. § 31-128e.

E. **Defendants are Entitled to Summary Judgment on Plaintiff's Claim Under C.G.S. § 31-51q.**

Contrary to plaintiff's contentions in her opposition memorandum, there is simply no genuine issue of material fact regarding: (1) the unilateral approach plaintiff adopted with regard to the creation and presentation of her proposed pastoral care policies to the members of the PCAC; or (2) the hard feelings that existed between plaintiff and the Beaulieus as a result of the insensitivity plaintiff demonstrated toward these long-time Hospital volunteers when enforcing her proposed policies. Thus, even if it is assumed that plaintiff's so-called attempt to protect patient privacy and confidentiality and prohibit religious discrimination at the Hospital via her proposed polices constitutes protected speech within the meaning of C.G.S. § 31-51q and that plaintiff was disciplined on account her "speech," there is no genuine issue of material fact that plaintiff's speech "substantially and materially" interfered with her performance as Staff Chaplain.

As an initial matter, it is undisputed that plaintiff drafted her proposed pastoral policies without any input from the PCAC, which was intended to serve as an "advisory" body to the Hospital with regard to pastoral care. As a result, the members of the PCAC were justifiably upset about their exclusion from the policymaking process. For instance, Reverend Larsen-Lawling "expressed dismay . . . about the substance of the changes *and the fact that the policies were being changed without PCAC input.*" (Pl.'s Memo., at p. 11, n.38). Likewise, Mr. Beaulieu testified that local clergypersons disapproved of the manner in which plaintiff communicated her long-range plans for the Hospital's pastoral care department. According to Mr. Beaulieu:

> When you're dealing with people that are accustomed to clergy that have . . . anywhere from 50 families to 1800 families, you don't talk down to them. You ask for cooperation, ask them what you can do for them, you're going to get it;

15

>   but when you start to dictate to them, right away they'll line up on the other side of the fence because they're not accustomed to being spoken to that way.

(Pl.'s Ex. 1, at p. 53).

In addition to alienating the members of the PCAC, plaintiff, as a result of her determination to enforce her policies, insulted and offended the Beaulieus. As discussed above and in defendants' original memorandum, there is no dispute that plaintiff: (1) blacked-out the name of the Beaulieus' church from some prayer pamphlets that Mr. Beaulieu had reproduced at his own expense for distribution to patients; (2) arranged to have the lock changed on the door to the pastoral care office (allegedly for privacy reasons) and, consequently, Mr. Beaulieu was locked out of the office; (3) questioned Mr. Beaulieu about who had contacted him to come to the Hospital to visit with a patient and "reminded" him that she was to be advised in the first instance of all requests for pastoral care; and (4) instructed Mr. Beaulieu to remove all of the Gideon's Bibles from patient rooms on account of her personal interpretation of JCAHO requirements (Pl.'s Memo., at pp. 5-6, n.16, 7, 9-10, 13, n.43 & 20).

In sum, contrary to plaintiff's bald assertion that there is no evidence that she failed to perform her duties, it is entirely undisputed that plaintiff's inability to effectively communicate her proposed policies to the PCAC and the Beaulieus or, for that matter, to include the PCAC in the development of the policies, interfered with her ability to perform one of her primary responsibilities, i.e., serve as the Hospital's liaison to local clergypersons and religious volunteers. In light of the undisputed evidence, no reasonable juror could conclude that plaintiff's so-called speech, in the form of her creation and enforcement of pastoral care policies, did not "substantially or materially interfere with [her] bona fide job performance" and, thus, defendants are entitled to summary judgment on plaintiff's claim under C.G.S. § 31-51q.

## Conclusion

For all of the foregoing reasons, and for the reasons set forth in defendants' motion papers, the facts concerning plaintiff's brief employment history with the Hospital and her performance problems and corresponding discipline are undisputed and are wholly unrelated to plaintiff's religion, gender, or alleged complaints of gender discrimination. Moreover, plaintiff cannot establish that her termination violated any public policy inherent in Connecticut's Personnel Files Act or establish an essential element of her claim under C.G.S. § 31-51q. Accordingly, the Court should grant defendants' motion for summary judgment with regard to each and every one of plaintiff's claims.

DEFENDANTS
WINDHAM COMMUNITY MEMORIAL
HOSPITAL and
HATCH HOSPITAL CORPORATION

By: *William J. Albinger*
Stephen B. Harris, ct13125
William J. Albinger, ct18861
Wiggin & Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
Their Attorneys

## CERTIFICATE OF SERVICE

This is to certify that on this 7th day of December, 2004, a copy of Defendants' Memorandum in Further Support of Motion for Summary Judgment was mailed, postage prepaid, to the following:

> Mary E. Kelly, Esq.
> Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.
> 557 Prospect Avenue
> Hartford, CT 06105-2922

*William J. Albinger* (signature)
William J. Albinger

\4033\89\499327.2