UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BARBARA CAMPBELL, : | |
| Plaintiff, : | |
| : | CIVIL ACTION NO. |
| v. : | 3:03-CV-520 (JCH) |
| : | |
| WINDHAM COMMUNITY MEMORIAL : | |
| HOSPITAL, INC. and HATCH : | |
| HOSPITAL CORPORATION, : | |
| Defendants. : | AUGUST 25, 2005 |

**RULING RE: DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT [DOC. NO. 35]**

Plaintiff Barbara Campbell brings this action pursuant to various federal and state statutes against her former employer, Windham Community Memorial Hospital and Hatch Hospital Corporation (collectively "Windham"). Campbell claims that the defendants terminated her employment on the basis of her religion and gender in violation of Title VII of the Civil Rights Act of 1964, see 42 U.S.C. § 2000e, et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), see Conn. Gen. Stat. § 46a-60, et seq. Campbell also claims that she was wrongfully discharged in violation of public policy. The defendant moves for summary judgment, claiming that there is no issue of material fact concerning the circumstances of Campbell's resignation and that it is entitled to judgment as a matter of law.[1] For the reasons stated below, the

---

[1] The defendants move for summary judgment on all seven counts of Campbell's complaint. Campbell opposes the motion for summary judgment on counts 1-5 and 7 but withdraws count 6, which alleged wrongful discharge in violation of Connecticut's public policy regarding religious discrimination. She maintains counts 5 and 7, which allege wrongful discharge in violation of Connecticut's public policy regarding employee evaluations and public policy regarding free speech, respectively.

defendant's motion is DENIED.

## I. FACTS[2]

The defendants operate a private, not-for-profit, non-denominational hospital in Willimantic, Connecticut. From 1992 to May of 2001, Windham did not employ a Staff Chaplain. Shawn Maynard, Administrative Director of Communications and Volunteer Services, oversaw volunteer clergy. Beginning in 1992, a Pastoral Care Advisory Committee ("PCAC"), whose members included volunteers and local clergy, provided input into the manner in which Windham provided for patients' spiritual needs. By 2000, the members of the PCAC represented four Christian denominations. The PCAC included members who were Roman Catholic, Pentecostal and Lutheran as well as a Pastor of the Light of the Hill Christian Fellowship. In the spring of 2001, Windham convened a Staff Chaplain Task Force, including hospital employees, physicians, and local clergy. The Task Force interviewed applicants previously screened by Maynard and Marty Levine, Vice President of Human Resources. Delphis Beaulieu, who with his wife Juanita Beaulieu had volunteered at Windham since 1987 and had served on the PCAC, participated in the recruitment process but was not a member of the Task Force. The Beaulieus' activities at Windham consisted largely of visiting Catholic patients in their capacity as lay clergy. Beaulieu, then chair of the PCAC, was present at Campbell's interview. Following all of the interviews, on March 21, 2001, the Task

---

[2]For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving party, here the plaintiff, where there is evidence to support his allegations.

Force chose to hire Campbell as Staff Chaplain. Campbell is a Unitarian Universalist.

A March 21, 2001 letter from Windham to Campbell provided that the Staff Chaplain position was a "30-hour professional benefitted position" and that the first three months of employment would serve as an "introductory" period during which Campbell's "performance will be evaluated." Campbell began work on May 7, 2001. As Staff Chaplain, Campbell reported to Allison Breault, Vice President for Patient Care Services. During the course of Campbell's employment, Campbell and Breault discussed the possibility of converting the position to a full-time forty hours per week position. The duties of the Staff Chaplain included planning and coordinating pastoral care at Windham and serving as a liaison to the local religious community and to coordinate the work of lay clergy.

During her employment, Campbell was advised that no policies or procedures existed with respect to pastoral care. There were, however, informal practices in this regard. Campbell was concerned that these informal practices conflicted with the standards of the Joint Commission on Accreditation of Health Care Organizations (JCAHO) and with requirements of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub.L. 104-191, Aug. 21, 1996, 110 Stat. 1936. Prior to May 7, 2001, Windham's practice was to provide local clergy with copies of patient lists, including patients' names, room numbers, and religious affiliations. Clergy reviewed the lists to determine whether any of their parishioners were patients at Windham. Campbell did not believe it was appropriate to provide clergy members with a list of all

Windham patients. She believed that this practice violated JCAHO standards as well as HIPAA. Some clergy members used the information on the lists to visit patients who were not members of their congregation or who had not identified membership in a particular congregation. During her employment, Campbell prepared draft policies concerning clergy visitations and notification.

While the parties dispute the details of Campbell's interaction with hospital staff and volunteers, they do not dispute that Campbell and Delphius Beaulieu disagreed over the hospital's practices with respect to pastoral care. Campbell disapproved of Beaulieu's placement of Gideon Bibles in patients' rooms, his distribution of prayer pamphlets to Roman Catholic patients, the Beaulieus' access to office space at Windham despite the fact that the hospital was required to be non-denominational, and Delphius Beaulieu's alleged failure to notify Campbell when patients requested pastoral care. Campbell claims that volunteers of other faiths were not provided office space and that on two occasions the Beaulieus' made an unannounced entry into the pastoral care office, shared by Campbell and the Beaulieus, when Campbell was meeting with a patient, thereby violating that patient's privacy. Campbell permitted the distribution of the prayer pamphlets but blacked out the name of the Beaulieu's church on those pamphlets, believing that to provide materials to patients that advocated a particular church or parish was inappropriate.

On June 19, 2001, Campbell met with the PCAC and conveyed her proposed changes to Windham's pastoral care practices. Among other things, Campbell

proposed that she be the first person notified when patients or family members requested visitation from clergy and that clergy members no longer have access to patient lists but only to information regarding their respective parishioners. Members of the PCAC objected to Campbell's proposed changes. For example, at least three local clergy members objected to the proposal that they be denied access to patient lists. For her part, Campbell believed that Windham's pastoral care practices, including allowing Roman Catholic clergy members to visit patients who were not members of their church and who had not requested such visits, in violation of written policies, was inappropriate. Campbell alleges that during the meeting members of the PCAC acted disrespectfully towards her by ignoring her when she spoke and rolling their eyes at certain of her comments.

     On August 1, 2001, Delphis Beaulieu, Breault, and others met via phone to discuss the plaintiff. Based on this conversation, Breault extended Campbell's probationary period. Two weeks later, Campbell met with Breault and Maynard to discuss her end of probation evaluation. At that time, Campbell's probationary employment period was extended for an additional three months. On August 22, 2001, Campbell met with Breault and provided her with two documents entitled "Evaluation Reply" and "Evaluation Suggestions."

     On August 28, 2001, at Maynard's suggestion, Campbell, Maynard, Breault, and the Beaulieus met. At that time, Campbell stated that it was not always appropriate, in offering pastoral care, to share one's personal story with a patient. This comment was

5

made in reference to an incident where Juanita Beaulieu had upset a patient by discussing the death of the Beaulieus' two sons. Maynard and Breault had previously asked that Campbell not raise this issue at this meeting. Delphius Beaulieu said to Campbell, in response to her comments, "if you were a man, I'd jack you up against the wall," or words to that effect.

On that day, Breault, Maynard, and Levine met to discuss Campbell's employment and determined she should be terminated. On September 4, 2001, Breault met with Campbell and asked that she resign. Campbell agreed. The defendants claim that Campbell was asked to resign because she "defaced" pamphlets distributed by Delphius Beaulieu to Catholic patients and initially refused to meet with the Beaulieus on August 28, and because of her behavior at the meeting on August 28, and the content of her response to her performance evaluation. Campbell alleges that these stated reasons are pretextual and that she was asked to resign on account of her gender and religion.

Following Campbell's resignation, Windham advertised the Staff Chaplain position as a 40-hour per week position. Reverend Steven Scott, an ordained Disciples of Christ minister, replaced Campbell as Staff Chaplain. In late 2002 or early 2003, Windham ceased funding for the Staff Chaplain position.

## II.    LEGAL STANDARD

### A.    SUMMARY JUDGMENT

Summary judgment is appropriate only when no genuine issue of material fact

6

exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Hermes Int'l v. Lederer de Paris Fifth Ave, Inc., 219 F.3d 104, 107 (2d Cir. 2000). The moving party bears the burden of showing that no genuine factual dispute exists. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)). When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Lipton v. The Nature Company, 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)). Additionally, a party may not rest on the "mere allegations or denials" contained in his pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible).

## B.  CLAIMS UNDER TITLE VII AND CFEPA

"Since 1964, Title VII has made it an 'unlawful employment practice for an employer . . . to discriminate against any individual . . ., because of such individual's race, color, religion, sex, or national origin.'"  Desert Palace, Inc. v. Costa, 123 S. Ct. 2148, 2150 (2003)(citing 42 U.S.C. § 2000e-2(a)(1)).  Notably, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).

In cases brought under Title VII and the Connecticut Fair Employment Practices Act,[3] courts follow the now-familiar, burden-shifting analysis first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-149 (2000); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-511 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-256 (1981).

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the Supreme Court "set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment."  Burdine, 450 U.S. at 253.  The initial burden in a disparate treatment claim brought under Title VII is on the plaintiff to establish a prima

---

[3]  Both parties agreed at oral argument that case law regarding federal fair employment legislation guides interpretation of the CFEPA.  See Bridgeport Hospital v. Commission on Human Rights and Opportunities, 232 Conn. 91 (1995).

facie case of discrimination.  To do so, the plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she experienced an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  Once a plaintiff has established a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for its actions.  See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  Upon the articulation of such a non-discriminatory reason for the employment action, the presumption of discrimination which arose with the establishment of the prima facie case drops out.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).

Once a defendant offers a legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to fulfill her ultimate burden of proving that the defendant intentionally discriminated against her in the employment decision.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).  In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination.  Id.  As the Supreme Court explained in Reeves:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.  In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the

>explanation that the employer is dissembling to cover up a discriminatory purpose. . . . Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

530 U.S. at 147 (citations omitted).

Evidence that an employer's reason is false, combined with the evidence presented to establish a prima facie case, in some cases can be sufficient to sustain a plaintiff's burden, and a plaintiff need not have further evidence of discrimination. Id.; see also Zimmerman v. Assoc. First Capital Corp., 251 F.3d 376, 381-82 (2d Cir. 2001). Ultimately, a finder of fact may consider the strength of the prima facie case, the probative value of the proof that the defendant's reason is pretextual, and any other evidence presented in the case when determining if the plaintiff has sustained her burden. Zimmerman, 251 F.3d at 381-82.

However, even courts mindful of the fact that "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated" have nonetheless granted summary judgment at the pretext stage where the plaintiff has "provided no indication that any evidence exists that would permit the trier of fact to draw a reasonable inference of pretext." See Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985); see also Dister, 859 F.2d 1108; Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998) (reversing jury verdict in ADEA case because "Norton's very weak prima facie case, combined with an at best highly dubious showing of pretext, that in itself does not implicate discrimination, is simply not enough to support the jury's conclusion

that he was fired because of his age."). According to the Second Circuit Court of Appeals in Meiri, "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." See 759 F.2d at 98.

### III.  DISCUSSION

#### A.  Campbell's Claims of Unlawful Discrimination on the Basis of Gender and Religion

"Findings of discrimination, discriminatory intent, and causation are findings of fact." Cornwell v. Robinson, 23 F.3d 694, 706 (2d Cir. 1994). In order for her claims to survive the University's motion for summary judgment, Campbell must show that there is an issue of material fact about whether the University discriminated against her on the basis of her religion and sex. See St. Mary's Honor Center, 509 U.S. at 511; Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir. 1997) (en banc). "At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." Byrnie v. Town of Cromwell, Board of Education, 243 F.3d 93, 102 (2d Cir. 2001). Reviewing the record as whole, as a jury would, see Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999), the court concludes that Campbell has met her burden of demonstrating a prima facie case of gender discrimination. As a woman and a Unitarian Universalist, Campbell is a member of a protected class. The fact of her hiring establishes that she was qualified for her position. She suffered an adverse employment action, namely, the

11

request that she resign her position as Staff Chaplain.  The individual who replaced her is a man and is not a Unitarian Universalist.

As conceded by defense counsel at oral argument, viewed in the light most favorable to Campbell, the facts suggest that the hospital treated local Catholic clergy members and lay ministers differently than it treated other clergy and that Campbell complained about such practices.  These facts cannot support a claim of retaliation under Title VII where Campbell's complaints addressed Windham's alleged preferential treatment of certain non-employees on the basis of religion.  See Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 134 (2d Cir. 1999) ("a complaint of retaliation for opposing discrimination by co-employees against non-employees . . . is not cognizable under Title VII because [the plaintiff's] opposition was not directed at an unlawful employment practice of his employer.").  They do, however, support an inference that decision-makers at Windham, including volunteers and local clergy who sat on hiring committees despite their not having been employed by the hospital, endorsed staff and policies that favored Roman Catholic lay and ordained clergy.

Furthermore, Campbell points to what she claims is the paucity of facts supporting Windham's purported reasons for firing her.  "[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000). "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements

12

of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).

Campbell claims that the rational trier of fact could infer the fact of intentional discrimination from the falsity of Windham's purported basis for her firing. Windham cites Campbell's relationship with local clergy members, her relationship with hospital staff and doctors, and her improper notation, on two occasions, on patients' charts. Campbell claims that clergy members' complaints regarding her performance were unsubstantiated. She claims that clergy members complained about the content of her proposed policy changes, not her style. The defendants have not provided admissible evidence of any complaints by patients.[4] Some staff members complained that Campbell did not observe social norms having to do with personal space and boundaries. Campbell points to hospital policies that allow the staff chaplain to make notations on charts and claims that she was never trained not to make such notations. Finally, Windham points to Campbell's behavior at the August 29th meeting with the Beaulieus as a reason for firing her. Campbell disputes Windham's facts regarding that meeting and, therefore, the existence of a material question of fact bars the court from finding, at this time, that the meeting provided a basis for terminating Campbell's employment. While he would not be required to do so, a rational trier of fact could

---

[4]Dawn Noel testified at her deposition of third-hand knowledge of a patient who had complained about Campbell's "new age" style of prayer. Such testimony is inadmissible hearsay and, if admissible, might support an inference of religious discrimination rather than a finding that Windham terminated Campbell's employment on the basis of legitimate patient complaints.

conclude that all of these complaints are simply pretext for firing Campbell based on discrimination. This conclusion would be bolstered by the fact that at a meeting of the Staff Chaplain Task Force, convened to discuss hiring Campbell's replacement, a member expressed "that it was very important to get someone from a standard religion rather than a 'spiritualist.'" Staff Chaplain Task Force Minutes [Doc. No. 45, Ex. 59] at 2. A local clergy member serving on that committee "agreed that the clergy serving the Hospital has the same concern [that the Staff Chaplain be someone from a standard religion." Id. With respect to gender discrimination, the defendants concede that during her employment, Campbell complained that local clergy members treated her poorly because of her gender and that these complaints were never pursued by Breault or Maynard.

Campbell raises issues of fact regarding the defendants' purported non-discriminatory basis for her termination. She also points to evidence to support an inference that decision-makers at Windham had discriminatory motives in firing her. The rational finder of fact could conclude that her termination was motivated by intentional discrimination.

    **B.    State Claims**

        **1. Employee Evaluations.** Connecticut law provides that employees have the right to question any information contained in their personnel files or medical records.

> "If upon inspection of his personnel file or medical records an employee disagrees with any of the information contained in such file or records,

14

> removal or correction of such information may be agreed upon by such employee and his employer. If such employee and employer cannot agree upon such removal or correction then such employee may submit a written statement explaining his position. Such statement shall be maintained as part of such employee's personnel file or medical records and shall accompany any transmittal or disclosure from such file or records made to a third party."

Conn. Gen. Stat § 31-128e.

Campbell claims that her termination was based, in part, on the fact that she submitted a written document disputing various factual statements included in her mid-probationary period evaluation. Campbell argues that this statute creates a strong public policy that supports her claim for wrongful discharge in violation of public policy. Essentially, she maintains that because Connecticut law creates the right of employees to question records maintained in their personnel files and, if necessary, to supplement those files, an employer cannot terminate an employee based on her exercise of that right without violating public policy.

Connecticut law recognizes that "public policy imposes some limits on the unbridled discretion to terminate the employment of someone hired at will." Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 476 (1980). A court must determine, then, whether, as a matter of law, an employer's purported reason for terminating an employee violated some state policy. "Certainly when there is a relevant state statute we should not ignore the statement of public policy that it represents." Id. at 480. Not every statute, however, gives rise to a cause of action for wrongful discharge in violation of public policy. "Absent unusual circumstances, we will interfere with a personnel

15

decision only if it implicates an explicit statutory or constitutional provision, or judicially conceived notion of public policy." Daley v. Aetna Life and Cas. Co., 249 Conn. 766, 803 (1999).  In Daley, the plaintiff argued that Connecticut and federal law governing family and medical leave gave rise to a public policy violated by the employer where allegedly terminated the plaintiff because of her continued requests to work-at-home. Connecticut Supreme Court refused to find that a discharge violated public policy where none of the statutes cited by the plaintiff "expressly obligate[d] an employer to accommodate an employee's work-at-home requests, or to refrain from taking adverse action against an employee who persists in her efforts to secure such arrangement." Id. at 804.

In order to prevail on this claim, Campbell must prove that the defendants' reason for requiring her resignation violated a public policy expressed by Connecticut General Statute § 31-128e.  That statute clearly creates the right of an employee to dispute the accuracy of statements in her personnel file, both by bringing such factual disputes to her employer's attention and, if necessary, supplementing her personnel file with written documentation of her disagreements with statements made in the file.  A discharge premised on the simple fact that an employee "disagrees with any of information contained in" her personnel file and brings this disagreement to the attention of her employer violates the public policy expressed by Connecticut General Statute § 31-128e.  Similarly, a discharge premised on the fact that an employee "submit[s] a written statement explaining [her] position" also violates such public policy.

Id.

The defendants claim that to the extent her discharge was premised on Campbell's written response to her evaluation, it was based on the content of that response, not the simple fact that Campbell provided a written response. The court agrees that the public policy expressed by the statute does not create an unlimited right for an employee to submit a written statement to her employer. Campbell has, however, created a question of material fact regarding the role her response played in Windham's decision to terminate her. Windham does not point to any inflammatory comments in Campbell's evaluation reply that might reasonably support a decision to terminate her. It is a question for the finder of fact whether Windham's decision to terminate Campbell was based on the fact that she submitted a reply or the content of that reply.

       **2. Free Speech.** "Any employer . . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state . . ." Conn. Gen. Stat. § 31-51q. In order to state a claim pursuant to § 31-51q, a plaintiff must allege that "(1) he was exercising rights protected by the first amendment to the United States Constitution (or an equivalent provision of the Connecticut Constitution); (2) he was fired on account of his exercise of such rights; and (3) his exercise of his first amendment . . . rights [ ] did not substantially or materially interfere with his bona fide job performance or with his

17

working relationship with his employer." Lowe v. Amerigas, Inc., 52 F. Supp. 2d 349, 359 (D. Conn. 1999).

"Section 31-51q extends protection of rights of free speech under the federal and state constitutions to employees in the private workplace. The statute is not limited to freedom of speech in the public arena." Cotto v. United Technologies Corp., Sikorsky Aircraft Division, 251 Conn. 1, 16 (1999). Nevertheless, the statute does not protect all speech. "The statute applies only to expressions regarding public concerns that are motivated by an employee's desire to speak out as a citizen." Id. at 17. The court must consider, therefore, whether Campbell spoke "as a citizen upon matters of public concern" or "instead as an employee upon matters only of personal interest." Connick v. Myers, 461 U.S. 138, 147 (1983). The Connecticut Supreme Court has concluded that, "it is within the province of the trial court to determine, as a matter of law, which topics are considered to be of public concern. The resolution of a whether an employee's statements address such a topic is, however, within the province of the jury, to be determined by looking to the content, form and context of the particular statements in question." Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 782 (1999). For example, "[m]otivation is a quintessential issue of fact." Daley, 249 Conn. at 778. Therefore, while generally determination of whether speech addresses a matter of public concern is a question of law for the court, where a person's motivation for engaging in such speech is disputed, the question may be one of fact.

It cannot be said that Campbell's speech concerned only "'the scope of the terms

and conditions of her employment.'" Winik-Nystrup v. Manufacturers Life Insurance Co., 8 F. Supp. 2d 157, 160 (D. Conn. 1998) (quoting Urashka v. Griffin Hospital, 841 F. Supp. 468, 473 (D. Conn. 1994). Her speech did not relate to the terms of her employment or her own pay and salary. Instead, it addressed in part her employer's potentially illegal practices with respect to private third parties. Whether a non-denominational not-for-profit hospital is discriminating against patients or disclosing confidential information is a matter of public concern. Furthermore, the fact that Campbell expressed her concerns privately rather than publicly does not cause her to relinquish protection of First Amendment-protected speech. Givhan v. Western Line Consolidated School Dist., 439 U.S. 410, 414 (1979); see also Gottlob v. Connecticut State Univ., 1996 WL 57087, *5 (Conn. Super. 1996) (considering whether Conn. Gen. Stat. § 31-51q protected university athletic director who refused to turn over a student's name to her superiors).

Therefore, the court concludes that, as a matter of law, Campbell's speech touched on a matter of public concern. There remains the "factual inquiry into [Campbell's] motivation for making such statements." Daley, 249 Conn. at 784. This is a question of fact, inappropriate for resolution on a motion for summary judgment.

**IV.    CONCLUSION**

For the foregoing reasons, the defendant's motion for summary judgment [Doc. No. 35] is DENIED.

**SO ORDERED.**

Dated this 25th day of August, 2005, at Bridgeport, Connecticut.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge